**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

---------------------------------------------------------x

In re            :

              :  **Chapter 11**

**HOMER CITY**       :

**GENERATION, L.P.**     :  **Case No. 17-[_____] (\_\_\_)**

              :

      **Debtor.**[1]   :

---------------------------------------------------------x

**PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**
**OF HOMER CITY GENERATION, L.P.**

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:   (302) 651-7701

*Proposed Attorneys For The Debtor And*
*Debtor In Possession*

Dated: January 9, 2017
    Wilmington, Delaware

---

[1] The last four digits of the Debtor's federal tax identification number are 3693.  The location of the Debtor's principal place of business is 1750 Power Plant Road, Homer City, Pennsylvania 15748.

## Table of Contents

Page

ARTICLE I.    DEFINITIONS AND INTERPRETATION. .................................................................. 1

    A.    Definitions ........................................................................................................ 1

    B.    Interpretation; Application of Definitions and Rules of Construction ........................... 11

    C.    Reference to Monetary Figures .......................................................................... 12

    D.    Controlling Document ...................................................................................... 12

ARTICLE II.    ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS. ....................................... 12

    2.1.    Administrative Claims. ................................................................................ 12
    2.2.    Fee Claims. ................................................................................................ 12
    2.3.    Priority Tax Claims. .................................................................................... 13
    2.4.    Restructuring Expenses ............................................................................... 13

ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS. ............................................... 13

    3.1.    Classification in General. ............................................................................ 13
    3.2.    Summary of Classification. .......................................................................... 13
    3.3.    Special Provision Governing Unimpaired Claims. ........................................... 14
    3.4.    Elimination of Vacant Classes. ..................................................................... 14

ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS. ...................................................... 14

    4.1.    Other Priority Claims (Class 1) ..................................................................... 14
    4.2.    Other Secured Claims (Class 2) .................................................................... 15
    4.3.    Notes Claims (Class 3). ............................................................................... 15
    4.4.    General Unsecured Claims (Class 4). ............................................................. 15
    4.5.    Intercompany Claims (Class 5). .................................................................... 16
    4.6.    Homer City Interests (Class 6) ...................................................................... 16

ARTICLE V.    MEANS FOR IMPLEMENTATION. ..................................................................... 17

    5.1.    Continued Existence. .................................................................................. 17
    5.2.    Exit Facility. .............................................................................................. 17
    5.3.    Authorization and Issuance of Securities. ...................................................... 18
    5.4.    Registration Exemptions .............................................................................. 18
    5.5.    Cancellation of Existing Securities and Related Agreements. ............................ 20
    5.6.    Officers and Boards of Directors. .................................................................. 20
    5.7.    Transitional Services Agreement .................................................................. 20
    5.8.    Effectuating Documents; Further Transactions. .............................................. 21
    5.9.    Cancellation of Liens. ................................................................................. 21
    5.10.    Nonconsensual Confirmation. ...................................................................... 22
    5.11.    Closing of the Chapter 11 Case. ................................................................... 22
    5.12.    Notice of Effective Date. ............................................................................. 22
    5.13.    GE Contribution. ........................................................................................ 22
    5.14.    Tax Reporting. ........................................................................................... 22

ARTICLE VI.    DISTRIBUTIONS. ........................................................................................... 23

    6.1.    Distributions Generally ................................................................................ 23
    6.2.    Distribution Record Date .............................................................................. 23

Table of Contents
(continued)

|  | 6.3. | Date of Distributions. | 23 |
|  | 6.4. | Disbursing Agent. | 23 |
|  | 6.5. | Rights and Powers of Disbursing Agent. | 24 |
|  | 6.6. | Expenses of Disbursing Agent. | 24 |
|  | 6.7. | No Postpetition Interest Return on Claims. | 24 |
|  | 6.8. | Delivery of Distributions. | 24 |
|  | 6.9. | Delivery of Distributions on Notes Claims. | 25 |
|  | 6.10. | Unclaimed Property. | 26 |
|  | 6.11. | Time Bar to Cash Payments. | 26 |
|  | 6.12. | Manner of Payment under Plan. | 26 |
|  | 6.13. | Satisfaction of Claims. | 26 |
|  | 6.14. | Fractional Interests. | 26 |
|  | 6.15. | Setoffs. | 27 |
|  | 6.16. | Allocation of Distributions between Principal and Interest. | 27 |
|  | 6.17. | No Distribution in Excess of Amount of Allowed Claim. | 27 |
|  | 6.18. | Withholding and Reporting Requirements. | 27 |
| ARTICLE VII. | PROCEDURES FOR DISPUTED CLAIMS. | | 28 |
|  | 7.1. | Disputed Claims Process. | 28 |
|  | 7.2. | Objections to Claims. | 28 |
|  | 7.3. | Expungement or Adjustment to Paid, Satisfied, Superseded, or Discharged Claims. | 28 |
|  | 7.4. | Estimation of Claims. | 28 |
|  | 7.5. | No Distributions Pending Allowance. | 29 |
|  | 7.6. | Distributions after Allowance. | 29 |
|  | 7.7. | Claim Resolution Procedures Cumulative. | 29 |
|  | 7.8. | Claim Resolutions Non-Binding Until Effective Date | 29 |
| ARTICLE VIII. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | | 29 |
|  | 8.1. | General Treatment. | 29 |
|  | 8.2. | Determination of Cure Disputes and Deemed Consent. | 30 |
|  | 8.3. | Payments Related to Assumption of Contracts and Leases. | 31 |
|  | 8.4. | Rejection Claims. | 31 |
|  | 8.5. | Indemnification by the Reorganized Debtor. | 31 |
|  | 8.6. | Insurance Policies. | 31 |
|  | 8.7. | Surety Bonds. | 32 |
|  | 8.8. | Intellectual Property Licenses and Agreements. | 32 |
|  | 8.9. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 32 |
|  | 8.10. | Reservation of Rights. | 32 |
| ARTICLE IX. | CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE. | | 33 |
|  | 9.1. | Conditions Precedent to Confirmation of the Plan. | 33 |
|  | 9.2. | Conditions Precedent to the Effective Date. | 33 |
|  | 9.3. | Waiver of Conditions Precedent. | 34 |
|  | 9.4. | Effect of Failure of a Condition. | 35 |

Table of Contents
(continued)

ARTICLE X.  EFFECT OF CONFIRMATION OF PLAN. ................................................. 35

    10.1.  Vesting of Assets. ............................................................................. 35
    10.2.  Binding Effect. ................................................................................. 35
    10.3.  Discharge of Claims and Termination of Interests. ......................... 35
    10.4.  Term of Injunctions or Stays. .......................................................... 36
    10.5.  Injunction. ........................................................................................ 36
    10.6.  Releases. .......................................................................................... 37
    10.7.  Exculpation. ..................................................................................... 39
    10.8.  Retention of Causes of Action/Reservation of Rights. .................... 39
    10.9.  Solicitation of Plan. ......................................................................... 40
    10.10.  Corporate Action. ........................................................................... 40

ARTICLE XI.  RETENTION OF JURISDICTION. ...................................................... 41

    11.1.  Retention of Jurisdiction. ................................................................. 41
    11.2.  Courts of Competent Jurisdiction .................................................... 42

ARTICLE XII.  MISCELLANEOUS PROVISIONS ...................................................... 42

    12.1.  Payment of Statutory Fees. .............................................................. 42
    12.2.  Substantial Consummation of the Plan. ........................................... 43
    12.3.  Plan Supplement. ............................................................................. 43
    12.4.  Request for Expedited Determination of Taxes. .............................. 43
    12.5.  Exemption from Certain Transfer Taxes. ......................................... 43
    12.6.  Amendments. .................................................................................... 43
    12.7.  Effectuating Documents and Further Transactions. ......................... 44
    12.8.  Revocation or Withdrawal of the Plan. ............................................ 44
    12.9.  Severability of Plan Provisions. ....................................................... 44
    12.10.  Governing Law. .............................................................................. 45
    12.11.  Time. ............................................................................................... 45
    12.12.  Dates of Actions to Implement the Plan. ........................................ 45
    12.13.  Immediate Binding Effect. .............................................................. 45
    12.14.  Deemed Acts. .................................................................................. 45
    12.15.  Successor and Assigns. ................................................................... 45
    12.16.  Entire Agreement. ........................................................................... 46
    12.17.  Exhibits to Plan. ............................................................................. 46
    12.18.  Notices. ........................................................................................... 46

Exhibit A        Restructuring Support Agreement

Homer City Generation, L.P. (the "**Debtor**") proposes the following prepackaged chapter 11 plan of reorganization (the "**Plan**") pursuant to section 1121(a) of title 11 of the United States Code (the "**Bankruptcy Code**").  Capitalized terms used herein shall have the meanings set forth in Article I.A below.

## ARTICLE I.  DEFINITIONS AND INTERPRETATION.

A.    **Definitions.**    The following terms shall have the respective meanings specified below:

1.1.    ***Administrative Claim*** means any Claim against the Debtor entitled to priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code for a cost or expense of administering the Chapter 11 Case incurred on or after the Commencement Date and before the Effective Date, including Fee Claims.

1.2.    ***Affiliate*** has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.3.    ***Allowed*** means, with reference to any Claim or Interest, a Claim or Interest (a) arising on or before the Effective Date as to which (i) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (ii) any objection has been determined in favor of the holder of the Claim or Interest by a Final Order, (b) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtor or Reorganized Debtor, (c) as to which the liability of the Debtor or Reorganized Debtor, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (d) expressly allowed hereunder; *provided*, *however*, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtor shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.4.    ***All Trade Motion*** means the *Debtor's Motion for Interim and Final Orders Authorizing the Debtor to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business Pursuant to Sections 105(a), 362(d), 363(b), and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004* [D.I. __].

1.5.    ***All Trade Order*** means both the *Interim Order Authorizing the Debtor to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business Pursuant to Sections 105(a), 362(d), 363(b), and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004* [D.I. __] and the *Final Order Authorizing the Debtor to Pay Prepetition Claims of General Unsecured Creditors in the Ordinary Course of Business Pursuant to Sections 105(a), 362(d), 363(b), and 503(b)(9) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004* [D.I. __].

1.6.    ***Amended Organizational Documents*** means the forms of certifications of incorporation, certificates of formation, limited liability company or partnership agreements, or other forms of organizational documents for the Reorganized Debtor as well as the NewCo Agreements, all of which shall be in a form and substance acceptable to the Debtor and the Requisite Noteholders.

1.7.    ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

1.8.    ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Case.

1.9.    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code.

1.10.   ***Business Day*** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.11.   ***Cash*** means legal tender of the United States of America.

1.12.   ***Cash Collateral Order*** means both the *Interim Order under 11 U.S.C. §§ 105, 361, 362, 363, 503, 507(b), and 552, Fed. R. Bankr. P. 2002, 4001(b), 6004(h), and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (IV) Granting Related Relief* [D.I. __] and the *Final Order under 11 U.S.C. §§ 105, 361, 362, 363, 503, 507(b), and 552, Fed. R. Bankr. P. 2002, 4001(b), 6004(h), and 9014 and Del. Bankr. L.R. 4001-2 (I) Authorizing the Debtor to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (IV) Granting Related Relief* [D.I. __], as each may be supplemented, modified or amended.

1.13.   ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, loss, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws). Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer, alter ego or similar claim.

1.14.   ***Chapter 11 Case*** means the voluntary case under chapter 11 of the Bankruptcy Code commenced by the Debtor on the Commencement Date in the Bankruptcy Court.

1.15.   ***Claim*** has the meaning set forth in section 101(5) of the Bankruptcy Code, as against the Debtor.

1.16.   ***Class*** means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.17.   ***Commencement Date*** means the date on which the Debtor commenced the Chapter 11 Case, which shall be on or before January 13, 2017.

1.18.   ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.19.   ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.20.   ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance acceptable to the Debtor and the Requisite Noteholders; *provided*, *that*, any provision of the Confirmation Order that is a GE Provision must also be in form and substance acceptable to GE; *provided*, *further*, *that*, any provision of such order materially affecting the Exit Arranger and Exit Lenders must also be in form and substance acceptable to the Exit Arranger and the Exit Lenders.

1.21.   ***Consenting Noteholders*** means the Noteholders (other than GE) that are party to the Restructuring Support Agreement, together with their permitted successors and assigns, and any subsequent Noteholder that becomes party to the Restructuring Support Agreement in accordance with the terms of the Restructuring Support Agreement.

1.22.   ***Consol Contract*** means the coal supply agreement, dated as of January 6, 2017, between Homer City and Consol Pennsylvania Coal Company, LLC, as modified or amended.

1.23.   ***Cure*** means the payment of Cash by the Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtor in accordance with the terms of an executory contract or unexpired lease of the Debtor and (b) permit the Debtor to assume such executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.24.   ***Cure Dispute*** means a pending objection relating to assumption of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.25.   ***Debtor*** has the meaning set forth in the introductory paragraph of the Plan.

1.26.   ***Debtor in Possession*** means the Debtor in its capacity as debtor in possession in the Chapter 11 Case pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.27.    ***Definitive Documents*** means, other than the Plan, the documents, orders, agreements, instruments, schedules, or exhibits, that are contemplated herein and that are otherwise necessary, related, or desirable to implementing the Restructuring Support Agreement and the Plan (including the Plan Supplement), including the Confirmation Order, the Exit Facility Documents, the Transitional Services Agreement, the Cash Collateral Order, advisory or management services agreements, member related agreements, all regulatory filings, or any other related documents, each of which shall contain terms and conditions consistent in all material respects with the Plan and shall otherwise be acceptable to the Debtor and the Requisite Noteholders; *provided*, *that*, any provision of a Definitive Document that is a GE Provision must also be in form and substance acceptable to GE.

1.28.    ***Disallowed*** means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

1.29.    ***Disbursing Agent*** means any Entity (including the Debtor if it acts in such capacity) in its capacity as a disbursing agent under Article VI of the Plan.

1.30.    ***Disclosure Statement*** means the disclosure statement for the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.31.    ***Disputed*** means with respect to a Claim, one (a) which is neither Allowed nor Disallowed under the Plan or a Final Order, nor deemed Allowed under sections 502, 503, or 1111 of the Bankruptcy Code or (b) for which the Debtor or any party in interest has interposed a timely objection or request for estimation, and such objection or request for estimation has not been withdrawn or determined by a Final Order.  If the Debtor disputes only a portion of a Claim, such Claim shall be deemed Allowed in any amount the Debtor does not dispute, and Disputed as to the balance of such Claim.

1.32.    ***Distribution*** means any distribution to the holders of Allowed Claims.

1.33.    ***Effective Date*** means, with respect to the Plan, the date selected by the Debtor with the reasonable consent of the Requisite Noteholders and GE, on which all conditions to the effectiveness of the Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms of the Plan.

1.34.    ***EFS GP*** means EFS HC GP, LLC, a Delaware limited liability company.

1.35.    ***EFS LP*** means EFS Homer City, LLC, a Delaware limited liability company.

1.36.    ***Entity*** means an individual, corporation, partnership, limited liability partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

1.37.    ***Estate*** means the estate of the Debtor created under section 541 of the Bankruptcy Code.

1.38.  ***Exculpated Parties*** means collectively: (a) the Debtor; (b) the Reorganized Debtor; (c) the Disbursing Agent; (d) any statutory committee appointed in the Chapter 11 Case; (e) each Entity that has been or is a party to the Restructuring Support Agreement; and (f) with respect to each of the foregoing Entities in clauses (a) through (e), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such Entities' respective heirs, executors, estates, servants, and nominees.

1.39.  ***Exit Administrative Agent*** means an administrative agent under the Exit Facility Credit Agreement acceptable to the Debtor or the Reorganized Debtor, as applicable, and the Requisite Noteholders.

1.40.  ***Exit Agents*** means, collectively, the Exit Administrative Agent, the Exit Collateral Agent and the Exit Depository Bank.

1.41.  ***Exit Arranger*** means Morgan Stanley Senior Funding, Inc., in its capacity as sole lead arranger of the Exit Facility.

1.42.  ***Exit Collateral Agent*** means a financial institution identified by the Exit Arranger and reasonably acceptable to the Debtor or the Reorganized Debtor, as applicable, in its capacity as collateral agent under the Exit Facility Credit Agreement.

1.43.  ***Exit Depository Bank*** means a financial institution identified by the Exit Arranger and reasonably acceptable to the Debtor or the Reorganized Debtor, as applicable, in its capacity as depository bank under the Exit Facility Credit Agreement.

1.44.  ***Exit Facility*** means, together, the (a) term loan facility provided in connection with the Exit Facility Credit Agreement and (b) Exit Letters of Credit.

1.45.  ***Exit Facility Credit Agreement*** means the credit agreement dated the Effective Date, between Reorganized Homer City, as borrower, New Holdco, as the guarantor, the Exit Lenders, the Exit Administrative Agent, the Exit Collateral Agent and the Exit Arranger, that will govern the Exit Facility, which shall be in form and substance acceptable to the Exit Arranger, the Exit Administrative Agent, the Exit Collateral Agent, the Exit Lenders, and the Requisite Noteholders; *provided*, *that*, the GE Provisions of the Exit Facility Credit Agreement shall be in form and substance acceptable to GE.

1.46.  ***Exit Facility Documents*** means, collectively, the Exit Facility Credit Agreement, Exit Facility Term Sheet and all other loan and security documents, and other documents and filings, in each case related to the Exit Facility and as the same may be modified, supplemented or replaced from time to time and which shall be in form and substance acceptable to the Exit Arranger, the Exit Agents, the Exit Lenders and the Requisite Noteholders; *provided*, *that*, the GE Provisions of the Exit Facility Documents shall be in form and substance acceptable to GE.

5

1.47.    ***Exit Facility Engagement Letter*** means that certain engagement letter, dated December 13, 2016, by and between the Exit Arranger and Homer City pursuant to which Homer City engaged the Exit Arranger to assist Homer City in any bankruptcy related financing.

1.48.    ***Exit Facility Term Sheet*** means the term sheet for the Exit Facility attached to the Plan Supplement, which shall be in form and substance acceptable to the Exit Arranger, the Exit Agents, the Exit Lenders, and Requisite Noteholders; *provided*, *that*, the GE Provisions shall be in form and substance acceptable to GE.

1.49.    ***Exit Lenders*** means the lenders from time to time party to the Exit Facility Credit Agreement.

1.50.    ***Exit Letters of Credit*** means the letters of credit issued under the Exit Facility, on the terms and conditions set forth in that certain letter of credit and reimbursement agreement.

1.51.    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Effective Date by professional persons retained by the Estate by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, or 503(b) of the Bankruptcy Code in the Chapter 11 Case.

1.52.    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument, or rehearing shall have expired; *provided*, *however*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.53.    ***GE*** means General Electric Company and any Affiliates thereof (other than the Debtor).

1.54.    ***GE Contribution*** means the delivery by GE of $3,000,000 (Three Million Dollars) to the Reorganized Debtor on the Effective Date.

1.55.    ***GE Guaranty or GE Guaranties*** means any guaranty, indemnity, or credit support provided by GE for the benefit of the Debtor.  For the avoidance of doubt, the term GE Guaranty or GE Guaranties does not include the GE Contribution.

1.56.    ***GE Notes Claims*** means all Claims on account of the Notes held by GE.

1.57.    ***GE Ordinary Course Claims*** means all Claims held by a GE entity (other than EFS GP or EFS LP) arising out of goods or services provided to the Debtor by such GE entity in the ordinary course of business in connection with or to support the operation of the Debtor's facility pursuant to a GE Ordinary Course Contract or otherwise.

1.58.    ***GE Ordinary Course Contract*** means a contract between a GE entity (other than EFS GP or EFS LP) and the Debtor for goods or services to be provided to the Debtor by such GE entity in the ordinary course of business in connection with or to support the operation of the Debtor's facility.

1.59.    ***GE Provision*** means any provision of the Plan or other Definitive Documents related to (i) the releases and injunctions in favor of GE set forth in the Plan; (ii) the replacement or satisfaction of GE's obligations under the GE Guaranties as contemplated under Plan; (iii) the GE Ordinary Course Contracts and the GE Ordinary Course Claims; (iv) the Transitional Services Agreement; (v) any claims of the Company against GE; (vi) the payment of Weil, Gotshal & Manges LLP and Reed Smith LLP's legal fees as restructuring counsel to GE in accordance with the Plan or the Cash Collateral Order; (vii) the GE Contribution; (viii) the amount or treatment of the GE Remainder; and (ix) any other provision that could materially adversely affect GE; *provided that* provisions of the Plan or other Definitive Documents relating to the treatment of GE, in its capacity as a holder of the Notes, shall not be "GE Provisions" covered by subsections (viii) and (ix) of this definition if the treatment of GE is consistent with the treatment of all other holders of the Notes (but such provisions may still be "GE Provisions" for the purposes of subsections (i), (ii), (iii), (iv), (v), (vi) or (vii) of this definition).

1.60.    ***GE Remainder*** means 33.33% of the GE Notes Claims' Pro Rata share of the NewCo Interests.

1.61.    ***General Unsecured Claims*** means all Claims, other than a Secured Claim, Other Secured Claim, Intercompany Claim, Administrative Claim, Priority Tax Claim, or Other Priority Claim.

1.62.    ***Hedge Agreement*** means any agreement with respect to any swap, forward, future, option, or derivative transaction involving or settled by reference to one or more rates, currencies, commodities, equity or debt securities, or economic, financial, or pricing indices, or any similar transaction.

1.63.    ***Homer City*** means Debtor Homer City Generation, L.P.

1.64.    ***Homer City Interests*** means all direct or indirect Interests in Homer City, including the Interests held by GE and MetLife.

1.65.    ***Indenture*** means the Indenture, dated as of December 14, 2012, between Homer City, as Issuer, and the Prepetition Trustee.

1.66.    ***Impaired*** means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.67.    ***Intercompany Claims*** means all Claims against the Debtor held by GE, other than the GE Notes Claims and the GE Ordinary Course Claims.

1.68.    ***Interests*** means any equity interest as defined in section 101(16) of the Bankruptcy Code, including all membership interests, common stock, partnership interests, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in the Debtor, whether or not transferable, and any option, warrant or right, contractual or otherwise.

1.69.    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.70.    ***MetLife*** means Metropolitan Life Insurance Company, a New York corporation.

1.71.    ***NewCo Agreements*** means, together, the (a) New Holdco LLC Agreement and (b) New Homer City LLC Agreement.

1.72.    ***New Holdco*** means a newly formed Delaware limited liability company that shall hold 100% of the membership Interests in the Reorganized Debtor.

1.73.    ***New Holdco LLC Agreement*** means the limited liability company operating agreement providing for, among other things, the issuance and governance of membership interests in New Holdco, and attached to the Plan Supplement.

1.74.    ***New Homer City LLC Agreement*** means the limited liability company operating agreement providing for, among other things, the issuance and governance of membership Interests in the Reorganized Debtor, and attached to the Plan Supplement.

1.75.    ***NewCo Interests*** means the membership interests in New Holdco.

1.76.    ***Noteholder*** means any holder of the Notes.

1.77.    ***Notes*** means, together, the (a) 8.137% Senior Secured Notes due 2019 and (b) 8.734% Senior Secured Notes due 2026, each issued by Homer City pursuant to the Indenture.

1.78.    ***Notes Claims*** means all Claims on account of the Notes, including the GE Notes Claims.

1.79.    ***O&M Agreement*** means the Operation and Maintenance Agreement, dated as of September 21, 2012, between Homer City and NRG Homer City Services LLC, as amended.

1.80.    ***Other Priority Claim*** means any Claim entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

1.81.    ***Other Secured Claim*** means a Secured Claim other than an Administrative Claim, a Priority Tax Claim, or a Notes Claim.

1.82.   ***Plan*** means this prepackaged chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time with the consent of the Requisite Noteholders and, with respect to the GE Provisions, GE, in accordance with the provisions of the Bankruptcy Code, the terms hereof, and the terms of the Restructuring Support Agreement.

1.83.   ***Plan Supplement*** means a supplemental appendix to the Plan containing, among other things, substantially final forms of (a) the Amended Organizational Documents (if such Amended Organizational Documents reflect material changes from the Debtor's existing organizational documents and bylaws), (b) the Exit Facility Term Sheet, (c) the NewCo Agreements, (d) the Schedule of Rejected Contracts, and (e) if known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; *provided*, *that*, through the Effective Date, the Debtor shall have the right, with the consent of the Requisite Noteholders and, with respect to the GE Provisions, GE, to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan.  The Plan Supplement shall be filed with the Bankruptcy Court at least five (5) days before the Confirmation Hearing. Each document, agreement, schedule and exhibit included in the Plan Supplement, including, for the avoidance of doubt, items (a) through (e) above, shall be in form and substance acceptable to the Requisite Noteholders; *provided*, *that*, any provision of a document, agreement, schedule or exhibit included in the Plan Supplement that is a GE Provision must also be in form and substance acceptable to GE.

1.84.   ***Prepetition Trustee*** means The Bank of New York Mellon, as trustee and collateral agent under the Indenture.

1.85.   ***Priority Tax Claim*** means any Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.86.   ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims and Disputed Claims (if any) in that Class.

1.87.   ***Reinstate, Reinstated, or Reinstatement*** means leaving a Claim Unimpaired under the Plan.

1.88.   ***Released Parties*** means collectively: (a) the Debtor; (b) the Reorganized Debtor; (c) each person or Entity that has been or is a party to the Restructuring Support Agreement; *provided that* any such party shall only be a Released Party if it has not objected to confirmation of the Plan (any objection by GE to cure amounts in connection with the assumption of a GE Ordinary Course Contract shall not be deemed an objection to confirmation for purpose of the definition of "Released Parties"); (d) the Prepetition Trustee; (e) the Disbursing Agent; (f) MetLife; (g) each Noteholder that votes for, and does not object to, the Plan; (h) the Exit Arranger; (i) the Exit Lenders; (j) each of the Exit Agents; and (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entities' predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives,

management companies, fund advisors and other professionals, and such Entities' respective heirs, executors, estates, servants, and nominees.

1.89. **_Reorganized Homer City or Reorganized Debtor_** means the Debtor as reorganized on the Effective Date in accordance with the Plan.

1.90. **_Reorganized Homer City Interests_** means the membership interests of the Reorganized Debtor issued to New Holdco.

1.91. **_Requisite Noteholders_** means, as of the date of determination, Consenting Noteholders holding at least a majority in aggregate principal amount of Notes held by all Consenting Noteholders.

1.92. **_Restructuring Expenses_** means the reasonable and documented fees and expenses incurred by the Consenting Noteholders and GE in connection with restructuring the Debtor, including the reasonable fees and expenses of (a) O'Melveny & Myers, LLP, counsel to the Consenting Noteholders, (b) Houlihan Lokey Capital, Inc., investment banker for the Consenting Noteholders, (c) Charles River Associates, financial advisor to the Consenting Noteholders, (d) Leidos Engineering, LLC, technical advisor for the Consenting Noteholders, (e) Young Conaway Stargatt & Taylor LLP, Delaware counsel to the Consenting Noteholders, (f) Post & Schell, P.C., Pennsylvania counsel to the Consenting Noteholders, (g) Emmett, Marvin & Martin, LLP, counsel to the Prepetition Trustee, (h) Weil, Gotshal & Manges LLP, counsel to GE, (i) Reed Smith LLP, Delaware counsel to GE, and (j) White & Case LLP, counsel to the Exit Agents; *provided*, *that*, the fees and expenses of Weil, Gotshal & Manges LLP and Reed Smith LLP after September 24, 2016 shall not exceed $1,250,000; and *provided further that* Weil, Gotshal & Manges LLP and Reed Smith LLP shall be compensated by Homer City only for services rendered in connection with Debtor's restructuring and/or the Chapter 11 Case, including Causes of Action asserted by any party, and Weil, Gotshal & Manges LLP and Reed Smith LLP shall not be compensated for assessing, responding to, or otherwise addressing any other claims threatened or asserted against GE.

1.93. **_Restructuring Support Agreement_** means the restructuring support agreement, dated January 9, 2017, among the Debtor, the Consenting Noteholders, EFS LP, EFS GP, EFS-N LLC, General Electric Company, GE Capital US Holdings, Inc., and GPFS Securities Inc., attached hereto as **Exhibit A**.

1.94. **_Schedule of Rejected Contracts_** means the schedule of executory contracts and unexpired leases to be rejected by the Debtor pursuant to the Plan, and attached to the Plan Supplement, which shall not include any GE Ordinary Course Contract.

1.95. **_Secured Claim_** means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtor, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. For the avoidance of doubt, all Notes Claims are Secured Claims.

1.96. **_Security_** has the meaning set forth in section 101(49) of the Bankruptcy Code.

1.97.  **Surety** means any Entity that has issued a surety bond for the benefit of the Debtor.

1.98.  **Surety Bond** means any surety bond posted to support Homer City's obligations to the Pennsylvania Department of Environmental Protection.

1.99.  **Tax Code** means the Internal Revenue Code of 1986, as amended from time to time.

1.100.  **Tax Order** means the *Order Pursuant to 11 U.S.C. §§ 105(A), 363(b), 507(a), and 541 Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees* [D.I. __].

1.101.  **Transitional Services Agreement** means the Transitional Services Agreement attached as an exhibit to the Restructuring Support Agreement.

1.102.  **Unclaimed Distribution** means a Distribution that is not claimed by a holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

1.103.  **Unclaimed Distribution Deadline** means ninety (90) days from the date the Disbursing Agent makes a Distribution of Cash or other property under the Plan to a holder of an Allowed Claim.

1.104.  **Undisputed** means a Claim that is not Disputed.

1.105.  **Unimpaired** means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

B.    **Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

D.      **Controlling Document.**

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, that* if there is determined to be any inconsistency between any provision of the Plan or the Plan Supplement, on the one hand, and any provision of the Confirmation Order, on the other hand, that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern.

## ARTICLE II.  ADMINISTRATIVE EXPENSE AND PRIORITY CLAIMS.

2.1.    *Administrative Claims*.

Except to the extent that a holder of an Allowed Administrative Claim agrees to different treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim payment in Cash in an amount equal to such Allowed Administrative Claim, payable on the later of the Effective Date and the date that is thirty (30) Business Days after such Administrative Claim becomes Allowed; *provided*, *however*, that Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtor, as Debtor in Possession, shall be paid by the Debtor or the Reorganized Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2.    *Fee Claims*.

All Entities seeking an award by the Bankruptcy Court of Fee Claims shall (a) file, on or before forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) two (2) Business Days after the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor or the Reorganized Debtor.

The Reorganized Debtor is authorized to pay or reimburse its professionals for services performed or expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.  On or about the Effective Date, holders of Fee Claims shall provide an estimate of their Fee Claims to the Debtor or the Reorganized Debtor, and the Reorganized Debtor shall separately reserve for such estimated amounts for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final

Order or agreement of the parties. For the avoidance of doubt, this Section shall not be applicable to any Restructuring Expenses, which shall be paid pursuant to Section 2.4 of the Plan.

2.3. *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim who was not paid pursuant to the Tax Order shall receive, in full and final satisfaction, settlement, release and discharge of such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtor, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, if such Claim is an Allowed Priority Tax Claim on the Effective Date, (ii) the date that is thirty (30) Business Days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (b) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date; *provided*, *that*, the Reorganized Debtor reserves the right to prepay all or a portion of any such amounts at any time under this option.

2.4. *Restructuring Expenses*

On the Effective Date, the Reorganized Debtor shall pay in full in Cash any outstanding Restructuring Expenses in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Case, and without the requirement for further notice or Bankruptcy Court review or approval.

**ARTICLE III. CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1. *Classification in General*.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *that*, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only if such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled before the Effective Date.

3.2. *Summary of Classification*.

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been separately classified. All of the potential Classes for the Debtor are set forth herein.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Notes Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (presumed to accept) |
| 5 | Intercompany Claims | Impaired | No (deemed to reject) |
| 6 | Homer City Interests | Impaired | No (deemed to reject) |

3.3. *Special Provision Governing Unimpaired Claims*.

Unless specifically stated, nothing under the Plan shall affect the rights of the Debtor or the Reorganized Debtor, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.4. *Elimination of Vacant Classes*.

Any Class of Claims against or Interests in the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

**ARTICLE IV.  TREATMENT OF CLAIMS AND INTERESTS.**

4.1. **Other Priority Claims (Class 1)**

(a)    *Classification*:  Class 1 consists of Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Other Priority Claim agrees to different treatment, each holder of an Other Priority Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, (i) payment in Cash in an amount equal to such Allowed Other Priority Claim, payable on the later of the Effective Date and the date that is thirty (30) Business Days after such Other Priority Claim becomes Allowed, or (ii) the Reinstatement of such holder's Allowed Other Priority Claim, or (iii) such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.

(c)    *Voting*:  Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.

4.2.  ***Other Secured Claims (Class 2)***.

    (a)  *Classification*:  Class 2 consists of the Other Secured Claims.  If Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2 for purposes of voting to accept or reject the Plan and receiving Distributions under the Plan.

    (b)  *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, release and discharge of such Allowed Other Secured Claim, at the sole option of the Debtor or the Reorganized Debtor, each such holder shall receive (i) payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is thirty (30) Business Days after such Other Secured Claim becomes Allowed, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under Section 506(b) of the Bankruptcy Code, (iii) the Reinstatement of such holder's Allowed Other Secured Claim, or (iv) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

    (c)  *Voting*:  Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.3.  ***Notes Claims (Class 3)***.

    (a)  *Classification*:  Class 3 consists of Notes Claims.

    (b)  *Allowance*:  The Notes Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code in an amount equal to $606,912,777.53, plus unpaid interest, fees, and other expenses arising under or in connection with the Notes Claims.

    (c)  *Treatment*:  Except to the extent that a holder of an Allowed Notes Claim agrees to a less favorable treatment of such Claim, (i) each such holder (other than GE) shall receive, in exchange for the contribution of such Notes Claim to New Holdco, such holder's Pro Rata share of one hundred percent (100%) of the NewCo Interests, plus such holder's Pro Rata share of the GE Remainder and (ii) GE, on account of the GE Notes Claims, shall receive in exchange for the contribution of the GE Notes Claims to New Holdco, 66.67% of its Pro Rata share of the NewCo Interests and no share of the GE Remainder.  Immediately thereafter, New Holdco shall receive, in full and final satisfaction, release and discharge of the Notes Claims contributed by each holder, Reorganized Homer City Interests.

    (d)  *Voting*:  Class 3 is Impaired, and the holders of Allowed Notes Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.4.  ***General Unsecured Claims (Class 4)***.

    (a)  *Classification*:  Class 4 consists of General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a holder of a General Unsecured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release and discharge of such General Unsecured Claim, each such holder of an Undisputed General Unsecured Claim who was not paid pursuant to the All Trade Order shall receive (i) payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after such General Unsecured Claim becomes Allowed, in each case, or as soon as reasonably practicable thereafter, or (ii) such other treatment so as to render such holder's General Unsecured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)     *Voting*:  Class 4 is Unimpaired, and holders of General Unsecured Claims are conclusively presumed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such General Unsecured Claims.

4.5.    ***Intercompany Claims (Class 5)***.

(a)     *Classification*:  Class 5 consists of Intercompany Claims.

(b)     *Treatment*:  On the Effective Date, all Intercompany Claims shall be deemed canceled, extinguished and discharged, and the holders of Intercompany Claims shall not receive or retain any distribution or property on account of such Claims.

(c)     *Voting*:  Class 5 is Impaired, and the holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

4.6.    ***Homer City Interests (Class 6)***.

(a)     *Classification*:  Class 6 consists of Homer City Interests.

(b)     *Treatment*:  On the Effective Date, prior to the release and discharge of the Notes Claims, all Homer City Interests shall be converted into Reorganized Homer City Interests.  Immediately following the release and discharge of the Notes Claims held by New Holdco (following the GE Contribution as described in Section 5.13 and the contribution of such Notes Claims to New Holdco, as described in Section 4.3) all of the Reorganized Homer City Interests, other than any Reorganized Homer City Interests owned by New Holdco at such time shall be cancelled, extinguished and discharged.

(c)     *Voting*:  Class 6 is Impaired, and the holders of Homer City Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, the holders of Homer City Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Homer City Interests.

# ARTICLE V.  MEANS FOR IMPLEMENTATION.

### 5.1.    *Continued Existence.*

(a)    Except as otherwise provided in the Plan, on the Effective Date, the Debtor will be converted, pursuant to Section 18-214 of the Delaware Limited Liability Company Act, into, and the Reorganized Debtor shall be, a Delaware limited liability company and the Debtor shall continue existing after the Effective Date as the Reorganized Debtor in accordance with the applicable laws of the jurisdiction in which it is organized and pursuant to the Amended Organizational Documents.

(b)    The Reorganized Debtor shall become a wholly owned subsidiary of New Holdco, with limited liability company interests in New Holdco distributed in accordance with the Plan.  Upon the conversion of the Debtor to a Delaware limited liability company, all of the partnership interests of the Debtor shall be converted into membership interests therein.

(c)    On or after the Effective Date, the Reorganized Debtor may, in its sole discretion, take such action that may be necessary or appropriate as permitted by applicable law and the Amended Organizational Documents, and that the Reorganized Debtor determines is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation, causing: (i) the legal name of the Reorganized Debtor to be changed and/or (ii) the closure of the Chapter 11 Case on or after the Effective Date.

### 5.2.    *Exit Facility*.

(a)    On the Effective Date, in accordance with, and subject to, the terms and conditions of the Exit Facility Credit Agreement, the Reorganized Debtor will enter into the Exit Facility.  Corporate authority to enter into the Exit Facility shall be deemed granted by the Confirmation Order without the need for any further consents or documents by Homer City, its partners, GE, or the holders of Claims or Interests.  The proceeds issued or deemed issued under the Exit Facility shall be used to (i) fund Distributions, costs, and expenses contemplated by the Plan, (ii) provide letters of credit or other credit support to replace the GE Guaranties in their entirety, including with respect to the O&M Agreement and with respect to any Surety Bond, and (iii) fund general working capital and for general corporate purposes of the Reorganized Debtor.

(b)    On the Effective Date, the Exit Facility Credit Agreement shall be executed and delivered substantially on the terms and conditions set forth in the Exit Facility Term Sheet, with such modifications to which the Debtor or Reorganized Debtor and the Exit Lenders, the Exit Administrative Agent, the Exit Collateral Agent, and the Exit Arranger may agree, with the consent of the Requisite Noteholders and, solely with respect any GE Provision of the Exit Facility Credit Agreement, the consent of GE, which modifications shall not affect the treatment of Claims under the Plan.

Without limiting the generality of the foregoing, all Liens and security interests granted pursuant to the Exit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject

to such document, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.  The Debtor, Reorganized Debtor, and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

     5.3.   ***Authorization and Issuance of Securities.***

     (a)   *Issuance of Reorganized Homer City Interests*.  Homer City or Reorganized Homer City, as applicable, is authorized to issue or cause to be issued and shall issue the Reorganized Homer City Interests to New Holdco in accordance with the terms of the Plan and the Amended Organizational Documents without the need for any further limited liability company action and without action by holders of Claims or Interests.  On the Effective Date, the Reorganized Homer City Interests will be owned by New Holdco in accordance with the Amended Organizational Documents.

     (b)   *Issuance of NewCo Interests*.  On the Effective Date, New Holdco is authorized to issue or cause to be issued and shall issue the NewCo Interests, in accordance with the Plan to the holders of Allowed Notes Claims, subject to the applicable NewCo Agreement without the need for any further limited liability company action and without action by holders of Claims or Interests.

     On the Effective Date, all applicable holders of NewCo Interests and New Holdco shall be deemed to be parties to the NewCo Agreements without the need for further corporate, or other entity, action or execution by any such holder.  The applicable NewCo Agreement shall be binding on all Entities receiving or holding NewCo Interests; *provided*, *that*, regardless of whether such Entities execute the applicable NewCo Agreement, such Entities will be deemed to have signed the applicable NewCo Agreement, which shall be as binding on such Entities as if they had actually signed it.

     Any direct or beneficial recipient of the NewCo Interests, including all Entities to whom such recipients may sell their NewCo Interests in the future and all Entities who purchase or acquire such Interests in future transactions, shall be party to, or shall be deemed to be bound by, the applicable NewCo Agreement.

     In the period following the Effective Date and pending distribution of the NewCo Interests to any holder of Allowed Notes Claims, any such holder will be entitled to exercise any rights and receive any distributions paid with respect to such holder's NewCo Interests and exercise all of the rights with respect of the NewCo Interests.

     5.4.   ***Registration Exemptions***.

     (a)   To the maximum extent provided by section 1145(a) of the Bankruptcy Code and applicable non-bankruptcy law, the issuance or distribution of the securities under the Plan, including the NewCo Interests and the Reorganized Homer City Interests, shall be exempt

from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code or pursuant to another applicable exemption from registration requirements of the Securities Act.  To the extent that section 1145 is not available to exempt the securities issued under the Plan, including, without limitation, the offer or sale under the Plan of such securities from registration under section 5 of the Securities Act, other provisions of the Securities Act, including, without limitation, section 3(a)(9), section 4(a)(2) or Regulation S of the Securities Act, and state securities laws, shall apply to exempt such issuance from the registration requirements of the Securities Act.

(b)    The offer, issuance, and distribution of the NewCo Interests under the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code without further act or action by any entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities.  In addition, under section 1145 of the Bankruptcy Code, any securities issued under the Plan that are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, unless the holder of the security is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code with respect to such security, and subject to (i)  compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, including Rule 144 of the Securities Act, which provides that securities will not be freely tradable if, at the time of transfer, the holder thereof is an "affiliate" of the issuer of such securities as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer; (ii) the restrictions, if any, on the transferability of such securities contained in the Amended Organizational Documents or NewCo Agreements; and (iii) applicable regulatory approval.

Whether any particular person would be deemed to be an "underwriter" with respect to the NewCo Interests would depend upon various facts and circumstances applicable to that person.  Given the complex nature of the question of whether a particular person may be an underwriter and other issues arising under applicable securities laws, accordingly, the Debtor expresses no view as to whether any person would be deemed an "underwriter" with respect to the NewCo Interests.

(c)    The offer, issuance, and distribution under the Plan of the Reorganized Homer City Interests hereunder to New Holdco and the NewCo Interests not issued under section 1145 of the Bankruptcy Code to holders of Allowed Notes Claims who are eligible holders (i.e., "accredited investors" as defined in Rule 501 of the Securities Act or "qualified institutional buyers" as defined in Rule 144A of the Securities Act) shall be exempt, pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, without further act or action by any entity, from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.  Persons who are issued Reorganized Homer City Interests and NewCo Interests pursuant to these exemptions will hold "restricted securities," subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

5.5. ***Cancellation of Existing Securities and Related Agreements.***

(a)     Except for the purpose of evidencing a right to a Distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtor, on the Effective Date, all instruments or other documents evidencing any Claim or Interest, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtor thereunder shall be deemed fully satisfied, released, and discharged.

(b)     On the Effective Date, any outstanding Hedge Agreements with Homer City that do not have any open transactions or outstanding obligations shall be deemed terminated and of no further force or effect.  If Reorganized Homer City enters into any new transactions with the counterparties to the Hedge Agreements on or after the Effective Date, any GE Guaranty previously provided to such counterparty shall not continue supporting such new transactions.

(c)     Notwithstanding such cancellation and discharge, the Indenture shall continue in effect solely to the extent necessary to allow the Debtor, Reorganized Debtor, Noteholders, and Prepetition Trustee, as applicable, (i) to receive Distributions under the Plan and (ii) to make post-Effective Date Distributions or take such other action pursuant to the Plan on account of the Notes and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; *provided*, *however*, that nothing in this Section 5.5 shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtor. Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor or its interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this Section 5.5 shall be deemed null and void and shall be of no force and effect, and the Debtor shall be entitled to continue using (in accordance with the remaining provisions of such document, instrument, lease, or other agreement) any land, facilities, improvements, or equipment financed with the proceeds of the Indenture.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of its counterparties under any executory contract or lease if such executory contract or lease has been assumed by the Debtor pursuant to a Final Order of the Bankruptcy Court or hereunder.

5.6. ***Officers and Boards of Directors.***

The composition of the board of directors, officers, managers, or partners of the Reorganized Debtor and New Holdco, shall be disclosed before the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

5.7. ***Transitional Services Agreement.***

Upon the Effective Date, Reorganized Homer City shall be authorized to enter into and perform under the Transitional Services Agreement without the need for any further corporate action and without further action by the holders of Claims or Interests.

5.8.    *Effectuating Documents; Further Transactions*.

(a)    On or as soon as practicable after the Effective Date, the Reorganized Debtor and New Holdco, as applicable, with the consent of the Requisite Noteholders, shall take such actions as may be (or may become) necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution and the Amended Organizational Documents pursuant to applicable state law, (iv) the issuance of securities, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, and (v) all other actions that the Reorganized Debtor and New Holdco, as applicable, determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

(b)    Each officer, director, partner, member, or manager of the Debtor, Reorganized Debtor, or New Holdco, as applicable, is authorized and directed to issue, execute, deliver, file, or record such contracts, certificates, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by any directors, members, managers, partners, or officers of the Debtor or the Reorganized Debtor) except for those expressly required pursuant to the Plan.

(c)    All matters provided for herein involving the corporate structure of the Debtor or Reorganized Debtor, or any corporate or related action required by the Debtor or Reorganized Debtor in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by New Holdco, or any partners, directors, members, managers, or officers of the Debtor or Reorganized Debtor, and with like effect as though such action had been taken unanimously by New Holdco, or any partners, directors, managers, members, or officers, as applicable, of the Debtor or Reorganized Debtor.

5.9.    *Cancellation of Liens.*

Except as otherwise specifically provided herein, upon the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, any Lien securing a Secured Claim (including any Notes Claim) shall be deemed released, and the holder of such Secured Claim (or any agent for such holder) shall be authorized and directed to release any

collateral or other property of the Debtor (including any Cash collateral) held by such holder and to take such actions as may be requested by the Debtor, Reorganized Debtor, or Exit Agent to cancel, extinguish, and release such Liens, if they have been or will be satisfied or discharged in full pursuant to the Plan.

5.10. ***Nonconsensual Confirmation.***

The Debtor reserves its right to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to Classes 5 and 6. Because Classes 5 and 6 are deemed to reject the Plan, the Debtor may confirm the Plan under section 1129(b) of the Bankruptcy Code.

5.11. ***Closing of the Chapter 11 Case.***

After the Estate has been fully administered, the Reorganized Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

5.12. ***Notice of Effective Date.***

As soon as practicable, but not later than three (3) Business Days after the Effective Date, the Reorganized Debtor shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

5.13. ***GE Contribution.***

On the Effective Date, GE shall make the GE Contribution in partial consideration for GE's treatment under the Plan.

5.14. ***Tax Reporting.***

Subject to definitive guidance from the Internal Revenue Service or from a court of competent jurisdiction to the contrary, all parties (including the Reorganized Homer City, New Holdco, the Noteholders and the holders of Homer City Interests) shall treat, for U.S. Federal income tax purposes, the implementation of the Plan on the Effective Date as follows, and shall not assert a contrary position in any tax filing with the IRS:

(a) New Holdco shall have filed a valid election to be treated as an association taxable as a corporation for federal income tax purposes effective prior to the Effective Date and the exchange of Notes Claims for NewCo Interests shall be treated as a contribution under Section 351 of the Tax Code;

(b) The GE Contribution to Homer City as a contribution under Section 721 of the Tax Code, unless the Requisite Noteholders provide written consent at least five (5) Business Days prior to the Effective Date to structure the transaction so as to cause the contribution to be excluded from section 351 of the Tax Code;

(c)      The exchange of Allowed Notes Claims for Reorganized Homer City Interests by New Holdco as a contribution under Section 721 of the Code;

(d)      The cancellation of the Allowed Notes Claims and allocation of cancellation of indebtedness income by Homer City to the holders of Reorganized Homer City Interests other than New Holdco; and

(e)      The cancellation of the Reorganized Homer City Interests other than those held by New Holdco as the termination of Homer City under Section 708(b)(1)(A) of the Tax Code.

## ARTICLE VI.  DISTRIBUTIONS.

### 6.1.    *Distributions Generally*.

The Disbursing Agent shall make all Distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

### 6.2.    *Distribution Record Date*.

At 5:00 p.m. (prevailing Eastern Time) on the Effective Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Debtor or the Reorganized Debtor shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Effective Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtor nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

### 6.3.    *Date of Distributions*.

Unless specifically stated, any Distributions and deliveries to be made under the Plan shall be made on, or as soon as reasonably practicable after, the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, *provided*, *that*, other than with respect to Distributions to holders of Allowed Notes Claims, the Reorganized Debtor may implement periodic distribution dates if it determines them to be appropriate.

### 6.4.    *Disbursing Agent*.

All Distributions under the Plan shall be made by the Reorganized Debtor, as Disbursing Agent, on or as soon as reasonably practical after the Effective Date or as otherwise provided herein; *provided*, *however*, that the Prepetition Trustee shall be the Disbursing Agent for the Allowed Notes Claims in accordance with Section 6.9 of the Plan.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents directly related

to Distributions hereunder shall be reimbursed by the Reorganized Debtor. The Reorganized Debtor shall cooperate in good faith with the Prepetition Trustee to comply with the reporting and withholding requirements outlined in Section 6.18 of the Plan.

6.5.     ***Rights and Powers of Disbursing Agent***.

(a)     From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

(b)     A Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all distributions contemplated hereby and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.     ***Expenses of Disbursing Agent***.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtor in the ordinary course of business.

6.7.     ***No Postpetition Interest Return on Claims***.

Except as otherwise provided in the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims on or after the Commencement Date; *provided*, *however*, if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

6.8.     ***Delivery of Distributions***.

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim shall be made to the Disbursing Agent, who shall transmit such Distribution to the applicable holders of Allowed Claims, or, in the case of Allowed Notes Claims, as set forth in Section 6.9 herein.

Undeliverable Distributions shall remain in the possession of the Disbursing Agent until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution.

Until such time as an undeliverable Distribution becomes an Unclaimed Distribution, within 30 days after the end of each calendar quarter following the Effective Date, or upon such other interval as the Bankruptcy Court may order, but in no event less frequently than annually, the Disbursing Agent shall make Distributions of all Cash and property that has become deliverable during the preceding quarter.

The Disbursing Agent shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions; *provided*, *however*, that nothing contained in this Plan shall require the Disbursing Agent to locate any holder of an Allowed Claim.

6.9. ***Delivery of Distributions on Notes Claims.***

Except as otherwise provided herein or reasonably requested by the Prepetition Trustee, all Distributions to holders of Allowed Notes Claims shall be deemed completed when made to the Prepetition Trustee pursuant to the terms of the Plan, which shall be deemed to be the holder of all Allowed Notes Claims for purposes of Distributions to be made hereunder. The Prepetition Trustee shall hold or direct such Distributions for the benefit of the holders of Allowed Notes Claims. As soon as practicable and in accordance with the terms set forth in this Article VI, the Prepetition Trustee shall arrange to deliver such Distributions to or on behalf of the actual holders of Allowed Notes Claims. If the Prepetition Trustee is unable to make, or consents to the Reorganized Debtor making, such Distributions, the Reorganized Debtor, with the Prepetition Trustee's cooperation, shall make such Distributions to the extent reasonably practicable to do so.

As to any holder of an Allowed Notes Claim that is held in the name of, or by a nominee of the Depository Trust Company ("**DTC**"), the Debtor or the Reorganized Debtor, as applicable, shall seek the cooperation of DTC so that Distributions under the Plan shall be made through the facilities of DTC to such holders on or as soon as practicable on or after the Effective Date; *provided*, *that*, to the extent such NewCo Interests are not eligible for distribution in accordance with DTC's customary practices, the Debtor or the Reorganized Debtor will take all such reasonable actions as may be required to cause such Distributions of the NewCo Interests to be made by delivery of one or more certificates representing such NewCo Interests as described herein or by means of book-entry registration on the books of the transfer agent for the NewCo Interests. In the period following the Effective Date and pending Distribution of the NewCo Interests to any holder entitled pursuant to this Plan to receive NewCo Interests, any such Holder will be entitled to exercise any voting rights and receive any dividends, distributions or Distributions paid with respect to such Holder's NewCo Interests and exercise all of the rights with respect of the NewCo Interests.

The Reorganized Debtor shall reimburse the Prepetition Trustee for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making Distributions pursuant to and in accordance with the Plan.

6.10.  ***Unclaimed Property.***

Undeliverable Distributions or Unclaimed Distributions shall remain in the possession of the Disbursing Agent until such time as a Distribution becomes deliverable or the holder accepts such Distribution, or such Distribution reverts back to the Reorganized Debtor and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Upon the Unclaimed Distribution Deadline, undeliverable Distributions or Unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code.  After such date all unclaimed property or interest in property shall revert to the Reorganized Debtor, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

6.11.  ***Time Bar to Cash Payments.***

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtor, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check prior to the expiration of the one hundred eighty (180) day period shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.12.  ***Manner of Payment under Plan***.

Except as otherwise specifically provided in the Plan, at the option of the Debtor or the Reorganized Debtor, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

6.13.  ***Satisfaction of Claims***.

Except as otherwise specifically provided in the Plan, any Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

6.14.  ***Fractional Interests***.

No fractional NewCo Interests shall be distributed.  If any Distributions of NewCo Interests pursuant to the Plan would result in the issuance of a fractional share of a NewCo Interest, then the number of shares of NewCo Interests to be issued in respect of such Distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of NewCo Interests to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.14.  No consideration shall be provided in lieu of fractional shares that are rounded down.  The Reorganized Debtor, New Holdco, and the Disbursing Agent shall not have any obligation to make a Distribution that is less than one (1) share of NewCo Interest.

6.15. *Setoffs*.

The Debtor and the Reorganized Debtor, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any Distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or Reorganized Debtor or their successor or successors of any claims, rights, or Causes of Action that the Debtor or Reorganized Debtor or their successors or assigns may possess against the holder of such Claim.

6.16. *Allocation of Distributions between Principal and Interest*.

Except as otherwise required by law (as reasonably determined by the Debtor or Reorganized Debtor), Distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

6.17. *No Distribution in Excess of Amount of Allowed Claim*.

Except as provided in Section 4.3 herein, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim.

6.18. *Withholding and Reporting Requirements*.

(a) *Withholding Rights*.  Any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b) *Forms*.  Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtor (which Entity shall subsequently deliver to the

Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8, unless such Entity is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtor, the Disbursing Agent, or such other Entity designated by the Reorganized Debtor or Disbursing Agent and the holder fails to comply before the date that is one hundred eighty (180) days after the request is made, the amount of such Distribution shall irrevocably revert to the Reorganized Debtor and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against the Reorganized Debtor or its property.

## ARTICLE VII.  PROCEDURES FOR DISPUTED CLAIMS.

7.1.    *Disputed Claims Process*.

Notwithstanding section 502(a) of the Bankruptcy Code, holders of Claims shall not be required to file proofs of Claim.  If a holder of a Claim elects to file a proof of Claim with the Bankruptcy Court, such holder shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to the Claim, and the Bankruptcy Court shall retain nonexclusive jurisdiction over all such Claims, which shall be resolved on a case-by-case basis through settlements, Claim objections (or, if necessary, through adversary proceedings), or by withdrawal of the Claims by the holders of such Claims.  From and after the Effective Date, the Reorganized Debtor may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

7.2.    *Objections to Claims*.

Any objections to proofs of Claims shall be served and filed (a) on or before the ninetieth (90th) day after the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtor or the Reorganized Debtor.  Nothing herein shall limit or affect the Debtor's or Reorganized Debtor's rights to dispute Claims asserted other than through a proof of Claim.

7.3.    *Expungement or Adjustment to Paid, Satisfied, Superseded, or Discharged Claims.*

Any Claim that has been or will be paid, satisfied, superseded, or discharged, may be expunged or adjusted on the claims register by the Debtor or Reorganized Debtor, as applicable, without a Claims objection having to be filed and without further notice to any other party or action, order, or approval of the Bankruptcy Court.

7.4.    *Estimation of Claims*.

The Debtor or the Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to

any such objection.  If the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.

7.5.    *No Distributions Pending Allowance*.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until, and only to the extent that such Claim becomes Allowed.

7.6.    *Distributions after Allowance*.

If a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, including the treatment provisions provided in Article IV of the Plan.

7.7.    *Claim Resolution Procedures Cumulative*.

The objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

7.8.    *Claim Resolutions Non-Binding Until Effective Date*

No resolution, settlement, or compromise of any Claim pursuant to the terms of the Plan prior to the Effective Date shall be binding on any party unless and until the Effective Date occurs.

**ARTICLE VIII.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.

8.1.    *General Treatment*.

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure amount, all executory contracts and unexpired leases to which the Debtor is a party, including, for the avoidance of doubt, the O&M Agreement, the Consol Contract, and the GE Ordinary Course Contracts, which have not expired by their own terms or have not been assumed on or before the Confirmation Date, shall be deemed assumed except for any executory contract or unexpired lease that (a) has been identified on the Schedule of Rejected Contracts, (b) has been rejected pursuant to a Final Order of the Bankruptcy Court, (c) is the subject of a separate assumption, assignment, or rejection motion filed by the Debtor, with the consent of the Requisite Noteholders, under section 365 of the Bankruptcy Code before the Confirmation Date, or (d) is the subject of a pending Cure Dispute.  For the avoidance of doubt, the GE Ordinary Course Contracts shall be assumed pursuant to the Plan.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan or the Schedule of Rejected

Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by any provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

8.2.    *Determination of Cure Disputes and Deemed Consent*.

(a)    Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Reorganized Debtor promptly upon assumption thereof.  Following the Commencement Date, the Debtor shall serve a notice, in form and substance acceptable to the Requisite Noteholders, on parties to executory contracts and unexpired leases to be assumed reflecting the Debtor's intention to assume the contract or unexpired lease in connection with the Plan.  If the counterparty believes any Cure amounts are due by the Debtor in connection with the assumption, it shall assert such Cure amounts against the Debtor either in the ordinary course of business or by objection to the notice of the proposed assumption within ten (10) days of service thereof.

(b)    Upon assumption, Cure amounts shall be paid by the Reorganized Debtor in the ordinary course, subject to all defenses and disputes the Debtor or the Reorganized Debtor may have with respect to such executory contracts or unexpired leases, which the Reorganized Debtor may assert in the ordinary course.  If there is a Cure Dispute pertaining to assumption of an executory contract or unexpired lease, such dispute shall be heard by the Bankruptcy Court before such assumption becomes effective; *provided*, *however*, before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may (with the consent of the Requisite Noteholders) settle any dispute regarding the Cure amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(c)    Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption of such executory contract or unexpired lease or the relevant Cure amount within ten (10) days of the service thereof, shall be (i)  deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (A) prohibit, restrict, or condition the transfer or assignment of such contract or lease, or (B) terminate or permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtor or terminating or modifying such contract or lease on account of transactions contemplated by the Plan, and (ii) forever barred, estopped, and enjoined from challenging the validity of such assumption or the Allowed amount of such Cure amount thereafter.  For the avoidance of doubt, all counterparties to assumed contracts and leases shall retain their right to contend that Cure amounts are owed or that defaults are outstanding under such contracts and leases.

8.3.    *Payments Related to Assumption of Contracts and Leases*.

Subject to resolution of any Cure Dispute, all Cures shall be satisfied by the Debtor or Reorganized Debtor, as the case may be, upon assumption of the underlying contracts and unexpired leases.  Assumption of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

8.4.    *Rejection Claims*.

If the rejection of an executory contract or unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be classified and treated in Class 4 (General Unsecured Claims).

8.5.    *Indemnification by the Reorganized Debtor*

The Reorganized Debtor shall indemnify and hold harmless and pay all judgments and claims against EFS GP, any of its affiliates, and their respective officers, directors, members, partners, shareholders, employees, managers, consultants, or agents (each an "**Indemnified Party**" and collectively, the "**Indemnified Parties**"), from and against any loss or damage incurred by an Indemnified Party or the Debtor for any act or omission by any Indemnified Party in connection with a claim that is released or barred against the applicable Indemnified Party pursuant to the Plan, including costs and reasonable attorneys' fees and any amount expended in the settlement of any claims or loss or damage, shall not be discharged or impaired by confirmation of the Plan; *provided*, *that*, the Reorganized Debtor shall not indemnify the Indemnified Party for any act or omission (i) not taken or omitted by the Indemnified Party in the good faith belief that such act or omission was in or not opposed to the Debtor's best interest, (ii) with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final decision, judgment, or order that such Indemnified Party committed intentional fraud or criminal conduct, or (iii) that is not released or barred against the Indemnified Party pursuant to the Plan.  Notwithstanding anything to the contrary herein, the maximum amount of the obligations payable by the Reorganized Debtor to all Indemnified Parties pursuant to this Section 8.5 shall not exceed the difference between $1,250,000.00 and the amount of the fees and expenses paid to Weil, Gotshal & Manges LLP and Reed Smith LLP as Restructuring Expenses.

8.6.    *Insurance Policies*.

All insurance policies pursuant to which the Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtor and Reorganized Debtor and shall

continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtor.

8.7.    ***Surety Bonds.***

Subject to this Section 8.7, each Surety Bond (if not replaced and cancelled by the Surety) shall be deemed assumed effective as of the Effective Date, and Reorganized Homer City shall pay all premium and other obligations due on or after the Effective Date with respect to any Surety Bond so assumed; *provided that* on the Effective Date, any collateral or guarantee provided by GE to any Surety for the benefit of the Debtor shall be replaced by Exit Letters of Credit issued under the Exit Facility Credit Agreement.  Upon delivery to the beneficiary of any GE Guaranty of such Exit Letters of Credit, any Claim for indemnity or contribution against GE relating to the Surety Bonds, including Claims arising from any obligations of the Debtor to any governmental units, shall be deemed released, discharged, precluded, and enjoined by the Plan and the Confirmation Order.

8.8.    ***Intellectual Property Licenses and Agreements***.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtor has any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtor and Reorganized Debtor and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to this Plan, a separate order of the Bankruptcy Court, or is the subject of a separate rejection motion filed by the Debtor (with the consent of the Requisite Noteholders) in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtor, and the Reorganized Debtor may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.9.    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements***.

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

8.10.    ***Reservation of Rights***.

(a)    Neither the exclusion nor inclusion of any contract or lease by the Debtor on the Schedule of Rejected Contracts, any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor or the Reorganized Debtor or its respective Affiliates have any liability thereunder.

(b)     Unless specifically stated otherwise, nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtor and the Reorganized Debtor under any executory or non-executory contract or any unexpired or expired lease.

(c)     Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor under any executory or non-executory contract or any unexpired or expired lease.

(d)     If there is a Cure Dispute or a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtor or Reorganized Debtor, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such Cure Dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

(e)     No resolution or settlement of a Cure Dispute pursuant to the terms of the Plan, and no proposal by the Debtor of any Cure amount in connection with the Plan, prior to the Effective Date shall be binding on any party unless and until the Effective Date occurs.

## ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE.

9.1.     *Conditions Precedent to Confirmation of the Plan*.

The following are conditions precedent to confirmation of the Plan:

(a)     the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(b)     the Restructuring Support Agreement shall not have been terminated; and

(c)     the Bankruptcy Court shall have entered the Confirmation Order.

9.2.     *Conditions Precedent to the Effective Date*.

The following are conditions precedent to the Effective Date of the Plan:

(a)     the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable;

(b)     all governmental and third-party approvals and consents, including, but not limited to, Bankruptcy Court approval and approval from the Federal Energy Regulatory Commission as required under section 203 of the Federal Power Act, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(c)    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto;

(d)    the Definitive Documents shall contain terms and conditions consistent in all material respects with the Plan and the Restructuring Support Agreement and shall otherwise be acceptable to the Debtor and the Requisite Noteholders; *provided*, *that*, any provision of a Definitive Document that is a GE Provision must also be in form and substance acceptable to GE;

(e)    all conditions precedent to the effectiveness of the Exit Facility Documents shall have been satisfied or waived in accordance with the terms thereof, and the Exit Facility Documents shall be in full force and effect and binding on all parties thereto;

(f)    all professional fees and expenses of retained professionals of the Debtor and its Estate that are approved by the Bankruptcy Court shall have been paid in full or estimated amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow pending approval by the Bankruptcy Court;

(g)    all beneficiaries of the GE Guaranties shall have delivered to GE full and irrevocable releases of all of the GE's obligations under the GE Guaranties (including releases of any existing or future claims against GE) effective as of the Effective Date;

(h)    the Bankruptcy Court shall have entered the Confirmation Order;

(i)    the Restructuring Expenses shall have been paid in full;

(j)    the Restructuring Support Agreement shall remain in force and effect; and

(k)    GE shall have made the GE Contribution.

9.3.    ***Waiver of Conditions Precedent.***

(a)    Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred before the taking of any other such action. Each condition precedent in Section 9.1 and Section 9.2 may be waived in writing by the Debtor with the prior written consent of (i) the Requisite Noteholders, (ii) solely to the extent a waiver of such condition precedent would adversely affect a GE Provision, GE; and (iii) solely with respect to the condition precedent in Section 9.2(e), the Exit Arranger, the Exit Agents and the Exit Lenders; *provided that* the Debtor shall file a notice of such waivers above with the Bankruptcy Court within three (3) Business Days of obtaining the consent of the Requisite Noteholders and GE, as applicable, for such waiver. If any such condition precedent is waived pursuant to this Section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied.

(b)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.4.    *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtor in a notice filed with the Bankruptcy Court before the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement or any Definitive Document shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtor, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, any of the Consenting Noteholders, GE or any other Entity.

## ARTICLE X.  EFFECT OF CONFIRMATION OF PLAN.

10.1.    *Vesting of Assets*.

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Estate shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, or the Exit Facility Documents.  On and after the Effective Date, the Reorganized Debtor may take any action, including, without limitation, the operation of its business, the use, acquisition, sale, lease and disposition of property, and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein.  Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

10.2.    *Binding Effect.*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) presumed to accept or deemed to reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

10.3.    *Discharge of Claims and Termination of Interests*.

Upon the Effective Date and in consideration of the Distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any

Affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtor.

10.4.    *Term of Injunctions or Stays*.

Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case, including under section 105 or 362 of the Bankruptcy Code or otherwise, and in effect on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.5.    *Injunction*.

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, shareholders, managers, members, partners, and Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold or may hold Claims against or Interests in the Debtor (regardless of whether proof of such Claims or Interests has been filed) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, shareholders, managers, members, partners, and Affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

(c)    **By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented**

to be bound by the Plan, including, without limitation, the injunctions set forth in this Section 10.5.

(d)      The injunctions in this Section 10.5 shall extend to any successors of the Debtor and the Reorganized Debtor and their respective property and interests in property.

10.6.  *Releases*.

(a)      **Releases by the Debtor**.

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents or an assumed contract that remain in effect or become effective after the Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtor, the Reorganized Debtor, and the Estate from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor, the Reorganized Debtor, the Estate or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party (except for future or continuing performance obligations in connection with such business or contractual arrangement), the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Plan (including the Plan Supplement), the Definitive Documents, the Exit Facility Engagement Letter, the NewCo Agreements, the Amended Organizational Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, and upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *that*, nothing in this Section 10.6(a) shall be construed to release the Released Parties from (a) intentional fraud or criminal conduct as determined by a Final Order or (b) any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Facility Documents, the NewCo Agreements, and the Plan Supplement) executed by such party to implement the Plan.

(b)   **Releases by Holders of Claims or Interests**.

**As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Debtor, Reorganized Debtor, and Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:**

    i.      **each other Released Party;**

    ii.      **each holder of an Impaired Claim or Interest that is not a Released Party, except any such holder that voted to reject, or abstained from voting on, the Plan <u>and</u> also checked the box on the applicable ballot or notice indicating that they opt out of granting the releases provided in the Plan;**

    iii.      **each holder of an Unimpaired Claim that does not timely object to the releases provided for in the Plan; and**

    iv.      **with respect to any Entity in the foregoing clauses (i)-(iii), such Entity's predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such Entity's respective heirs, executors, estates, servants and nominees;**

**in each case, from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, purchase, sale or rescission or the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party (except for future or continuing performance obligations in connection with such business or contractual arrangement), the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Plan (including the Plan Supplement), the Definitive Documents, the Exit Facility Engagement Letter, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, and upon any other act or omission,**

transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *that*, nothing in this Section 10.6(b) shall be construed to release the Released Parties from (a) intentional fraud or criminal conduct as determined by a Final Order or (b) any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Facility Documents, the NewCo Agreements, and the Plan Supplement) executed by such party to implement the Plan.

10.7.  *Exculpation*.

Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, the Exculpated Parties shall neither have nor incur any liability to any holder of a Claim or Interest or any other party in interest in the Chapter 11 Case, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or direct or indirect Affiliates, or any of their successors or assigns, for any act or omission (both before and after the Commencement Date) in connection with, related to, or arising out of, the Chapter 11 Case, the Restructuring Support Agreement, the Plan (including, without limitation, the Plan Supplement), the Definitive Documents, the Indenture, any settlement or agreement in the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan and the Definitive Documents, the offer, issuance, and distribution of any securities issued or to be issued pursuant to the Plan, whether such distribution occurs after the Effective Date, the administration of the Plan or property to be distributed hereunder, or agreements, instruments, other documents, or negotiations regarding or concerning any of the foregoing; *provided*, *that*, nothing in this Section 10.7 shall be construed to exculpate the Exculpated Parties from intentional fraud or criminal conduct as determined by a Final Order.  The Exculpated Parties have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

10.8.  *Retention of Causes of Action/Reservation of Rights*.

Except as otherwise provided herein, including in Sections 10.5, 10.6 and 10.7, (a) nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately before the Effective Date on behalf of the Estate or of itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law and (b) the Reorganized Debtor shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date as if the Chapter 11 Case had not been commenced. Notwithstanding the foregoing, the Debtor shall not retain any Claims or Causes of Action

released pursuant to Sections 10.5, 10.6, and 10.7 of the Plan against the Released Parties or arising under chapter 5 of the Bankruptcy Code (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures pursuant to section 502(d) of the Bankruptcy Code or otherwise).

10.9.    *Solicitation of Plan*.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtor and each of its directors, officers, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore is not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.10.    *Corporate Action*.

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects by the Confirmation Order, including (a) the selection of any partners, members, managers, directors, or officers for New Holdco or the Reorganized Debtor, (b) the Distribution of the Reorganized Homer City Interests, (c) the entry into the Exit Facility Documents, (d) the amendment of the Amended Organizational Documents, (e) the distribution of NewCo Interests, (f) the entry into the NewCo Agreements, (g) the entry into and performance under the Restructuring Support Agreement, and (h) all other actions contemplated by or reasonably necessary to effectuate the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate, limited partnership or limited liability company structure of the Debtor or the Reorganized Debtor, and any corporate, limited partnership, or limited liability company action required by New Holdco, the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the partners, members, Interest holders, directors, managers or officers of the Debtor or the Reorganized Debtor.

On or before the Effective Date, the appropriate partners, members, managers, directors, or officers of New Holdco, the Debtor, or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, certificates, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor, including (w) the Amended Organizational Documents, (x) the NewCo Agreements, (y) the Exit Facility Documents, and (z) any and all other agreements, documents, certificates, securities and instruments relating to the Plan or the foregoing. The authorizations and approvals contemplated

by this Section 10.10 shall be effective notwithstanding any requirements under non-bankruptcy law.

## ARTICLE XI.  RETENTION OF JURISDICTION.

11.1.  *Retention of Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)    to hear and determine motions or applications for the assumption, assignment, or rejection of executory contracts or unexpired leases, including Cure Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)    to ensure that Distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to Distributions under the Plan;

(d)    to consider the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate if the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Fee Claims;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing (other than the Exit Facility Documents);

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Plan;

(k)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)     to hear, enforce, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)     to resolve disputes concerning Disputed Claims or the administration thereof;

(o)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)     to enter a final decree closing the Chapter 11 Case;

(q)     to recover all assets of the Debtor and property of the Estate, wherever located;

(r)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(s)     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1).

11.2.   ***Courts of Competent Jurisdiction***

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII.  MISCELLANEOUS PROVISIONS.

12.1.   ***Payment of Statutory Fees.***

On the Effective Date and thereafter as may be required, the Reorganized Debtor shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code for the Chapter 11 Case, or until such time as a final decree is entered closing

the Chapter 11 Case, a Final Order converting Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Chapter 11 Case is entered.

### 12.2. *Substantial Consummation of the Plan*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3. *Plan Supplement*.

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court. Documents included in the Plan Supplement will also be posted at the website of the Debtor's notice, claims, and solicitation agent.

### 12.4. *Request for Expedited Determination of Taxes*.

The Debtor shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Commencement Date through the Effective Date.

### 12.5. *Exemption from Certain Transfer Taxes*.

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any Securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtor pursuant to, in implementation of or as contemplated in the Plan (whether to the Reorganized Debtor or otherwise), (d) the grant of collateral under the Exit Facility Documents and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 12.6. *Amendments*.

(a)    *Plan Modifications*.  Subject to the consent of the Requisite Noteholders, the Plan may be amended, modified, or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional

disclosure pursuant to section 1125 of the Bankruptcy Code; *provided*, *that*, the provisions of the Plan that are GE Provisions may only be amended, modified, or supplemented with the consent of GE.

(b)    *Other Amendments*.  Notwithstanding Section 12.6(a), before the Effective Date, the Debtor may amend, modify, or supplement the Plan and the documents contained in the Plan Supplement to cure any ambiguity, defect (including any technical defect), or inconsistency without further order or approval of the Bankruptcy Court; *provided*, *that*, any amendments, modifications, or supplements pursuant to this Section 12.6(b) do not materially adversely affect the rights, interests, or treatment of the Consenting Noteholders or GE, as applicable, under the Plan.

12.7.    ***Effectuating Documents and Further Transactions***.

Each partner, officer, member, manager, or executive of the Reorganized Debtor is authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.8.    ***Revocation or Withdrawal of the Plan***.

The Debtor reserves the right to revoke or withdraw the Plan before the Effective Date with the consent of the Requisite Noteholders; *provided*, *however*, that the Debtor may revoke or withdraw the Plan without such consents as permitted under the Restructuring Support Agreement or in the exercise of the Debtor's fiduciary duties.  If the Plan has been revoked or withdrawn before the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur on the Effective Date, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor, any of the Consenting Noteholders, or any other Entity.

12.9.    ***Severability of Plan Provisions***.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, with the consent of the Requisite Noteholders and, with respect to the GE Provisions, GE, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall

provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtor or the Reorganized Debtor (as the case may be), the Requisite Noteholders, and, solely with respect to anything that adversely affects any GE Provision, GE, and (c) nonseverable and mutually dependent.

12.10. *Governing Law*.

Except if the Bankruptcy Code, federal law, the Plan Supplement, or an exhibit hereto provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

12.11. *Time*.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.12. *Dates of Actions to Implement the Plan*.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

12.13. *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtor.

12.14. *Deemed Acts.*

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.15. *Successor and Assigns*.

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.16. ***Entire Agreement***.

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.17. ***Exhibits to Plan.***

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.18. ***Notices***.

All notices, requests, and demands prior to the Effective Date to or upon the Debtor to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

    (a)    to the Debtor:

        Homer City Generation, L.P.
        1750 Power Plant Road
        Homer City, PA 15748
        Attn:  Matthew L. Weidner, Esq.
        E-mail:  matthew.weidner@ge.com

          - and -

        Richards, Layton & Finger, P.A. (as counsel to the Debtor)
        920 North King Street
        Wilmington, DE 19801
        Attn:   Mark D. Collins, Esq.
               Russell C. Silberglied, Esq.
        Telephone:   (302) 651-7700
        Facsimile:   (302) 651-7701
        E-mail:   Collins@rlf.com
               Silberglied@rlf.com

    (b)    to GE:

        Weil, Gotshal & Manges LLP (as counsel to GE)
        767 Fifth Avenue
        New York, NY 10153
        Attn:   Robert J. Lemons, Esq.
               Sunny Singh, Esq.
        Telephone:   (212) 310-8000

Facsimile:    (212) 310-8007
E-mail:    Robert.Lemons@weil.com
    Sunny.Singh@weil.com

(c)    to the Consenting Noteholders:

O'Melveny & Myers LLP (as counsel to the Consenting Noteholders)
7 Times Square
New York, NY 10036
Attn:   George A. Davis, Esq.
       Andrew M. Parlen, Esq.
Telephone:    (212) 236-2000
Facsimile:    (212) 236-2061
E-mail:    GDavis@omm.com
    AParlen@omm.com

After the Effective Date, the Debtor has authority to send a notice informing Entities that to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file renewed requests to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

*[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]*

Dated: January 9, 2017
      Wilmington, Delaware

Respectfully submitted,

Homer City Generation, L.P.
By: EFS HC GP, LLC, its General Partner

By: _____
    Name: John Pettengill
    Title:  Vice President

**Exhibit A**

**Restructuring Support Agreement**

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement"), dated January 9, 2017, is entered into by and among:

(a)    Homer City Generation, L.P. (the "Company");

(b)    EFS Homer City, LLC, EFS HC GP, LLC, EFS-N LLC, General Electric Company, GE Capital US Holdings, Inc., and GPSF Securities Inc. (collectively, the "GE Parties" or "GE"); and

(c)    the undersigned beneficial holders, investment advisors to, or managers for the account of, beneficial holders of the 8.137% or 8.734% senior secured notes due 2019 or 2026 respectively (the "Notes," and any holders thereof the "Noteholders" who together with their respective successors and permitted assigns and any subsequent Noteholder that becomes party hereto in accordance with the terms hereof, the "Consenting Noteholders"), issued under the indenture dated December 14, 2012 between the Company, as issuer, and The Bank of New York Mellon, as trustee and collateral agent (the "Trustee," and such indenture, as amended, modified, or otherwise supplemented from time to time, the "Indenture").

The Company, the GE Parties, and each Consenting Noteholder and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof, are collectively referred to herein as the "Parties" and each individually as a "Party."

As of the date hereof, the Consenting Noteholders hold, in the aggregate, more than 66.67% of the aggregate principal amount of Notes outstanding under the Indenture other than Notes held by the GE Parties or any other affiliates of the Company.

The Parties have agreed to undertake a financial restructuring of the Company (the "Restructuring"), which is anticipated to be effected pursuant to a prepackaged bankruptcy case on the terms and conditions set forth in the plan of reorganization, attached hereto as Exhibit A (including any schedules and exhibits attached thereto, and as may be amended from time to time in accordance with this Agreement and the terms of the Plan, the "Plan"), through the commencement by the Company of a voluntary case  (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

The Parties have also agreed to the consensual use of Cash Collateral (as defined in the Bankruptcy Code) pursuant to the terms and conditions of an interim order attached hereto as Exhibit B (the "Interim Cash Collateral Order") and a final order, with any necessary changes to the Interim Cash Collateral Order, to be entered by the Bankruptcy Court in form and substance acceptable to the Company and the Requisite Noteholders (as hereinafter defined) (such final order together with the Interim Cash Collateral Order, the "Cash Collateral Orders")

*provided*, *that*, any provision of a Definitive Document that is a GE Provision (as defined below) must also be in form and substance acceptable to the GE Parties.

The Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in the Plan and hereunder, and therefore agree as follows:

## 1.    Certain Definitions.

As used in this Agreement, the following terms have the following meanings:[1]

(a)    "Consol Agreements" means, collectively, the (i) Coal Supply Agreement, dated as of January 6, 2017, between the Company and Consol Pennsylvania Coal Company, LLC; and (ii) Mutual Release and Dismissal Agreement, dated as of January 6, 2017, by and among Consol Pennsylvania Coal Company LLC, GE Capital Global Holdings, LLC, and the Company.

(b)    "Definitive Documents" means the documents (including any related agreements, instruments, schedules or exhibits) that are necessary or desirable to implement, or otherwise relate to, the Restructuring, including the Plan, the Disclosure Statement, the Transitional Services Agreement, the Cash Collateral Orders, the Confirmation Order, any corporate or organizational documents for the Company, any post-Effective Date financing documents, and all regulatory filings necessary to implement the Restructuring, in each case, in form and substance acceptable to the Company and the Requisite Noteholders; *provided, that* any provision of a Definitive Document that is a GE Provision must also be in form and substance acceptable to the GE Parties.

(c)    "Disclosure Statement" means the disclosure statement of the Company in respect to the Plan attached hereto as Exhibit C, as may be amended from time to time in accordance with this Agreement.

(d)    "Effective Date" means the date upon which the Plan is effective.

(e)    "GE Guaranties" means any guaranty, indemnity, or credit support provided by the GE Parties to or for the benefit of the Company.

(f)    "GE Notes Claims" means any Claims (as defined under section 101(5) of the Bankruptcy Code) of the GE Parties arising under or on account of the Notes.

(g)    "GE Provisions" means the provisions of the Plan or other Definitive Documents related to (i) the releases and injunctions in favor of GE set forth in the Plan; (ii) the replacement or satisfaction of GE's obligations under the GE Guaranties as contemplated under Plan; (iii) the GE Ordinary Course Contracts and the GE Ordinary Course Claims; (iv) the Transitional Services Agreement; (v) any claims of the Company against GE; (vi) the payment of Weil, Gotshal & Manges LLP and Reed Smith LLP's legal fees as restructuring counsel to GE in

---

[1] Capitalized terms used but not defined in this agreement shall have the meanings ascribed to them in the Plan.

accordance with the Plan or the Cash Collateral Order; (vii) the GE Contribution, (viii) the amount or treatment of the GE Remainder; and (ix) any other provision that could materially adversely affect GE; *provided that* provisions of the Plan or other Definitive Documents relating to the treatment of GE, in its capacity as a holder of the Notes, shall not be "GE Provisions" covered by subsections (viii) and (ix) of this definition if the treatment of GE is consistent with the treatment of all other holders of the Notes (but such provisions may still be "GE Provisions" for the purposes of subsections (i), (ii), (iii), (iv), (v), (vi) or (vii) of this definition).

(h)      "Notes Claims" means any Claim (as defined in section 101(5) of the Bankruptcy Code) of a Noteholder arising under or relating to the Notes.

(i)      "Optional Noteholder Extension" means a one-time extension to certain Plan milestones that shall become effective upon agreement of the Company and the Requisite Noteholders equal to 45 days from the applicable deadline.

(j)      "Outside Date" means the date that is ninety (90) calendar days after the Commencement Date.

(k)      "Requisite Noteholders" means, as of the date of determination, Consenting Noteholders holding at least a majority in aggregate principal amount of Notes held by all Consenting Noteholders at such time other than Notes held by the GE Parties or any other affiliates of the Company.

(l)      "Supermajority Noteholders" means, as of the date of determination, Consenting Noteholders holding, controlling or having the ability to control at least 66.67% in aggregate principal amount of Notes outstanding under the Indenture other than Notes held by the GE Parties or any other affiliates of the Company.

(m)      "Solicitation" means the solicitation of votes for the Plan pursuant to, and in compliance with, the Bankruptcy Code and any applicable nonbankruptcy law, rule, or regulation governing the adequacy in connection with such solicitation.

(n)      "Transitional Services Agreement" means the transitional services agreement dated the Effective Date between the Company, as reorganized under the Plan, and GE Capital US Holdings Inc., and attached hereto as Exhibit D, as may be amended from time to time in accordance with this Agreement.

**2.      The Plan**.  The Plan is expressly incorporated herein and made a part of this Agreement.  The terms and conditions of the Restructuring are set forth in the Plan; provided that the Plan is supplemented by the terms and conditions of this Agreement.  In the event of any inconsistencies between the terms of this Agreement and the Plan, the Plan shall govern.

**3.      Bankruptcy Process; Plan of Reorganization.**

(a)      Solicitation.   The Company shall initiate a Solicitation of votes with respect to the Plan on or before January 11, 2017.

(b)     <u>Commencement of the Cases</u>.  The Parties hereby agree that on January 13, 2017 (or such earlier date approved by the Requisite Noteholders) the Company shall file (the date on which such filing occurs, the "<u>Commencement Date</u>") with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case.

(a)     <u>Filing of the Plan and Disclosure Statement</u>.   On the Commencement Date, the Company shall file the Plan and the Disclosure Statement with the Bankruptcy Court.

(c)     <u>Assumption of this Agreement</u>.   On the Commencement Date, the Company shall file a motion seeking entry of an order approving the assumption of this Agreement pursuant to section 365 of the Bankruptcy Code, and following the Commencement Date shall use good faith efforts to obtain entry of such order.

(d)     <u>Cash Collateral</u>.  On the Commencement Date, the Company shall file a motion with the Bankruptcy Court seeking approval of the Cash Collateral Orders.

(e)     <u>Confirmation of the Plan</u>.   The Company shall use its commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable following the Commencement Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement; and each Consenting Noteholder and the GE Parties shall use its commercially reasonable efforts to cooperate fully in connection therewith.

## 4.     **Agreements of the Consenting Noteholders.**

(a)     If this Agreement has not been terminated in accordance with the terms hereof, each Consenting Noteholder (except in the case of any investment advisor or manager of or with power and/or authority to bind any claim or interest against the Company, then solely for the period within which such power and/or authority was held; <u>provided</u>, <u>however</u>, that such claim or interest shall continue to be subject to this Agreement) agrees that it shall:

(i)     subject to the receipt by such Consenting Noteholder of the Disclosure Statement and other solicitation materials in respect of the Plan, vote all of its claims (or all of its claims that it controls) against the Company to accept the Plan and issue a release of its claims against a Released Party (as such term is defined in the Plan), by promptly after commencement of the Solicitation delivering its duly executed and completed ballots accepting the Plan and granting the release;

(ii)     not change or withdraw (or cause to be changed or withdrawn) any such vote or release in clause (i) above except as otherwise expressly permitted pursuant to this Agreement (including upon the occurrence of a Creditor Termination Event or Other Termination Event);

(iii)     not (x) object to, delay, impede, or take any other action to interfere with acceptance or implementation of the Plan or (y) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any plan of reorganization for the Company other than the Plan;

4

(iv)    not direct any administrative agent, collateral agent, or indenture trustee (as applicable), including the Trustee, to take any action inconsistent with such Consenting Noteholder's obligations under this Agreement, and, if any applicable administrative agent, collateral agent, or indenture trustee takes any action inconsistent with such Consenting Noteholder's obligations under this Agreement, such Consenting Noteholder shall use its commercially reasonable efforts to require such administrative agent, collateral agent, or indenture trustee to cease and refrain from taking any such action; and

(v)    support and take all commercially reasonable actions necessary or reasonably requested by the Company or the GE Parties to facilitate entry of the Cash Collateral Orders, the Solicitation, approval of the Disclosure Statement, confirmation and consummation of the Plan, and consummation of the Transitional Services Agreement (it being understood that the Consenting Noteholders shall not be required to incur any costs or expense in connection therewith, other than such costs and expenses to be reimbursed by the Company).

(b)    Transfers.  (i) Each Consenting Noteholder agrees that, for the duration of the period commencing on the date hereof and ending on the date on which this Agreement is terminated in accordance with Section 6, such Consenting Noteholder shall not sell, transfer, loan, issue, pledge, hypothecate, assign, or otherwise dispose of (each, a "Transfer"), directly or indirectly, in whole or in part, any of its claims or any option thereon or any right or interest therein or any other claims against or interests in the Company (collectively, the "Claims") (including grant any proxies, deposit any Claims into a voting trust or entry into a voting agreement with respect to any such Claims), unless the transferee thereof either (i) is a Consenting Noteholder or (ii) before such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Noteholder and to be bound by all of the terms of this Agreement applicable to the Consenting Noteholders (including with respect to any and all Claims such transferee already may hold against or in the Company before such Transfer) by executing a joinder agreement substantially in the form attached hereto as Exhibit E (a "Joinder Agreement"), and delivering an executed copy thereof within two (2) business days following such execution, to (i) Richards, Layton & Finger, P.A. ("RLF"), counsel to the Company, and (ii) O'Melveny & Myers LLP ("OMM"), counsel to the Consenting Noteholders (the "Consenting Noteholders' Counsel"), in which event (A) the transferee shall be deemed to be a Consenting Noteholder hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations.  Each Consenting Noteholder agrees that any Transfer of any Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

(ii)    Notwithstanding Section 4(b)(i): (A) a Consenting Noteholder may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker become a Party; provided that (x) such Qualified Marketmaker must Transfer its right, title, or interest in such Claims in no event later than the earlier of (I) one (1) business day prior to any voting deadline established by the Bankruptcy Court with respect to the Plan (solely if the Qualified Marketmaker acquires such

Claims prior to such voting deadline) and (II) twenty (20) business days after its receipt thereof, (y) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Consenting Noteholder at the time of such transfer, and (z) such Consenting Noteholder shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this <u>Section 4</u>; (B) if a Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title, or interest in Claims that the Qualified Marketmaker acquires from a holder of the Claims who is not a Consenting Noteholder without the requirement that the transferee be or become a Consenting Noteholder; (C) the foregoing provisions shall not preclude a Consenting Noteholder from settling or delivering securities that would otherwise be subject to the terms of this Agreement to settle any confirmed transaction pending as of the date of such Consenting Noteholder's entry into this Agreement (subject to compliance with applicable securities laws and it being understood that such securities so acquired and held (i.e., not as a part of a short transaction) shall be subject to the terms of this Agreement; and (D) a Consenting Noteholder may Transfer any Claims pursuant to or in connection with any repurchase transaction, reverse repurchase transaction, or any swap or other derivative transaction without satisfying the requirements set forth in this Section 4 only if, in connection with such Transfer, the Consenting Noteholder (or a wholly-owned subsidiary controlled by it) retains the contractual right to exercise any voting right or other direction that may be made on account of such Claims, and the transferee thereof does not otherwise take any action inconsistent with such Consenting Noteholder's obligations under this Agreement.

For these purposes, a "<u>Qualified Marketmaker</u>" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Company (including debt securities or other debt) or enter with customers into long and short positions in claims against the Company (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Company, and (ii) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

For purposes of subclause (D), a person shall be deemed to be "controlled" by another person if such person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other person, whether through the ownership of voting securities, by contract, or otherwise.

      (c)    <u>Additional Claims</u>.  Nothing in this Agreement shall be deemed to limit or restrict the ability or right of a Consenting Noteholder to purchase or take assignment of any additional Claims; <u>provided</u> that each Consenting Noteholder agrees that if any Consenting Noteholder acquires additional Claims, then without any further action such Claims shall be subject to this Agreement (including the obligations of the Consenting Noteholders under this <u>Section 4</u>).

      (d)    <u>Forbearance</u>.  During the period commencing on the execution of this Agreement by the Parties and ending on the termination of this Agreement in accordance with its terms, each Consenting Noteholder hereby agrees to, other than as expressly permitted by the Plan, forbear from the exercise (or direction to exercise) of any rights or remedies it may have under the Indenture, any other Transaction Document (as defined in the Indenture), or applicable

United States or foreign law, in each case, with respect to any defaults or events of default which may arise under the Indenture during such period.  For the avoidance of doubt, the forbearance set forth in this <u>Section 4(d)</u> shall not constitute a waiver with respect to any defaults or events of default under the Indenture and shall not bar any Consenting Noteholder from filing a proof of claim or taking action to establish the amount of such claim.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Consenting Noteholder or the Trustee or the ability of each Consenting Noteholder or the Trustee to protect and preserve its rights, remedies, or interests, including its claims against the Company or to enforce any right, remedy, condition, consent, or approval requirement under this Agreement or the Definitive Documents.  Upon the termination of this Agreement, the agreement of the Consenting Noteholders to forbear from exercising rights and remedies in accordance with this paragraph 4(d) shall immediately terminate without requirement of any demand, presentment or protest of any kind, all of which the Company hereby waives.

(e)     The covenants and agreements of the Consenting Noteholders in this <u>Section 4</u> are several and not joint.

**5.     <u>Agreements of the Company and the GE Parties</u>**.

(a)     If this Agreement has not been terminated in accordance with the terms hereof, the Company agrees to the following:

(i)     <u>Solicitation and Confirmation</u>.  The Company agrees to (i) act in good faith and use commercially reasonable efforts to support and successfully complete the Solicitation in accordance with the terms of this Agreement and (ii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with, and within the time frames contemplated by, this Agreement (including within the deadlines set forth in Section 5(b)), in each case, to the extent not inconsistent with, based upon the advice of counsel, the Company's fiduciary duties as debtor in possession and otherwise under applicable law; provided that the Company shall not be obligated to agree to any modification of any document that is inconsistent with the Plan.

(ii)     <u>Access to Information</u>.  The Company will afford the Consenting Noteholders and their respective attorneys, consultants, accountants, and other authorized representatives full access, upon reasonable notice during normal business hours, and at other reasonable times, to all properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Company.  In addition, the Company shall promptly notify the Consenting Noteholders of any material developments with respect to its business, the litigation with Consol Pennsylvania Coal Company LLC (subject to any confidentiality limitations), the Chapter 11 Case, or otherwise.

(iii)     <u>Certain Additional Chapter 11 Related Matters</u>.  The Company shall (i) provide draft copies of any proposed amended version of the Plan or Disclosure Statement that the Company intends to file with the Bankruptcy Court to the Consenting Noteholders' and the GE Parties' counsel at least three (3) calendar days before the date

7

of filing of any such document; and (ii) except in circumstances that it is not reasonably practicable, provide draft copies of all other material motions or applications, other documents relating to the Plan, Disclosure Statement, and all first day pleadings that the Company intends to file with the Bankruptcy Court to the Consenting Noteholders' and the GE Parties' counsel at least two (2) calendar days before the date of filing of any such pleading or other document. In each case, counsel to the Company shall consult in good faith with the Consenting Noteholders' and the GE Parties' counsel regarding the form and substance of any such proposed filing.

(b)    If this Agreement has not been terminated in accordance with the terms hereof, the GE Parties agree that they shall:

(i)    subject to the receipt by the GE Parties of the Disclosure Statement and other solicitation materials in respect of the Plan, vote all of their claims and interests (if any) (or all of its claims that it controls) against or in the Company to accept the Plan and issue a release of their claims against a Released Party (as such term is defined in the Plan), by promptly after commencement of the Solicitation delivering its duly executed and completed ballots accepting the Plan and granting the release;

(ii)    not change or withdraw (or cause to be changed or withdrawn) any such vote or release in clause (i) above except as otherwise expressly permitted pursuant to this Agreement (including upon the occurrence of a GE Termination Event or Other Termination Event);

(iii)    not (x) object to, delay, impede, or take any other action to interfere with acceptance or implementation of the Plan or (y) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any plan of reorganization for the Company other than the Plan; and

(iv)    support and take all commercially reasonable actions necessary or reasonably requested by the Company or the Consenting Noteholders (including providing all information reasonably requested by the Consenting Noteholders) to facilitate entry of the Cash Collateral Orders, the Solicitation, approval of the Disclosure Statement, confirmation and consummation of the Plan, and consummation of the Transitional Services Agreement (it being understood that the GE Parties shall not be required to incur any material costs or expense in connection therewith in excess of the costs and expenses to be reimbursed by the Company).

## 6.    Termination of Agreement.

This Agreement shall automatically terminate three (3) business days after delivery of written notice to the other Parties (in accordance with Section 22) from (i) the Requisite Noteholders at any time after the occurrence and during the continuance of any Creditor Termination Event, (ii) the Company at any time after the occurrence and during the continuance of any Company Termination Event, or (iii) the GE Parties at any time after the occurrence and during the continuance of any GE Termination Event. In addition, this Agreement shall terminate automatically on the Effective Date without any further required action or notice.

8

(a)    A "Creditor Termination Event" shall mean any of the following:

(i)    The breach in any material respect by the Company or the GE Parties of any of the undertakings, representations, warranties, or covenants of the Company or the GE Parties set forth herein that remains uncured for a period of five (5) calendar days after the receipt of written notice of such breach from the Requisite Noteholders pursuant to this Section 6 and in accordance with Section 22 (as applicable).

(ii)    The failure by the Company to commence Solicitation by January 11, 2017.

(iii)    The failure of the Commencement Date to occur by January 13, 2017.

(iv)    The failure of the Company to file the Plan, the Disclosure Statement and a motion seeking an order approving assumption of this Agreement pursuant to section 365 of the Bankruptcy Code on the Commencement Date.

(v)    The Company amends the Plan, the Disclosure Statement, the Definitive Documents, or any amendments, modifications, exhibits or supplements thereto in a manner that adversely affects the Consenting Noteholders without the consent of the Requisite Noteholders or except as otherwise permitted by this Agreement or the Plan.

(vi)    The Company withdraws the Plan or publicly announces its intention not to support the Plan, or propound, or otherwise support any chapter 11 plan other than the Plan.

(vii)    The order confirming the Plan and approving the Disclosure Statement (the "Confirmation Order") is not in form and substance satisfactory to the Consenting Noteholders.

(viii)    The Confirmation Order is stayed, reversed, vacated, or otherwise modified in an  adverse manner to the Consenting Noteholders.

(ix)    The sale of any assets by the Company outside of the ordinary course of business, without the prior written consent of the Requisite Noteholders.

(x)    The Bankruptcy Court grants relief that is inconsistent with this Agreement or the Plan in any material respect, except if such relief is granted pursuant to a motion by any Consenting Noteholder.

(xi)    The Company fails to pay the fees and expenses incurred by the advisors to the Consenting Noteholders as required by the Cash Collateral Orders within five calendar days of such payment becoming due;

(xii)    The occurrence of an Other Termination Event (as defined in Section 6(c)).

(xiii)    Any of the GE Parties as beneficial owner of the Notes (the "GE Holder") undertakes any action or inaction that would be considered a breach of the agreements of a Consenting Noteholder in Sections 4(a) and 4(d) of this Agreement (assuming for purposes of this clause, such GE Holder is deemed to be a Consenting Noteholder).

(b)    A "Company Termination Event" shall mean any of the following:

(i)    The breach in any material respect by one or more of the Consenting Noteholders  of any of the undertakings, representations, warranties, or covenants of the Consenting Noteholders set forth herein that would prevent and result in a material adverse effect on the consummation of the Plan in accordance with this Agreement and which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 22 (as applicable), but only if the non-breaching Consenting Noteholders constitute less than the Supermajority Noteholders.

(ii)    The general partner, board of directors, or other governing body of the Company reasonably determines in good faith based upon the advice of outside counsel that the Company's continued performance under this Agreement, the Plan, or the Definitive Documents would be inconsistent with the exercise of its fiduciary duties as a debtor in possession or otherwise under applicable law; provided that the Company provides notice of such determination to the Consenting Noteholders and the GE Parties within five (5) business days after the date thereof.

(iii)    The Consenting Noteholders at any time cease to constitute Supermajority Noteholders.

(iv)    The occurrence of an Other Termination Event (as defined in Section 6(d)).

(c)    A "GE Termination Event" shall mean any of the following:

(i)    The breach in any material respect by one or more of the Consenting Noteholders or the Company, respectively, of any of the undertakings, representations, warranties, or covenants of the Consenting Noteholders or the Company set forth herein that would prevent and result in a material adverse effect on the consummation of the Plan in accordance with this Agreement and which remains uncured for a period of five (5) business days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 22 (as applicable), but, as to the Consenting Noteholders, only if the non-breaching Consenting Noteholders constitute less than the Supermajority Noteholders.

(ii)    Any provisions of the Plan (including by the Confirmation Order) is stayed, reversed, vacated, or otherwise modified in any manner that adversely affects any of the GE Provisions and such modification is not acceptable to the applicable GE Party.

(iii)    The Confirmation Order is stayed, reversed, vacated, or otherwise modified in any manner that adversely affects any of the GE Provisions and such modification is not acceptable to the applicable GE Party.

(iv)    The Cash Collateral Order is stayed, reversed, vacated, or otherwise modified in any manner that adversely affects any of the GE Provisions and such modification is not acceptable to the applicable GE Party.

(v)    The Consenting Noteholders at any time cease to constitute Supermajority Noteholders.

(vi)    The occurrence of an Other Termination Event (as defined in Section 6(d)) other than the Other Termination Events set forth in sections 6(d)(i), 6(d)(ii), 6(d)(iii) and 6(d)(iv).

(d)    Other Termination Events. An "Other Termination Event" shall mean at 11:59 p.m. (Eastern Time) on the date that:

(i)    is seven (7) calendar days after the Commencement Date if the Bankruptcy Court shall not have entered the Interim Cash Collateral Order, subject only to modifications that either would not have an adverse effect on the Consenting Noteholders and the Company or are otherwise acceptable to the Company and the Requisite Noteholders (provided that the Consenting Noteholders shall not have the right to terminate under this clause (i) because modifications would have an adverse effect on the Company, and the Company shall not have the right to terminate under this clause (i) because modifications would have an adverse effect on the Consenting Noteholders);

(ii)    is thirty (30) calendar days after the Commencement Date if the Bankruptcy Court shall not have entered a final order, in form and substance acceptable to the Company and the Requisite Noteholders, authorizing the use of cash collateral and granting adequate protection to Noteholders;

(iii)    an order is entered by the Bankruptcy Court or a court of competent jurisdiction, staying, reversing, vacating, or modifying the Cash Collateral Orders in a manner materially adverse to the Consenting Noteholders or the Company (provided that the Consenting Noteholders shall not have the right to terminate under this clause (iii) because modifications would have a material adverse effect on the Company, and the Company shall not have the right to terminate under this clause (iii) because modifications would have a material adverse effect on the Consenting Noteholders);

(iv)    is sixty (60) calendar days after the Commencement Date, if the Bankruptcy Court shall not have entered the Confirmation Order, subject to the Optional Noteholder Extension;

(v)    an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Plan; provided that the Parties shall not have the right to terminate this Agreement pursuant to this clause (v) if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of

11

the Plan subject only to modifications to the Plan or Disclosure Statement that would not have a material adverse effect on (i) the Consenting Noteholders or (ii) the GE Provisions;

(vi)    an order is entered by the Bankruptcy Court or a court of competent jurisdiction either converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Case;

(vii)    twenty (20) business days after the date on which any governmental authority, including any regulatory authority or court of competent jurisdiction, issues any ruling, judgment, or order enjoining the consummation of or rendering illegal the Restructuring, which ruling, judgment, or order has not been not stayed, reversed, or vacated; or

(viii)    is eighty (80) days from the Commencement Date, subject to the Optional Noteholder Extension, if the Company has not obtained a commitment for postpetition exit financing on terms acceptable to the Company and the Consenting Noteholders, provided that the provisions of the exit financing related to a GE Provision shall also be acceptable to the GE Parties;

(ix)    The Bankruptcy Court enters an order appointing, in respect of the Company, a trustee, a responsible officer or an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of section 1106(a)) under section 1106(b) of the Bankruptcy Code;

(x)    is the Outside Date, if the Effective Date has not occurred, subject to the Optional Noteholder Extension; and

(xi)    the Consol Agreements fail to remain in full force and effect.

Notwithstanding the foregoing, any of the dates set forth in this Section 6 may be extended by agreement among the applicable Parties.  This Agreement may only be terminated upon an Other Termination Event by the Company, the GE Parties or the Requisite Noteholders, as applicable, and no such Party may terminate this Agreement upon the occurrence of an Other Termination Event if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, and such failure to perform or comply caused, or resulted in, the occurrence of the applicable Other Termination Event.

(e)    Mutual Termination.  This Agreement may be terminated by mutual agreement of the Parties upon the receipt of written notice delivered in accordance with Section 22.

(f)    Effect of Termination.  Subject to the provisions contained in Section 15, upon the termination of this Agreement in accordance with this Section 6, this Agreement shall become void and of no further force or effect and each Party shall, except as otherwise provided in this Agreement, be immediately released from its respective liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement, shall have no further rights, benefits, or privileges hereunder, and shall have all the rights and remedies that it

would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder before the date of such termination.  If the transactions contemplated hereby are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  For the avoidance of doubt, if this Agreement is terminated other than as a result of the occurrence of the Effective Date of the Plan, the GE Parties shall not be obligated to perform the Transitional Services Agreement, which agreement shall also be deemed terminated upon such termination of this Agreement, make the GE Contribution or accept less than 100% of its pro rata share of distributions or any other value on account of the Notes Claims (as defined in the Plan).

(g)    Automatic Stay.    The Company acknowledges that after the commencement of the Chapter 11 Case, the giving of notice of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code; provided that nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this Agreement.

**7.    Definitive Documents; Good Faith Cooperation; Further Assurances.** Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation and consummation of the Restructuring, as well as the negotiation, drafting, execution, and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, the Parties shall take such action as may be reasonably necessary or reasonably requested by any Party to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**8.    Professional Fees and Expenses.**  The Company shall pay when due all reasonable and documented fees and expenses incurred by (a) the advisors to the Consenting Noteholders, including the fees and expenses of (i) OMM, (ii) Houlihan Lokey Capital, Inc., (iii) Charles River Associates, (iv) Leidos Engineering, LLC; (v) Young Conaway Stargatt & Taylor, LLP; and (vi) Post & Schell, P.C.; (b) Emmet, Marvin & Martin, LLP, as counsel to BNY; and (c) Weil, Gotshal & Manges LLP ("Weil"), as counsel  to the GE Parties, and Reed Smith LLP ("Reed Smith"), as Delaware counsel to the GE Parties; provided that the fees and expenses of Weil and Reed Smith, collectively, after September 24, 2016 shall not exceed $1,250,000; and provided further that Weil and Reed Smith shall be compensated by the Company only for services rendered in connection with Debtor's restructuring and/or the Chapter 11 Case, including Causes of Action asserted by any party, and Weil and Reed Smith shall not be compensated for assessing, responding to, or otherwise addressing any other claims threatened or asserted against GE.

**9.    Representations and Warranties.**

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Noteholder becomes a party hereto):

13

(i)      Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder.   The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership, or other similar action on its part.

(ii)     The execution, delivery, or performance by such Party of this Agreement does not and will not (A) violate any provision of law, rule, or regulation applicable to it, (B) violate its charter or bylaws (or other similar governing documents), or (C) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party, except, in the case of the Company, for the filing of the Chapter 11 Case and, with respect to (A) and (C), except for a violation, conflict, breach or default which would not individually or in the aggregate have a material and adverse effect on the Plan and Restructuring.

(iii)    The execution, delivery, or performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state, or governmental authority or regulatory body.

(iv)     This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(b)      Each Consenting Noteholder severally (and not jointly) represents and warrants to the Company and the GE Parties that as of the date hereof (or as of the date such Consenting Noteholder becomes a party hereto), such Consenting Noteholder (i) is the owner of the aggregate principal amount of Notes set forth below its name on the signature page hereto or to the Joinder Agreement, as applicable and/or (ii) is the nominee, investment manager, or advisor for beneficial holders of or discretionary accounts holding the signatory's Notes, and it has (A) sole investment or voting discretion with respect to such Notes, (B) full power and authority to vote on and consent to matters concerning such Notes or to exchange, assign and Transfer such Notes, and (C) full power and authority to bind or act on the behalf of, such beneficial owner(s).

14

(c)    The GE Parties represent that, in their good faith belief, the assets the GE Parties have transferred to the Company, together with the provision of the GE Services (as defined in the Transitional Services Agreement), will enable the Company, through the term of the Transitional Services Agreement, to conduct its business substantially in the manner in which it is now conducted.

10.    **Disclosure; Publicity**.    The Company shall submit drafts to the Consenting Noteholders' Counsel of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least three (3) calendar days before making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any agreement between the Company and any Consenting Noteholder, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Noteholder), other than advisors to the Company, the principal amount or percentage of Notes held by any Consenting Noteholder, in each case, without such Consenting Noteholder's prior written consent; provided that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Noteholder a reasonable opportunity to review and comment before such disclosure and shall take commercially reasonable measures to limit such disclosure, (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Notes held by all the Consenting Noteholders collectively and (c) any Party may disclose information requested by a regulatory or tax authority with jurisdiction over its operations to such authority without limitation or notice to any other Party.  Notwithstanding the provisions in this Section 10, any Party may disclose a Consenting Noteholder's individual holdings if consented to in writing by such Consenting Noteholder.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, that includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Noteholder and, in the case of managed accounts, the specific name of the account managed (provided that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

11.    **Amendments and Waivers.**    Except as otherwise expressly set forth herein, (a) this Agreement may not be waived, modified, amended, or supplemented except in a writing signed by the Company, the Requisite Noteholders and the GE Parties and (b) the Disclosure Statement (including any exhibits or schedules thereto) may not be waived, modified, amended, or supplemented except in a writing signed by the Company, the Requisite Noteholders and, to the extent such modification, amendment, or supplement adversely affects the GE Provisions, the GE Parties; provided that (i) any modification, amendment or change to the definition of Consenting Noteholder or Requisite Noteholders shall require the written consent of each Consenting Noteholder affected thereby, and (ii) any waiver, change, modification, or amendment to this Agreement or the Plan that materially adversely affects the economic recoveries or treatment of any Consenting Noteholder compared to the recoveries or treatment set forth in the Plan attached may not be made without the written consent of each such materially adversely affected Consenting Noteholder.  No terms of the Plan (including any exhibits or schedules thereto) may be waived, modified, amended or supplemented except as expressly permitted by the terms of the Plan.  If a Consenting Noteholder ("Non-Consenting Noteholder") does not consent to a waiver, change, modification, or amendment to this Agreement or the Plan requiring the consent of each Consenting Noteholder, but such waiver,

15

change, modification, or amendment receives the consent of the Supermajority Noteholders, this Agreement shall be deemed to have been terminated only as to such Non-Consenting Noteholder, but this Agreement shall continue in full force and effect in respect to all other Consenting Noteholders.

          **12.**    **Effectiveness**.  This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto; provided, that signature pages executed by Consenting Noteholders shall be delivered to (a) the Company, the other Consenting Noteholders, the GE Parties and any advisors for the GE Parties in a redacted form that removes such Consenting Noteholders' holdings of the Notes and, in the case of managed accounts, the specific name of the account managed, and (b) RLF in an unredacted form (to be held by RLF on a professionals' eyes only basis).  For the avoidance of doubt, no affiliate of a Consenting Noteholder shall be subject to this Agreement unless they separately become a party thereto.

          **13.**    **Governing Law; Jurisdiction; Waiver of Jury Trial**.

          (a)    This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.  The Parties irrevocably agree that any legal action, suit, or proceeding (each, a "Proceeding") arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York (the "New York Courts"), and the Parties hereby irrevocably and generally submit to the exclusive jurisdiction of the New York Courts for themselves and with respect to their property, and unconditionally with respect to any Proceeding arising out of or relating to this Agreement and the Restructuring.  The Parties agree not to commence any Proceeding relating hereto or thereto except in the New York Courts, other than Proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any New York Court.  The Parties further agree that notice as provided in Section 22 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  The Parties hereby irrevocably and unconditionally waive and agree not to assert that a Proceeding in any New York Court is brought in an inconvenient forum or the venue of such Proceeding is improper.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Case, all Proceedings contemplated by this Section 13(a) shall be brought in the Bankruptcy Court.

          (b)    The Parties hereby waive, to the fullest extent permitted by applicable law, any right they may have to a trial by jury in any Proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory).

          **14.**    **Specific Performance/Remedies**.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy.  The Parties hereby waive any requirement for the security or posting of any bond in connection with

16

such remedies. For the avoidance of doubt, the remedies provided for in this Section 14 apply only to this Agreement (without reference to the exhibits).

15.    **Survival**.  Notwithstanding the termination of this Agreement pursuant to Section 6, Sections 9-26 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.    **Headings**.  The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.    **Successors and Assigns; Severability**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators, and representatives; provided that nothing contained in this Section 17 shall be deemed to permit Transfers of the Notes or any Claims other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effectuate the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18.    **Several, Not Joint, Obligations**.  The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

19.    **Relationship Among Parties**.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.  No Party shall have any responsibility for the transfer, sale, purchase, or other disposition of securities by any other entity, including with respect to the Notes, by virtue of this Agreement.  No prior history, pattern, or practice of sharing confidences among the Parties shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

20.    **Prior Negotiations; Entire Agreement**.  This Agreement, including the exhibits and schedules hereto (including the Plan), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations regarding the subject matters hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between the Company and each Consenting Noteholder before the execution of this Agreement shall continue in full force and effect.

21.   **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

22.   **Notices**.  All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers or such other addresses of which notice is given pursuant hereto:

(a)   if to the Company, to:

Homer City Generation, L.P., EFS Homer City, LLC, and EFS HC GP, LLC
c/o GE Energy Financial Services
800 Long Ridge Road
Stamford, CT 06924
Attention:    Matthew Weidner, Esq.
Facsimile:    (203) 327-6632
E-mail:        Matthew.Weidner@ge.com

with a copy (which shall not constitute notice) to:

Richards, Layton & Finger, P.A. (as counsel to the Company)
920 North King Street
Wilmington, DE 19801
Attention:    Mark D. Collins, Esq. and Paul N. Heath, Esq.
Facsimile:    (302) 651-7701
E-mail:        Collins@RLF.com and Heath@RLF.com

-and-

(b)   If to the GE Parties:

GE Energy Financial Services
800 Long Ridge Road
Stamford, CT 06924
Attention:    Matthew Weidner, Esq.
Facsimile:    (203) 327-6632
E-mail:        Matthew.Weidner@ge.com

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP (as counsel to GE)
767 Fifth Avenue
New York, NY 10153
Attention:    Robert Lemons, Esq. and Sunny Singh, Esq.
Facsimile:    (212) 310-8007
E-mail:        Robert.Lemons@weil.com and Sunny.Singh@weil.com

(c)    if to a Consenting Noteholder or a transferee thereof, to the addresses, facsimile numbers, or e-mail addresses set forth below such Consenting Noteholder's signature hereto (or as directed by any transferee thereof), as the case may be, with a copy (which shall not constitute notice) to:

O'Melveny & Myers LLP
7 Times Square
New York, NY 10036
Attention:    George A. Davis, Esq. <u>and</u> Andrew M. Parlen, Esq.
Facsimile:    (212) 326-2062
E-mail:        gdavis@omm.com and aparlen@omm.com

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine, or electronic mail (as applicable) confirmation of transmission.

**23.    <u>Settlement Discussions</u>**.  This Agreement and the Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence, and any other applicable law, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any Proceeding other than a Proceeding to enforce its terms.

**24.    <u>No Solicitation; Adequate Information</u>**.  This Agreement is not and shall not be deemed to be a solicitation for consents to the Plan.  The votes of the holders of claims against the Company will not be solicited until such holders who are entitled to vote on the Plan have received the Plan, the Approved Disclosure Statement, related ballots, and other required solicitation materials.  In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

**25.    <u>Business Day Convention</u>**.  Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday. When a period of days under this agreement ends on a day that is not a business day, then such period shall be extended to the specified hour of the next business day.

**26.    <u>Interpretation; Rules of Construction; Representation by Counsel</u>**. When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or."  The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding, or rule of construction providing that ambiguities

19

in an agreement or other document shall be construed against the party drafting such agreement or document.

[*Signature pages follow.*]

20

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**Homer City Generation, L.P.**
By: EFS HC GP LLC, its General Partner


By:_____
    Name:
    Title:


**EFS HC GP, LLC**


By:_____
    Name:
    Title:


**EFS Homer City, LLC**

By:  EFS-N LLC

By:_____
    Name:
    Title:


**EFS-N LLC**


By:_____
    Name:
    Title:

**General Electric Company**

By:_____
    Name:
    Title:

**GE Capital US Holdings, Inc.**

By:_____
    Name:
    Title:

**GPSF Securities Inc.**

By:_____
    Name:
    Title:

22

HOLDERS:

**[HOLDER]**


By:_____
    Name:
    Title:

Aggregate Principal Amount of Notes Beneficially Owned or Over Which the Above Signed Entity has the Power to Direct on Behalf of the Beneficial Owners:

**8.137% Senior Secured Notes**: $_____

**8.734% Senior Secured Notes**: $_____


<u>Notice Address</u>:


_____
_____
_____
Fax:_____
Attention:_____
E-mail:_____

## **Exhibit A**

Plan

(See above)

**Exhibit B**

**Interim Cash Collateral Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------- X
                                                   :    Chapter 11
In re:                                             :
                                                   :    Case No. 17- _____ (___)
HOMER CITY GENERATION L.P.,                        :
                                                   :
                   Debtor¹.                        :
                                                   :    Re: Docket No. ___
                                                   :
-------------------------------------------------- X
```

**INTERIM ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 503, 507(b),
AND 552, FED. R. BANKR. P. 2002, 4001(b), 6004(h), AND 9014 AND DEL.
BANKR. L.R. 4001-2 (I) AUTHORIZING THE DEBTOR TO USE CASH
COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES, (III) SCHEDULING A FINAL HEARING PURSUANT
TO FED. R. BANKR. P. 4001(b) AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**"),[2] of Homer City Generation L.P. ("**Homer City**") as a debtor and debtor-in-possession (the "**Debtor**") in the above captioned case (the "**Case**") for interim and final orders under sections 105, 361, 362, 363, 503, 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, the "**Bankruptcy Code**"), Rules 2002, 4001(b), 6004(h), and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (as amended, the "**Local Bankruptcy Rules**") seeking:

(a)    authorization for the Debtor to (i) use the Cash Collateral (as defined in paragraph 5(b) below) and all other Collateral (as defined in paragraph 4(e) below) pursuant to section 363 of the Bankruptcy Code, and

---

[1] The last four digits of the Debtor's federal tax identification number are 3693.  The location of the Debtor's principal place of business is 1750 Power Plant Road, Homer City, Pennsylvania 15748.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

(ii) provide adequate protection to the Prepetition Secured Parties (as defined in paragraph 4(e) below) on the terms set forth in this order (the "**Interim Order**");

(b) granting the Collateral Agent relief from the automatic stay to exercise remedies under the Existing Agreements (each as defined in paragraph 4(d) below) upon the occurrence and during the continuance of a Termination Event (as defined in paragraph 8 below), subject to the terms set forth in this Interim Order;

(c) subject to entry of the Final Order, the waiver by the Debtor of any right to seek to surcharge against the Collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or any other applicable principle of law or equity or any "equities of the case" claims under section 552(b) of the Bankruptcy Code;

(d) to schedule, pursuant to Bankruptcy Rule 4001(b), an interim hearing (the "**Interim Hearing**") on the Motion to be held before the Court to consider entry of this Interim Order; and

(e) to schedule, pursuant to Bankruptcy Rule 4001(b), a final hearing (the "**Final Hearing**") for the Court to consider entry of a final order (the "**Final Order**") approving the relief granted herein on a final basis;

and due and sufficient notice of the Motion having been provided under the particular circumstances, and it appearing that no other or further notice of the Interim Hearing need be provided; and the Court having reviewed the Motion; and the Interim Hearing having been held by this Court; and the Court having determined that the interim relief requested in the Motion is

(i) in the best interests of the Debtor, its creditors, and its estate and all other parties-in-interest in this Case; (ii) the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm; and (iii) the legal and factual bases set forth in the Motion establish just case for the interim relief granted; and upon the record made by the Debtor in the Motion, the First Day Declaration, and at the Interim Hearing and after due deliberation and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.     *Jurisdiction*.  This Court has core jurisdiction over the Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     *Notice*.  Notice of the Motion was served by the Debtor on the following parties (or their counsel):  (i) the Collateral Agent; (ii) counsel to the Ad Hoc Group; (iii) the GE Parties (as defined below); (iv) the Office of the United States Trustee for the District of Delaware; (v) the holders of the thirty (30) largest unsecured claims against the Debtor's estate; and (vi) all other parties entitled to notice, pursuant to Bankruptcy Rules 2002 and 4001(b) and Local Rule 4001-2(c).   The Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rules 2002 and 4001(b) and Local Rule 4001-2(c).

3.     *Approval of Motion*.  The interim relief requested in the Motion is granted as described herein.   Any objection to the entry of this Interim Order that has not been withdrawn, waived, resolved, or settled, is hereby denied and overruled on the merits.

4.     *Debtor's Stipulations*.  Subject to paragraph 18 below, the Debtor acknowledges, admits, stipulates, and agrees that:

(a)     Prior to the Commencement Date, Homer City entered into that certain indenture, dated as of December 14, 2012 (as amended, modified, restated and/or supplemented from time to time, the "**Indenture**"), by and among Homer City and Bank of New York Mellon, as trustee and collateral agent (the "**Collateral Agent**"), pursuant to which Homer City issued the 8.137% Senior Secured Notes due 2019 (the "**2019 Notes**") and 8.734% Senior Secured Notes due 2026 (the "**2026 Notes**", together with the 2019 Notes, collectively, the "**Notes**").  The Indenture was executed in accordance with *the Plan of Reorganization of Homer City Funding LLC Pursuant to Chapter 11 of the Bankruptcy Code*, which was confirmed by the United States Bankruptcy Court for the District of Delaware in *In re Homer City Funding LLC*, Case No. 12-13024, on December 6, 2012 and became effective on December 14, 2012.

(b)     As of the Commencement Date, Homer City was indebted and liable in respect of the Notes to the holders of the Notes (collectively, the "**Senior Noteholders**") without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $606,912,777.53, plus accrued and unpaid interest thereon and, to the extent payable, prepayment premium and make-whole amounts, and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, to the extent that they are chargeable or reimbursable under the Indenture), charges, indemnities and other obligations incurred in connection therewith as provided in the Indenture (collectively, the "**Prepetition Indebtedness**").

(c)     The Prepetition Indebtedness, including the amounts specified in paragraph 4(b), constitutes the legal, valid, and binding obligations of the Debtor, enforceable in accordance with its terms, without objection, offset, defense, or counterclaim of any kind or nature to the Prepetition Indebtedness.  The Debtor does not have (and shall not assert) any

claim, counterclaim, setoff, or defense of any kind, nature, or description that would in any way affect the validity, enforceability, and non-avoidability of any of the Prepetition Indebtedness. The Prepetition Indebtedness and any amounts previously paid to any Prepetition Secured Party pursuant to the terms of the Indenture on account thereof or with respect thereto are not subject to avoidance, reduction, disallowance, impairment, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(d)      To secure the Prepetition Indebtedness under the Indenture, the Debtor (or its affiliates) entered into the following prepetition collateral documents (the "**Collateral Documents**", and together with the Indenture, the "**Existing Agreements**"):

i.      that certain Security Agreement, dated as December 14, 2012, by and among Homer City and the Bank of New York Mellon as Collateral Agent (the "**Security Agreement**"); and

ii.      that certain Security Agreement, dated as December 14, 2012, by and among EFS Homer City, LLC and the Bank of New York Mellon as Collateral Agent;

iii.      that certain Open-End Mortgage, Security Agreement, Assignment of Rents and Fixture Filing, dated December 12, 2012, by and among Homer City and Bank of New York Mellon as Collateral Agent and Mortgagee; and

iv.      any other agreements defined as "Security Documents" in the Indenture including, but not limited to, control agreements (as contemplated by section 4.9 of the Security Agreement).

(e)      Pursuant to the Collateral Documents, the Debtor as party thereto granted security interests in, and continuing liens on, certain assets of the Debtor (the

"**Collateral**") to and/or for the benefit of the Collateral Agent or the Senior Noteholders (collectively, the "**Prepetition Secured Parties**" and each, a "**Prepetition Secured Party**") under the Collateral Documents (such liens, the "**Prepetition Liens**").  For the avoidance of doubt, the Collateral includes the Cash Collateral (as defined in paragraph 5(b) below) and the assets of the Debtor in or upon which a lien or other security interest has been granted in favor or for the benefit of the Prepetition Secured Parties in connection with, pursuant to, or under the applicable Existing Agreements that existed as of the Commencement Date and postpetition proceeds, products, offspring, rents, and profits.

(f)     The Collateral Documents are valid and binding agreements and obligations of the Debtor, and the Prepetition Liens constitute valid, binding, enforceable, and perfected security interests and "Liens", as that term is defined in the Existing Agreements ("**Liens**"), and such Claims and Liens are not subject to avoidance, recharacterization, reduction, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, except as provided in the Existing Agreements or this Interim Order.

(g)     The Collateral Agent has properly perfected its security interests and Liens in and on the Collateral by taking possession of, or obtaining control over, certain assets and/or by the filing of UCC-1 financing statements, mortgages, and other required documents against the Debtor and such Collateral with the proper state and county offices for the perfection of such security interests and Liens.

(h)     The Debtor, on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries, and assigns (collectively, the "**Releasors**"), to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully and forever releases, acquits, relinquishes, waives, and discharges each of the

Prepetition Secured Parties (in their capacities as such), and each of their respective former, current, or future subsidiaries, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, affiliates, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case in their respective capacity as such (collectively, the "**Releasees**") of and from any and all claims, demands, liabilities, responsibilities, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, or judgments of every type, whether known or unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof with respect to the Prepetition Indebtedness, Collateral, the Existing Agreements, or the transactions contemplated under such documents, including, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection, or avoidability of the Prepetition Liens.  The Debtor's acknowledgements, stipulations, and releases shall be binding on the Debtor and its respective representatives, successors, and assigns and, subject to any action timely commenced by the official committee of unsecured creditors (the "**Committee**") appointed in the Case, if any, or any other party-in-interest prior to the Investigation Termination Date (as defined in paragraph 18 below), on the Debtor's estate, and all creditors thereof and each of their respective representatives, successors and assigns, including any trustee or representative appointed in the Case.

5.    *Findings Regarding the Use of Cash Collateral and the Collateral.*

(a)    Good cause has been shown for the entry of this Interim Order.

(b)    The Debtor has an immediate and critical need to use the Collateral (including cash that is property of the Debtor and that constitutes "cash collateral" as defined by section 363(a) of the Bankruptcy Code, including any and all proceeds of any Collateral that is property of the Debtor ("**Cash Collateral**") on the terms set forth herein (including compliance with the Budget (as defined in paragraph 6(a) below)), in order to, among other things, permit the orderly continuation of its business and preserve its going concern value.

(c)    The terms of the use of the Collateral, including the Cash Collateral, pursuant to this Interim Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration.

(d)    This Interim Order and the terms of the use of the Collateral, including the Cash Collateral, have been negotiated extensively, in good faith, and at arm's length between the Debtor, the Collateral Agent, an ad hoc group consisting of holders of more than two-thirds of the outstanding principal amount of the Notes (the "**Ad Hoc Group**"), and the GE Parties.

(e)    The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2).  Unless the interim relief set forth in this Interim Order is granted immediately, the Debtor's estate and business will be immediately and irreparably harmed.  In particular, the Debtor requires immediate use of the Collateral, including the Cash Collateral, to, among other things, permit the orderly continuation of its business and preserve going concern value for the benefit of stakeholders.  The use of the Collateral, including the Cash

Collateral, in accordance with this Interim Order is therefore in the best interest of the Debtor's estate.

6.      *Authorization to Use Cash Collateral.*

(a)      Subject to the terms, conditions, and limitations set forth in this Interim Order, the Debtor is hereby authorized to use Cash Collateral pursuant to the 13-week budget setting forth projected receipts and disbursements, on a cash basis, for the period beginning on the Commencement Date, a copy of which is attached hereto as <u>Exhibit A</u> (the "**Budget**").  The Debtor shall adhere to the Budget during the Case (subject to the Permitted Variance (as defined in paragraph 6(d) below)).  The first testing date shall be the Friday of the third full week following the Commencement Date (the "**First Testing Date**," and each testing date thereafter, a "**Testing Date**"); *provided that* a Termination Event may occur anytime on or after the Commencement Date if the Debtor fails to satisfy the covenant set forth in paragraph 8(d) of this Interim Order.  Compliance with the Budget shall be tested every Friday on a four-week trailing basis commencing the first Friday after the First Testing Date (each such four week period, the "**Budget Period**"); *provided that* where less than four weeks have elapsed between the Commencement Date and the Testing Date, the Budget will be tested on a trailing basis back to the Commencement Date.  The Variance Report (as defined in paragraph 14(e)(iv) below) reflecting the results of each such compliance test shall be provided on or before the Friday following the end of each Budget Period pursuant to paragraph 14(e) below.  For the avoidance of doubt, under no circumstances shall professional fees be tested as part of this Budget covenant.  During the period from the Commencement Date through and including the Termination Date, the Debtor shall be authorized to use Cash Collateral to satisfy the professional fee payments required to be made pursuant to paragraph 14(d) below.

(b)     The Prepetition Secured Parties shall have no obligation with respect to the Debtor's use of the Cash Collateral, and shall not be obligated to ensure or monitor the Debtor's compliance with the Budget or to pay (directly or indirectly from the Cash Collateral) any expenses incurred or authorized to be incurred pursuant to the Budget.   The Prepetition Secured Parties' consent to the Budget shall not be construed as consent to the use of any Cash Collateral after the Termination Date, regardless of whether the aggregate funds shown on the Budget have been expended.

(c)     On each Friday the Debtor shall provide a 13-week cash forecast beginning on the following Monday with supporting detail and documentation in form and detail reasonably satisfactory to the Collateral Agent and Required Noteholders.   Every four weeks, upon the acceptance by the Required Noteholders, the updated 13-week cash forecast shall become the Budget for such period for purposes of this Interim Order (each, a "**Supplemental Budget**").

(d)     Notwithstanding the Budget, so long as no Termination Event has occurred, the Debtor shall be authorized to use Cash Collateral in accordance with the Budget and this Interim Order in an amount that would not cause Net Operating Cash Flow (as defined in the Budget) to be less than 85% of the projected Net Operating Cash Flow according to the Budget for any Budget Period (a "**Permitted Variance**").

7.     *Carve-Out*.  For purposes hereof, the "**Carve-Out**" shall mean (a) any fees payable to the Clerk of the Court and to the Office of the U.S. Trustee pursuant to section 1930(a) of title 28 of the United States Code, (b) allowed, accrued and unpaid fees and out-of-pocket expenses of each professional retained by order of the Court (regardless of when such fees and expenses become allowed by order of the Court, including after a Carve-Out Event (as

defined in this paragraph 7) incurred on or prior to the occurrence of a Carve-Out Event in aggregate accrued amounts for each such professional not in excess of the amounts set forth in the Budget for the relevant professional through the date of such Carve-Out Event, (c) up to $350,000 of allowed and unpaid fees and expenses of all professionals retained by the Debtor and approved by the Court incurred after the occurrence of a Carve-Out Event (the "**Post-Carve Out Notice Cap**"), and (d) any and all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $25,000.   For the purposes hereof, a "**Carve-Out Event**" shall occur upon the occurrence and during the continuance of a Termination Event and upon delivery of a written notice thereof to the Debtor, the Debtor's counsel (Richards, Layton & Finger, P.A.), the U.S. Trustee, and counsel to any Committee stating that the Termination Date has occurred and that the Debtor's ability to pay professionals is now subject to the Carve-Out (a "**Carve-Out Notice**").   Upon the delivery of a Carve-Out Notice, the Debtor shall provide immediate notice by email to all retained professionals informing them that a Carve-Out Event has occurred and that the Debtor's ability to pay professionals is subject to the Carve-Out; *provided that* nothing in this Order shall impair the right of any party to object to the reasonableness of any such fees or expenses to be paid by the Debtor's estate.   A waiver of a Termination Date triggering a Carve-Out Event shall constitute the cancellation of such Carve-Out Event allowing the Debtor to pay compensation and reimbursement of expenses authorized to be paid under Bankruptcy Code sections 330 and 331 or otherwise pursuant to an order of the Court, as the same may be due and payable, without reducing the Carve-Out.   Upon delivery of the Carve-Out Notice, the Debtor shall establish a segregated reserve account in an amount (the "**Carve-Out Reserve**") equal to the sum of (i) all billed and unpaid fees, disbursements, costs, and expenses of all retained professionals

(including any outstanding holdbacks, but not in excess of the amount set forth in the Budget for the relevant professional); (ii) all unbilled fees, disbursements, costs, and expenses of all retained professionals incurred prior to the delivery of the Carve-Out Notice, but not in excess of the amount set forth in the Budget for the relevant professional, and (iii) the Post Carve-Out Notice Cap. The Debtor shall not commingle any funds contained in the Carve-Out Account and shall use such funds to pay only the retained professionals' fees, as and when allowed by order of the Court. To the extent the Court does not approve any of the fees, disbursements, costs, and expenses of a retained professional that were segregated as a part of the Carve-Out Reserve, or such amounts are ultimately not used, such disallowed or unused fees, disbursements, costs, and expenses shall be released to the Debtor.

8. *Termination of Use of Cash Collateral.* Subject to paragraphs 8, 10, and 11, the Debtor's right to use the Cash Collateral pursuant to this Order shall automatically terminate (the date of any such termination, the "**Termination Date**") without further notice or court proceedings on the earliest to occur of any of the events set forth in clauses (a) through (t) below (such events collectively referred to herein as the "**Termination Events**"). As used herein, "**Required Noteholders**" means, as of any date of determination, holders constituting a majority in aggregate principal amount of the Notes then outstanding, excluding the Notes held by the GE Parties.

(a)    The date that is 45 days after the entry of this Interim Order, unless a Final Order has been entered on or before such date;

(b)    failure by the Debtor to adhere to the Budget subject to the Permitted Variance or the Debtor's use of Cash Collateral in violation of Paragraph 6 of this Interim Order;

(c)      the Debtor (i) causes Ending Cash (as defined in the Budget) to fall below $8,000,000 for three consecutive business days or (ii) funds capital expenditures, major maintenance and spare parts purchases  in an  amount that exceeds $5,000,000 in the aggregate since the Commencement Date;

(d)      failure of the Debtor to deliver to the Collateral Agent any of the documents or other information required to be delivered pursuant to the Interim Order or Final Order, as applicable when due or any such documents or other information shall contain a material misrepresentation;

(e)      failure of the Debtor to make any payment authorized pursuant to paragraph 14(d) of this Interim Order within five days following the end of the time period specified by that paragraph;

(f)      five business days after notice from the Collateral Agent or the Required Noteholders of the failure of the Debtor to comply with a provision of this Interim Order;

(g)      (i) the Case shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code or a trustee under chapter 11 of the Bankruptcy Code or an examiner with expanded powers shall be appointed in the Case, or (ii) the Debtor shall seek entry of an order accomplishing any of the foregoing;

(h)      other than pursuant to an order of this Court satisfactory to the Required Noteholders, the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any Collateral that has a value in excess of $500,000 in the aggregate;

(i)        except as authorized by the Budget (without giving effect to the Permitted Variance) or an order of this Court satisfactory to the Required Noteholders, the payment of any prepetition claim other than a payment or series of payments of prepetition claims in an aggregate amount no greater than $100,000;

(j)        the Debtor shall create, incur, or suffer to exist any postpetition liens or security interests on any Collateral other than:  (i) those granted pursuant to this Interim Order; (ii) the filing of a preliminary lien notice or similar notice by a carrier, mechanic, warehouseman, repairman, or similar party in advance of such party providing services to the Debtor, *provided that* any liens created in favor of any such party for services provided shall be subject to clause (iii) of this paragraph 8(j), and *provided further* that any act to enforce such liens or preliminary lien notices shall be subject to the applicable provisions of this Interim Order, including, without limitation, paragraph 8(g) hereof; (iii) carriers', mechanics', warehousemen's, repairmen's, or other similar liens arising in the ordinary course of business or by operation of law in an aggregate amount no greater than $1 million; (iv) deposits to secure the payment of any postpetition statutory obligations, performance bonds, and other obligations of a like nature incurred in the ordinary course of business; and (vi) any other junior liens or security interests of the type and in the amounts that the Debtor is permitted to incur under the Existing Agreements;

(k)        an order shall be entered, or any proceeding shall be commenced by the Debtor seeking, or otherwise consenting to, granting another claim or lien *pari passu* with or senior to the Adequate Protection Liens  (as defined in paragraph 14(a) below) or 507(b) Claims (as defined in paragraph 14(c) below) granted to the Prepetition Secured Parties under this Interim Order;

(l)      an order of the Court shall be entered reversing, staying, vacating or otherwise amending, supplementing, or modifying this Interim Order without the written consent of the Required Noteholders;

(m)      one or more judgments or decrees required to be satisfied as an administrative expense claim shall be entered after the Commencement Date against the Debtor involving in the aggregate a liability that equals or exceeds $500,000 (not paid or to the extent not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged, or stayed or bonded pending appeal for any period of 30 days from entry thereof;

(n)      the Debtor shall support (by way of any motion or any other pleading filed with the Bankruptcy Court or any other writing to any party-in-interest duly authorized and executed by or on behalf of the Debtor or by any statement made during a Court hearing) any other person's opposition to any motion made in the Court by the Prepetition Secured Parties seeking confirmation of the amount of the Prepetition Secured Parties' claims or the validity or enforceability of the Liens in favor of the Prepetition Secured Parties;

(o)      any proceeding shall be commenced by  the Debtor seeking, or otherwise consenting to, (i) the invalidation, subordination, or other challenging of the Prepetition Liens, 507(b) Claims or Adequate Protection Liens or (ii) subject to entry of the Final Order, any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral, including the Cash Collateral;

(p)      the Debtor shall file a motion, pleading, or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the

Prepetition Secured Parties, or there is a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment;

(q)    (i) any provision of this Interim Order shall cease to be valid and binding for any reason or (ii) the Debtor shall seek any modification of this Interim Order that is adverse to the Prepetition Secured Parties without the prior written consent of the Collateral Agent and the Required Noteholders;

(r)    the Restructuring Support Agreement dated as of January 9, 2017 among the Debtor, certain Prepetition Secured Parties and certain other parties (the "**RSA**") terminates or ceases to be in full force and effect or any Termination Event occurs under the RSA;

(s)    the effective date of any confirmed chapter 11 plan of reorganization or liquidation in the Case; or

(t)    the expiration of the Budget, unless a Supplemental Budget has been agreed to by the Required Noteholders.

9.    *Remedies After a Termination Date*.  Subject to the provisions of this paragraph and paragraphs 8 and 11, the Debtor's authority to use Cash Collateral shall automatically terminate upon the occurrence of a Termination Event unless such Termination Event is waived in writing by the Required Noteholders, all without further order or relief from the Court.  The automatic stay under section 362 of the Bankruptcy Code is hereby vacated and modified to the extent necessary to permit the Collateral Agent and the Prepetition Secured Parties to exercise, upon five (5) business days' prior written notice (the "**Waiting Period**") to the Debtor (with a copy to counsel to the Debtor, counsel to the Committee, and the U.S. Trustee) given upon the occurrence or during the continuance of a Termination Event, all rights

and remedies against the Collateral, including the Cash Collateral, provided for in this Order, the Existing Agreements, and applicable law, unless the Court orders otherwise.  During the Waiting Period, except as may be otherwise ordered by the Court, the Debtor shall not use any Cash Collateral to pay any expenses except those which are (i) necessary to preserve the Debtor's going concern value or (ii) necessary to contest in good faith whether a Termination Event has occurred and/or is continuing.  The Debtor reserves the right to seek a hearing before this Court to contest whether a Termination Event has occurred and the right to seek Court approval of a new order approving the use of Cash Collateral over the objection of the Prepetition Secured Parties; *provided that* nothing in this Order shall impair the right of any party to object to such relief.  The delay or failure of the Collateral Agent or the Prepetition Secured Parties to exercise rights and remedies under the Existing Agreements, or this Interim Order shall not constitute a waiver of their respective rights hereunder, thereunder or otherwise.   In no event shall any of the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

10.    *Application of Collateral Proceeds.*  Subject to entry of the Final Order, after the expiration of the Waiting Period following the occurrence of a Termination Event, unless the Court orders otherwise, (a) the Debtor is hereby authorized and directed to remit all collections, remittances, and proceeds to the Collateral Agent, for the benefit of the Prepetition Secured Parties, and (b) the automatic stay provisions of Bankruptcy Code section 362 are hereby modified to permit the Prepetition Secured Parties to retain and apply all collections, remittances, and proceeds of the Collateral, subject to and in accordance with this Interim Order and the Existing Agreements, to the Prepetition Indebtedness in accordance with the provisions of the Existing Agreements (subject to the Carve-Out, as described above).

11.     *Limitation on Charging Expenses Against Collateral*.  Subject to and effective upon entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged or assessed against or recovered from the Prepetition Secured Parties or the Collateral pursuant to sections 105 and 506(c) of the Bankruptcy Code or any similar principle of law.  No action, inaction, or acquiescence by the Prepetition Secured Parties, including permitting the use of Cash Collateral to fund the Debtor's ongoing operations, shall be construed as consent to a charge against the Collateral pursuant to sections 105(a) or 506(c) of the Bankruptcy Code.

12.     *Limitations under Section 552(b) of the Bankruptcy Code*.  The Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to and effective upon entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to (i) proceeds, products, offspring, or profits of any of the Collateral, including the Cash Collateral or (ii) the extension of the Adequate Protection Liens to cover proceeds of the Collateral.

13.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the Prepetition Secured Parties pursuant to the Existing Agreements or (except as provided in paragraph 19 of this Interim Order) pursuant to the provisions of this Interim Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment, or other liability.

14.     *Adequate Protection for the Collateral Agent and the Prepetition Secured Parties*.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), and

507 of the Bankruptcy Code, to adequate protection of their interests in the Collateral, for and equal in amount to the aggregate diminution in the value of the Prepetition Secured Parties' prepetition security interests in all Collateral from and after the Commencement Date, if any, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtor (or other decline in value) of the Collateral, the Debtor's use of Cash Collateral and other Collateral, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Adequate Protection Claim**").  As adequate protection of the Adequate Protection Claim, the Prepetition Secured Parties are hereby granted the following (collectively, the "**Adequate Protection Obligations**"):

(a)     Adequate Protection Liens.  Valid, enforceable, non-avoidable, perfected security interests in and Liens on (the "**Adequate Protection Liens**") all property of any kind or nature whatsoever, whether now owned or hereafter acquired or existing and wherever located, of each Debtor's estate (as created pursuant to section 541(a) of the Bankruptcy Code), whether real or personal, tangible or intangible, including all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, intellectual property including, without limitation, patents, trademarks, copyrights and licenses, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax, or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, vehicles, deposit accounts, commercial tort claims, securities accounts, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, leases, securities including, without limitation, all of the issued and outstanding capital stock of each subsidiary of the Debtor and other equity or ownership interests, including equity interests in non-wholly owned subsidiaries, money, and causes of action, Cash Collateral, and all cash and non-cash

proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above (all such property, the "**Adequate Protection Collateral**"), which Liens and security interests shall be senior to any and all other Liens and security interests, subject only to (i) the Carve-Out and (ii) any Liens permitted under the Existing Agreements or any valid, perfected and non-avoidable Liens that were in existence as of the Commencement Date and are senior to the Liens of the Collateral Agent and the Prepetition Secured Parties.  Subject to and effective upon the entry of the Final Order, the Adequate Protection Collateral shall also include, without limitation, the proceeds of property recovered, unencumbered or otherwise, from any claims and causes of action of the Debtor arising under section 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code.  For the avoidance of doubt, the Adequate Protection Liens shall be deemed to be effective and perfected automatically as of the Commencement Date and without the necessity of the execution by the Debtor, or the filing of, as applicable, any mortgages, security agreements, pledge agreements, financing statements, state or federal notice, recordings, or other agreements and without the necessity of taking possession or control of any Adequate Protection Collateral.  Except as provided in paragraph 18 below, under no circumstances shall the Adequate Protection Liens be made subordinate to the lien of any other party, no matter when arising.

(b)    <u>Postpetition Interest</u>.    To the extent permitted under the Bankruptcy Code and subject to paragraph 18 below, the Prepetition Secured Parties shall be entitled, as part of their allowed claims, to the accrual of interest at the default interest rate under the Indenture after the Commencement Date calculated in accordance with the terms of the Indenture and to the extent permitted under section 506(b) of the Bankruptcy Code.

(c)　　Section 507(b) Claims.　　Allowed superpriority administrative expense claims pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, as provided in section 507(b) of the Bankruptcy Code (the "**507(b) Claims**"), which claims shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(a), 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 552 (subject to entry of a Final Order), 726, or 1114 of the Bankruptcy Code, whether or not such expenses or claims arise in the Case or in any subsequent case or proceedings under the Bankruptcy Code that may result therefrom, subject and subordinate only to the Carve-Out.　The 507(b) Claims shall be an allowed claim against the Debtor.　Other than the Carve-Out, no cost or expense of administration of the Case, including any cost or expense resulting from or arising after the conversion of any such Case to one under chapter 7 of the Bankruptcy Code, shall be senior to, or *pari passu* with, the 507(b) Claims.

(d)　　Fees and Expenses.　　The Debtor is authorized and directed to pay all reasonable and documented fees and expenses of (i) the Collateral Agent (including fees and expenses incurred by counsel to the Collateral Agent), and the reasonable and documented fees and disbursements of O'Melveny & Myers LLP, Houlihan Lokey, Inc., Charles River Associates, Leidos Engineering, LLC, Young Conaway Stargatt & Taylor, LLP, Post & Schell, P.C. and any other consultant retained by the Ad Hoc Group in connection with the restructuring, and, (ii) so long as the RSA has not been terminated, Weil, Gotshal & Manges ("**Weil**"), as counsel to General Electric Company and its Affiliates (other than the Debtor) including GPFS Securities Inc., a holder of the Notes, (collectively, the "**GE Parties**"), and Reed Smith LLP ("**Reed Smith**"), as local Delaware counsel to the GE Parties, provided that the fees and

expenses of Weil and Reed Smith, collectively, after September 24, 2016 shall not exceed $1,250,000; and *provided further that* Weil, Gotshal & Manges LLP and Reed Smith LLP shall be compensated by Homer City only for services rendered in connection with Debtor's restructuring and/or the Chapter 11 Case, including Causes of Action asserted by any party, and Weil, Gotshal & Manges LLP and Reed Smith LLP shall not be compensated for assessing, responding to, or otherwise addressing any other claims threatened or asserted against GE. None of the fees and expenses payable pursuant to this paragraph 14(d) shall be subject to approval by this Court (but this Court shall resolve any dispute as to the reasonableness of such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto. The Debtor shall pay the reasonable and documented fees and expenses provided for in this paragraph 14(d) within 15 days following receipt of invoices therefor by the Debtor, counsel for the Committee (if any), and the U.S. Trustee; *provided that* upon any objection to the reasonableness of such fees made within 10 days following receipt of such invoices, the Debtor shall pay all amounts that are not subject to such objection and shall pay the balance following the resolution of such objection or upon an order of this Court. The invoices shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a reasonably detailed description of services provided and the expenses incurred by the applicable professional; *provided, however*, that any such invoice: (i) may be redacted to protect privileged, confidential or proprietary information and (ii) shall not be required to contain individual time detail (provided, that such invoice shall contain (except for financial advisors compensated on other than an hourly basis), at a minimum, summary data regarding hours worked by each timekeeper for the applicable professional and such timekeepers' hourly rates).

(e)    <u>Reporting Obligations</u>.  The Debtor is authorized and directed to provide the following to counsel to the Ad Hoc Group, and to such other advisors as directed:

i. Presentations during normal business hours to the Ad Hoc Group and its advisors at times and places as the Ad Hoc Group may reasonably request in writing (including via electronic mail) with reasonable prior notice;

ii. Weekly (or less frequently as may be agreed to between the Debtor, the Collateral Agent, and the Ad Hoc Group) calls with the Collateral Agent, the Ad Hoc Group, and their respective advisors;

iii. A statement provided on each business day setting forth in reasonable detail the cash balance for  the Debtor's deposit accounts as of the end of the prior business day;

iv. On or before Friday of each calendar week, (x) an updated 13 week cash flow forecast, including supporting assumptions relating to merchant receipts, coal purchases, and operator vendor disbursements, and a list of any and all prepetition claims paid during the immediately preceding week (with a notation indicating which order authorized such payments) and the cumulative total of all prepetition claims paid (with a notation indicating which order authorized such payments), and (y) a report of Net Operating Cash Flow (as defined in the Budget) (the "**Variance Report**"), which shall include a reconciliation of Net Operating Cash Flow with the projected amounts in the Budget or applicable Supplemental Budget on a weekly, cumulative, and four-week trailing basis, *provided that* only the four-week trailing basis reconciliation shall be used for testing compliance with the Budget or the Supplemental Budget pursuant to paragraph 6 above; and

v.  Beginning with the year-to-date period ended December 31, 2016, (x) a monthly and year-to-date income statement and balance sheet, with additional supporting information, as may be reasonably requested by the Collateral Agent or the Ad Hoc Group (y) a monthly and year-to-date summary of capital expenditures, and (z) a monthly report summarizing key operational metrics in a form reasonably acceptable to the Collateral Agent and the Ad Hoc Group.  For the avoidance of doubt, each of (x), (y), and (z) shall be provided within twenty-five days following the end of the previous month.  To the extent requested by the Required Noteholders, the Debtor shall hold a call with the Collateral Agent, the Ad Hoc Group, and their respective advisors to discuss the monthly reporting results.

15.  *Reservation of Rights of the Prepetition Secured Parties*.  The Prepetition Secured Parties consent to the adequate protection provided herein.  Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Secured Parties pursuant hereto is without prejudice to, and does not constitute a waiver of, expressly or implicitly, (a) the right of the Prepetition Secured Parties to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection (subject to the rights of the Debtor to object thereto), (b) the Prepetition Secured Parties' rights under the Existing Agreements, or (c) any of the rights of the Prepetition Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law.  Nothing contained in this Interim Order (including the authorization to use the Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to the Prepetition Secured Parties.

16.  *Perfection of Adequate Protection Liens*.

(a)  The Collateral Agent is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien, or similar

instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the Adequate Protection Liens granted to it hereunder.  Whether or not the Collateral Agent shall, in its respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, take possession of or control over, or otherwise confirm perfection of the Adequate Protection Liens, such Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute, or subordination as of the date of entry of this Interim Order, subject to any Challenge (as defined in paragraph 18 below) to the Prepetition Indebtedness or the Prepetition Liens.  A certified copy of this Interim Order may, in the discretion of the Collateral Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(b)     The Debtor shall execute and deliver to the Collateral Agent all such agreements, financing statements, instruments, and other documents as the Collateral Agents may reasonably request to evidence, confirm, validate, or perfect the Adequate Protection Liens.

17.     *Preservation of Rights Granted Under the Order*.

(a)     It shall constitute a Termination Event if any claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order to the Prepetition Secured Parties shall be granted or allowed while any portion of the Prepetition Indebtedness and the Adequate Protection Obligations remain outstanding.

(b)     The Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated, or stayed, such reversal, stay, modification, or vacatur shall not affect (i) the validity, priority, or enforceability of any Prepetition Indebtedness or the Adequate Protection Obligations incurred prior to the effective date of such reversal, stay, modification, or vacatur or (ii) the validity, priority or enforceability of the Adequate Protection Liens to the extent of any diminution in value incurred prior to the effective date of such reversal, stay, modification or vacatur.  Notwithstanding any such reversal, stay, modification or vacatur, any use of the Cash Collateral or any Adequate Protection Obligations incurred by the Debtor to the Prepetition Secured Parties, as the case may be, prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the original provisions of this Interim Order.

(d)     Except as expressly provided in this Interim Order or in the Existing Agreements, the Adequate Protection Liens, the 507(b) Claims and all other rights and remedies of the Prepetition Secured Parties granted by this Interim Order and the Existing Agreements shall survive, and shall not be modified, impaired, or discharged by (i) the entry of an order converting the Case to a case under chapter 7 of the Bankruptcy Code or dismissing the Case, or (ii) the entry of an order confirming a plan of reorganization in the Case.  In any superseding chapter 7 case under the Bankruptcy Code, the Adequate Protection Liens, the Adequate Protection Obligations, the Section 507(b) Claims, the other administrative claims

granted pursuant to this Interim Order, and all other rights and remedies of the Prepetition

Secured Parties granted by this Interim Order shall continue in full force and effect until all

Adequate Protection Obligations are indefeasibly paid in full in cash.

18.     *Effect of Stipulations on Third Parties*.  The stipulations and admissions

contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim

Order, shall be binding on the Debtor's estate and all parties in interest, including, without

limitation, the Committee, unless the Committee, or another party in interest (other than the

Debtor) with standing and requisite authority, has timely commenced a contested matter or

adversary proceeding (subject to the limitations set forth in paragraph 19 hereof, including, for

the avoidance of doubt, the Investigation Budget), challenging the amount, validity, or

enforceability of the Prepetition Indebtedness or the perfection or priority of the Prepetition

Liens, or otherwise asserting any objections, claims, or causes of action on behalf of the Debtor's

estate against the Prepetition Secured Parties relating to the Prepetition Indebtedness or the

Prepetition Liens (such adversary proceeding or contested matter, a "**Challenge**"), on or before

the earlier to occur of the 75th calendar day after the date of entry of this Interim Order, or five

(5) days before the hearing to consider confirmation of the Debtor's prepackaged chapter 11

plan(the "**Investigation Termination Date**").  If no such Challenge is timely commenced as of

the Investigation Termination Date, without further order of the Court, (i) the Prepetition

Indebtedness shall constitute allowed, secured prepetition claims for all purposes in the Case and

any subsequent proceedings under the Bankruptcy Code, including, without limitation, any

chapter 7 proceeding if the Case is converted to a case under chapter 7 of the Bankruptcy Code

or in any proceedings related to any of the foregoing (a "**Successor Case**"); (ii) the Prepetition

Liens shall be deemed legal, valid, binding, enforceable, perfected, not subject to subordination

or avoidance for all purposes in the Case and any Successor Case; (iii) the Prepetition Indebtedness, the Prepetition Liens, and prior payments on account of or with respect to the Prepetition Indebtedness shall not be subject to any other or further claim, cause of action, objection, contest, setoff, defense, or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of the Debtor; and (iv) the Debtor and its estate shall be deemed to have relinquished, released, and waived any and all claims or causes of action against the Prepetition Secured Parties with respect to the Existing Agreements or any related transactions.  Notwithstanding anything to the contrary herein, if no Challenge is timely commenced, the stipulations contained in paragraph 4 of this Interim Order shall be binding on the Debtor's estate, the Committee, and all parties in interest.  If a Challenge is timely commenced, the stipulations contained in paragraph 4 of this Interim Order shall be binding on the Debtor's estate and all parties in interest except to the extent such stipulations are specifically challenged in such Challenge; *provided that* if and to the extent a Challenge is withdrawn, denied, or overruled, the stipulations specifically challenged in such Challenge also shall be binding on the Debtor's estate and all parties in interest.  In the event the Committee or other party in interest initiates an investigation of potential claims against any party other than the Prepetition Secured Parties, the Prepetition Secured Parties shall have the right to fully participate in such investigation.

19.     *Limitation on Use of Cash Collateral and Collateral*.  The Debtor shall use the Collateral, including the Cash Collateral, solely as provided in this Interim Order. Notwithstanding anything herein or in any other order of this Court to the contrary, none of the Collateral, including the Cash Collateral, may be used to (a) to pay any professional fees and expenses incurred in connection with the initiation or prosecution of any claims, causes of action,

adversary proceedings, or other litigation against the Prepetition Secured Parties; (b) contest, or raise any defense to the validity, perfection, priority, extent, or enforceability of any amount due under the Existing Agreements or the Liens or claims granted under this Interim Order or the Existing Agreements; (c) assert any Claims and Defenses or any other causes of action against the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys, or advisors; (d) prevent, hinder, or otherwise delay the Prepetition Secured Parties' assertion, enforcement, or realization on the Collateral in accordance with the Existing Agreements or this Interim Order (e) seek to modify any of the rights granted to the Prepetition Secured Parties hereunder or under the Existing Agreements, in the case of each of the foregoing clauses (a) through (e), without such party's prior written consent; or (f) pay any amount on account of any claims arising prior to the Commencement Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the Budget or this Interim Order.   Notwithstanding the foregoing, the Committee and its advisors may investigate the Liens granted pursuant to the Existing Agreements prior to the Investigation Termination Date and any causes of action in connection therewith at an aggregate expense for such investigation not to exceed $20,000 (the "**Investigation Budget**").

20.     *Proof of Claim*.  Neither the Collateral Agent nor the Senior Noteholders shall be required to file a proof of claim with respect to any claims arising under the Indenture, and the stipulations and findings set forth in this Interim Order shall constitute a timely proof of claim in respect of such claims.

21.     *Credit Bidding*. Subject to and effective upon entry of the Final Order, the Collateral Agent or Senior Noteholders shall have the right to credit bid, up to the full amount of their secured claim in any sale of the Collateral as provided for in section 363(k) of the

Bankruptcy Code, without the need for further Court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

22.    *Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order, on the one hand, and the Motion or the Existing Agreements, on the other, the provisions of this Interim Order shall govern.

23.    *Binding Effect; Successors and Assigns*.  The provisions of this Interim Order, including all findings herein, shall be binding upon and inure to the benefit of all parties-in-interest in the Case, including the Prepetition Secured Parties, to the extent as set forth herein, and the Debtor, the Committee appointed in the Case, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the Debtor, an examiner with expanded powers appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor); *provided that* the Prepetition Secured Parties shall have no obligation to permit the use of the Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estate of the Debtor.

24.    *Limitation of Liability*.  Subject to and effective upon entry of the Final Order, in permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to the Final Order or the Existing Agreements, the Prepetition Secured Parties shall not solely by reason thereof be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute).  Furthermore, subject to and effective upon entry of the Final Order, nothing in this Order or in the Existing Agreements shall in any way be construed or interpreted to impose or allow the imposition upon the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtor.

25.    *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of this Interim Order.

26.    *Final Hearing*.  The Final Hearing is scheduled for _____**, 2017 at** _____ **.m (Eastern Standard Time),** before this Court.

27.    *Final Hearing Notice*.  The Debtor shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) on the parties having been given notice of the Hearing, and to any other party that has filed a request for notices with this Court and to the Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon:  (i) the proposed attorneys for the Debtor, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 (Attn: Mark D. Collins, Esq., Russell C. Silberglied and Paul N. Heath, Esq.), and (ii) the Notice Parties, and shall be filed with the Clerk of the Court, in each case so as to be received by 4:00 p.m. (Eastern Standard Time) no later than seven days prior to the Final Hearing.

Dated: _____, 2017
   Wilmington, Delaware

          _____
          UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT A</u>**

**(BUDGET)**

(To Come)

**<u>Exhibit C</u>**

Disclosure Statement

(Filed contemporaneously herewith)

**<u>Exhibit D</u>**

**Transitional Services Agreement**

*Execution Version*

<u>DATED [●]</u>

**GE CAPITAL US HOLDINGS, INC.**

and

**HOMER CITY GENERATION, L.P.**

———————————————————————

**TRANSITIONAL SERVICES AGREEMENT**

———————————————————————

*Execution Version*

<u>**Transitional Services Agreement**</u>

This TRANSITIONAL SERVICES AGREEMENT (this "**Agreement**"), dated as of [●], is between GE Capital US Holdings, Inc., a Delaware limited liability company ("**Supplier**") and Homer City Generation, L.P., a Delaware limited partnership, as reorganized pursuant to chapter 11 of title 11 of the United States Code in accordance with the Plan ("**Recipient**").

WHEREAS, the Recipient, the Consenting Noteholders described therein, and certain other parties have entered into that certain Restructuring Support Agreement, dated as of [●] (as amended and modified from time to time, the "**Restructuring Support Agreement**"), pursuant to which, among other things, the parties thereto have agreed to support a restructuring of Recipient to be effectuated by the Plan;

WHEREAS, the Restructuring Support Agreement requires the execution and delivery of this Agreement upon, and subject to the occurrence of, the Effective Date; and

WHEREAS, in connection with the Restructuring Support Agreement, Supplier will provide certain transitional arrangements to Recipient, after the Effective Date and for the term of this Agreement thereafter and in accordance with and subject to the terms of this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual covenants contained herein and in the Restructuring Support Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    **Transitional Arrangements**

1.1    Subject to <u>Clause 2</u> and <u>Clause 5</u>, Supplier will provide (or procure the provision of) the transitional arrangements described in <u>Schedule 1</u> to the Recipient (each a "**Transitional Arrangement**"), in each case for the term of this Agreement. Subject to <u>Clause 2.2</u>, it is the intent of the parties that the Transitional Arrangements include the performance by Supplier of, or Supplier's assistance to the Recipient's asset manager in the Recipient's asset manager's assumption of the performance of, each asset management service and arrangement which had been performed by the general partner of Recipient or its Affiliates in the ordinary course of business immediately prior to the Effective Date pursuant to Section 4.1 of the Amended and Restated Agreement of Limited Partnership of Recipient (the "**GP Services**" and each a "**GP Service**"), notwithstanding the limited description set forth in <u>Schedule 1</u>.

2.    **Obligations of Supplier and Recipient**

2.1    Supplier's obligations with respect to each Transitional Arrangement are limited to providing each Transitional Arrangement materially in accordance with the description set out in <u>Schedule 1</u>. Supplier is not obliged to disclose to Recipient any contracts by which Supplier or any of its Affiliates acquires from third parties components or inputs to that Transitional Arrangement.

2.2    During the term of this Agreement, Supplier may make changes to the Pre-Plan Form of a service or access right that has, upon or following the Effective Date, become a Transitional Arrangement only to the extent necessary to effectively separate Recipient's data from Supplier's (or any of its Affiliates') data or implement any other reasonable security measure consistent with the Parties no longer being

Affiliated.  If any of the GP Services were omitted from Schedule 1 as of the Effective Date, and Recipient provides Notice to Supplier that it wishes to receive such GP Service, then such GP Service shall be automatically included as a new Transitional Arrangement or a modification to an existing Transitional Arrangement and such modification shall be reflected in an updated draft of Schedule 1 (each an "**Omitted Arrangement**"), at no additional cost (apart from the Charges set out in Clause 5), and Supplier shall provide such Omitted Arrangement in accordance with such updated draft.

2.3     To the extent that the existence or occurrence of any Dependency (as defined below) adversely affects the provision of any Transitional Arrangement, Supplier is relieved of its obligation to provide such affected Transitional Arrangement but only: (i) for that part of the Transitional Arrangement affected by the Dependency; (ii) for the duration of that adverse effect; and (iii) to the extent that Supplier uses commercially reasonable efforts to mitigate the adverse effect, and gives Recipient Notice of the adverse effect reasonably promptly after becoming aware of the Dependency and its adverse effect.  Following the cessation of the effect of the Dependency, Supplier shall as soon as reasonably practicable resume providing that part of the Transitional Arrangement or its obligation that was affected by the Dependency.  The following are dependencies for the purpose of this Clause 2.3 (each a "**Dependency**") in relation to each Transitional Arrangement: (1) failure by Recipient to comply with its obligations under this Agreement; (2) defects in the completeness, accuracy and quality of applicable information provided by or on behalf of Recipient; (3) changes in the Applicable Laws; (4) the presence of viruses, trojan horses, worms or other disabling features in Recipient's computing environment (other than any of the foregoing introduced by Supplier in performing any Transitional Arrangement); (5) any modification by Recipient of any of its processes or information technology systems to the extent such modification adversely impacts on the provision of any Transitional Arrangement; (6) failure by Recipient to provide Supplier with access to its applicable systems to the extent and for the duration that is reasonably necessary to enable Supplier to provide the relevant Transitional Arrangement; and (7) any other dependencies mutually agreed upon in writing by the Parties.

2.4     Recipient shall, in relation to a Transitional Arrangement: (i) comply with any express conditions or requirements imposed on it under this Agreement in relation to each Transitional Arrangement or as specified in Schedule 1; (ii) use each Transitional Arrangement only for the benefit of its commercial activities that are substantially the same as those carried out by Recipient immediately prior to the Effective Date; (iii) not use any Transitional Arrangement in breach of any Applicable Law; and (iv) comply with the terms of any third party agreement, approval or consent with or between Supplier or its Affiliates and such third party under which Supplier provides such Transitional Arrangement, other than terms that require the payment of fees, as if it were a party to that agreement but only after and only to the extent Recipient is given reasonable prior Notice of those terms.  Recipient covenants that it will use best efforts to secure such license agreements, service agreements and entitlements (if any) as are necessary for Recipient to replace or perform or have performed on its behalf each Transitional Arrangement on or before the expiration of the term of this Agreement, and Supplier covenants it will use best efforts to assist

Recipient in Recipient's securing of such licenses, service agreements and entitlements (if any) as Recipient has documented to Supplier are necessary for Recipient to replace the Transitional Arrangements.  If Recipient proposes to modify any of its processes or information technology systems and such modification impact the provision of any Transitional Arrangement by Supplier, Recipient shall accept that it may not receive the full benefit of any affected Transitional Arrangement because of such modifications.

2.5    Supplier shall separate and extract Recipient's data into the format used by Supplier in the performance of the applicable Transitional Arrangement.  Supplier is under no obligation to separate or otherwise re-format any of Recipient's data that is stored or processed in connection with each Transitional Arrangement: (i) in a different software instance than that used by Supplier; or (ii) on different hardware than that used by Supplier.  However, Supplier shall re-format such data into a flat file or into an industry-standard format, if requested by Recipient, where Supplier is able to do so without incurring any costs which, in Supplier's reasonable opinion, are significant or without adversely impacting the performance of such Transitional Arrangements.  Supplier shall also make available domain expertise to support and assist with the mapping and/or migration of such data into Recipient's (or its replacement provider's) target systems.

**3.    No Variation**

Supplier has no obligation under this Agreement beyond those provided in this Agreement and Schedule 1, and any variations of Supplier's obligations provided herein and therein are subject to the prior written consent of Supplier in its sole discretion.

**4.    Governance**

4.1    No later than five calendar days after the Effective Date, the Parties shall establish a steering committee comprised of two representatives with decision-making authority from Recipient and two representatives with decision-making authority from Supplier (the "**Steering Committee**").  The Steering Committee shall be responsible for agreeing to and overseeing the provision of the Transitional Arrangements, as well as the implementation of any agreed upon transition plan.  The Steering Committee shall meet by telephone every fifteen (15) calendar days during the term of this Agreement.  Either Party may change its Steering Committee representatives by providing Notice to the other Party.  Any meeting at which at least one (1) representative from each Party is present shall constitute a meeting of the Steering Committee.

**5.    Charges; Term and Termination**

5.1    Recipient shall pay Supplier $250,000 per month in advance during the term of this Agreement, payable in U.S. Dollars five business days prior to the first day of each calendar month during the term of this Agreement (the "**Charges**").  Charges shall be prorated for any partial months during the term of this Agreement. Recipient shall bear any and all sales, goods and services, harmonized sales, value added, use, transaction and transfer taxes and other similar charges (and any related interest and

penalties) imposed on, or payable with respect to, any Charges payable by Recipient pursuant to this Agreement.

5.2    This Agreement shall become effective on the Effective Date and shall continue for a period of three months thereafter.  Subject to advance notice to Supplier at least thirty (30) days prior to the expiration of such three (3) month period, Recipient may, at its sole discretion, extend the term of this Agreement on a month-to-month basis for up to two (2) additional months; provided that the Charges for such additional months shall be $300,000 per month.

5.3    Recipient may terminate this Agreement or any Service provided by Supplier under this Agreement for convenience, upon thirty (30) days' Notice to Supplier.

5.4    If any Party commits a material breach of this Agreement, including a failure to pay the Charges when due, that is not remedied within thirty (30) days after receiving Notice of such breach from the other Party, the non-breaching Party may terminate this Agreement effective immediately upon Notice to the breaching party.

6.    **Intellectual Property Rights**

6.1    The Transitional Arrangements leverage shared platforms that Supplier uses for its own business and the business of its other Affiliates.  Consequently, Recipient acknowledges that unless expressly set forth otherwise in Schedule 1, ownership of any IP Right with regard to the Transitional Arrangements remains with Supplier and Supplier's obligations to provide a Transitional Arrangement do not affect Supplier's ownership in any such IP Rights.  Notwithstanding the foregoing, the ownership of Recipient's data processed and extracted in connection with the Transitional Arrangements in accordance with Clause 2.5 and any IP Rights therein remain with Recipient.

7.    **Confidentiality**

7.1    Each Party ("**Receiving Party**") must not (i) use the Confidential Information of the other Party ("**Disclosing Party**") other than for the purposes of performing or giving effect to this Agreement; or (ii) disclose the Disclosing Party's Confidential Information except in accordance with Clause 7.2.

7.2    The Receiving Party may disclose the Disclosing Party's Confidential Information: (i) during this Agreement's term, to each of its directors, officers, employees or professional advisers, Recipient's asset manager or those of its Affiliates (each, a "**Specified Recipient**") to the extent that such disclosure is necessary for the purposes of performing the Receiving Party's obligations under this Agreement or receiving services under any Transitional Arrangement; (ii) at any time to a Specified Recipient to the extent that such disclosure is necessary for Recipient to carry out its business as conducted prior to the Effective Date; (iii) to the extent required to be disclosed by Applicable Law or legal process or under the terms of an order issued by a court of competent jurisdiction or any Government Authority or a stock exchange having jurisdiction over the Receiving Party, provided that, in the case of Clause 7.2(ii) or (iii), the Receiving Party, to the extent that it is lawful for it to do so, provides prompt Notice to the Disclosing Party of any such requirement, discloses

no more information than is so required and cooperates at the Disclosing Party's request and expense, with any attempts to obtain a protective order or similar treatment; or (iv) to the extent that the Disclosing Party has given prior written consent to such disclosure.

7.3    Before disclosure of Confidential Information to a Specified Recipient, the Receiving Party shall ensure that the Specified Recipient is made aware of and complies with the Receiving Party's obligations of confidentiality under this Agreement as if the Specified Recipient were a party to this Agreement.

7.4    The Receiving Party must treat the Disclosing Party's Confidential Information with no less than the degree of care, secrecy and protection with which it treats the Receiving Party's own Confidential Information.

7.5    For the purpose of this Clause 7: (i) the following data is taken to be the "Confidential Information" of both Parties: (a) the terms of this Agreement; (b) data about transactions to which both Recipient and Supplier are parties; (c) data that otherwise relates to both Recipient and Supplier; and (d) the minutes of the Steering Committee meetings; (ii) the following data is taken to be the "Confidential Information" of Recipient: (a) data about transactions to which Recipient is a party but Supplier is not; and (b) data that otherwise relates to Recipient and does not also relate to Supplier (an example of which is data relating to the Recipient's employees); and (iii) the following data is taken to be the "Confidential Information" of Supplier: the form, nature and standard of each Transitional Arrangement provided by Supplier, in each case (i) - (iii) of this Clause 7.5, to the extent that such information does not fall within the exceptions to the definition of "Confidential Information" in paragraph (a), (b) or (c) of that definition.

7.6    To avoid doubt, Supplier's obligations under Schedule 1 to export or extract Recipient's "data" do not extend to data of the type contemplated in Clause 7.5(iii).

7.7    The Receiving Party must use its commercially reasonable efforts, upon the reasonable request of the Disclosing Party, to deliver to the Disclosing Party or otherwise destroy all documents or other materials containing or referring to Confidential Information of the Disclosing Party that are: (i) in the Receiving Party's possession, power or control; or (ii) in the possession, power or control of Specified Recipients who have received Confidential Information under Clause 7.2(i) or (ii), except to the extent the Receiving Party is required by Applicable Law to retain a copy for its records.   Subject to the provisos of Clause 9.1, any such request from Recipient shall be taken to be a Force Majeure Event if Supplier cannot reasonably supply such Transitional Arrangement without such Confidential Information.

7.8    The provisions of Clause 7 shall survive termination of this Agreement.

7.9    Nothing in this Agreement shall prevent any Party from seeking injunctive relief in respect of a breach by the other Party of its confidentiality obligations under this Agreement.

RLF1 16563366V.1

**8.      Indemnification; No Warranty; Limitation of Liability**

8.1      Recipient hereby agrees to indemnify and hold harmless Supplier and each of Supplier's Affiliates who are so affected (together, the "**Supplier Indemnified Parties**") from and against: (i) each third party Claim that the Supplier Indemnified Parties may suffer or incur; and (ii) reasonable costs and expenses incurred by the Supplier Indemnified Parties, in each case to the extent that each such Claim or cost arises out or in connection with the Recipient's use of any Transitional Arrangement. The indemnity under this <u>Clause 8.1</u> will not apply unless: (x) Supplier as soon as practicable gives Recipient Notice upon receipt of any such Claim; and (y) the relevant Supplier Indemnified Party reasonably consults Recipient in relation to the conduct or defence of that Claim.  Notwithstanding the foregoing, Recipient shall have no obligation to indemnify Supplier against Claims for license fees or other costs or damages in connection with Recipient's use of software or rights in information technology utilized by Recipient prior to the date hereof.

8.2      Supplier hereby agrees to indemnify and hold harmless Recipient and each of Recipient's Affiliates who are so affected (together, the "**Recipient Indemnified Parties**") from and against losses that the Recipient Indemnified Parties may suffer or incur, and reasonable costs and expenses (including the costs of obtaining services from another source to the extent a Transitional Arrangement is terminated because of a failure to provide such Transitional Arrangement in accordance with this Agreement), in each case to the extent that each such loss or expense arises out or in connection with the Supplier's gross negligence or willful misconduct in the provision of or failure to provide the Transitional Arrangements to Recipient in accordance with the requirements of this Agreement.

8.3      Notwithstanding any other provision of this Agreement: The Transitional Arrangements are provided solely for Recipient's internal benefit and use and Supplier accepts no responsibility or liability for losses or damages arising from any other use or purpose.  Supplier accepts no liability or responsibility to any third party who benefits from or uses the Transitional Arrangements or gains access to any deliverables thereunder.  The Transitional Arrangements are not intended to be relied upon by any third party.  Accordingly, Recipient may not provide any deliverables under the Transitional Arrangements or make the benefit of the Transitional Arrangements available to any third party.  Any spreadsheets, electronic materials or software tools that Supplier provides to Recipient, are for Recipient's convenience and are provided as-is.  In providing Transitional Arrangements hereunder, Supplier and its Affiliates may rely in good faith upon the advice of any third party adviser, law firm or other professional adviser that Supplier and its Affiliates reasonably believe to be reliable and competent in respect of the matters presented to it and shall not be liable for any Claim by Recipient to the extent that Supplier and its Affiliates act in good faith upon the advice of such adviser, law firm or other professional adviser; and SUPPLIER HEREBY EXPRESSLY DISCLAIMS AND SHALL NOT BE DIRECTLY OR INDIRECTLY LIABLE OR ACCOUNTABLE TO RECIPIENT OR ANY OF ITS AFFILIATES OR ANY THIRD PARTY FOR: (I) ANY AND ALL REPRESENTATIONS AND WARRANTIES REGARDING THE TRANSITIONAL ARRANGEMENTS, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION   OR   WARRANTY   IN   REGARD   TO   QUALITY,

PERFORMANCE, NON-INFRINGEMENT, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS OF THE TRANSITIONAL ARRANGEMENTS FOR A PARTICULAR PURPOSE AND RECIPIENT SPECIFICALLY DISCLAIMS THAT IT IS RELYING UPON OR HAS RELIED UPON ANY SUCH REPRESENTATION OR WARRANTY; (II) ANY AND ALL CONTRACTUAL OR OTHER RESPONSIBILITY, LIABILITY OR DUTY OF CARE TO ANY PARTY OTHER THAN RECIPIENT BASED UPON THE TRANSITIONAL ARRANGEMENTS OR ANY DELIVERABLES THEREUNDER OR ADVICE PROVIDED BY SUPPLIER, OR ITS AFFILIATES OR ITS SUBCONTRACTORS; AND/OR (III) RECIPIENT'S OR ANY OTHER PARTY'S RELIANCE ON ANY ADVICE, DATA, PROJECTIONS, STATEMENTS, REPRESENTATIONS, PREPARATIONS, SUGGESTIONS, RECOMMENDATIONS OR THE LIKE MADE BY SUPPLIER OR ANY OF ITS AFFILIATES OR CONTRACTORS DURING PERFORMANCE OF THE TRANSITIONAL ARRANGEMENTS UNDER THIS AGREEMENT.

8.4     EXCEPT AS EXPRESSLY PROVIDED UNDER CLAUSE 8.2, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUPPLIER SHALL HAVE NO LIABILITY TO RECIPIENT WHATSOEVER WITH RESPECT TO ANY TRANSITIONAL ARRANGEMENT.

8.5     EXCEPT FOR LIABILITY ARISING FROM SUPPLIER'S WILLFUL MISCONDUCT, THE MAXIMUM AGGREGATE LIABILITY OF SUPPLIER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER AS A RESULT OF INDEMNIFICATION (OTHER THAN FOR WILLFUL MISCONDUCT), BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF THE THEORY OF LIABILITY ASSERTED, SHALL BE LIMITED TO THE AGGREGATE CHARGES PAID OR PAYABLE BY RECIPIENT TO SUPPLIER UNDER THIS AGREEMENT.  NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE PARTIES ACKNOWLEDGE AND AGREE THAT SUPPLIER SHALL HAVE NO LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT (INCLUDING IN CONTRACT OR TORT (INCLUDING NEGLIGENCE), UNDER STATUTE OR OTHERWISE) TO THE EXTENT THAT SUCH LIABILITY RELATES TO: (I) CONSEQUENTIAL, SPECIAL, INCIDENTAL, INDIRECT OR PUNITIVE DAMAGES; (II) LOSS OF PROFITS (INCLUDING LOSS OF REVENUE, INCOME OR ANTICIPATED SAVINGS) OR DIMINUTION OF VALUE OR LOSS OF GOODWILL, LOSS OR CORRUPTION OF DATA OR LOSS OF POTENTIAL BUSINESS OPPORTUNITY, EVEN IF SUCH LOSS WAS REASONABLY FORESEEABLE; OR (III) ANY LIABILITY THAT DOES NOT HAVE A REASONABLE CAUSAL RELATIONSHIP TO THE BREACH THAT GAVE RISE TO THE CLAIM.

8.6     The Parties shall comply with applicable Data Protection Legislation to the extent applicable to the provision of the Transitional Arrangements and shall ensure that all necessary permissions and registrations as may be necessary to allow the provision of the Transitional Arrangements are obtained.

9.    **Force Majeure**

9.1    A Party will not be liable to the other Party for any default or delay in the performance of its obligations under this Agreement to the extent that that default or delay is caused or contributed to by, directly or indirectly, a Force Majeure Event, provided that the Party that is unable to perform as a result of the Force Majeure Event: (i) uses commercially reasonable efforts to recommence performance of such obligations without delay, including through the use of a workaround and alternate providers; and (ii) shall not be excused for any default or delay in performance of its obligations under this Agreement to the extent that such default or delay would have been avoided if such Party had commercially reasonable business continuity and disaster recovery arrangements in place.  A Party wishing to rely on a Force Majeure Event under this Clause must give the other Party Notice, as soon as practicable, of the occurrence of such Force Majeure Event, giving reasonable details of the Force Majeure Event.

10.    **Notice**

10.1    A notice under this Agreement ("**Notice**") shall only be effective if it is issued in writing, by registered courier or email.  Notices, demands or other communications made under or in connection with the matters contemplated by this Agreement shall be sent to a Party at its address or number and for the attention of the individual set out below:

| Party and title of individual | Address | Email |
|---|---|---|
| Supplier Attention: General Counsel | The registered office of Supplier from time to time, with copy to:<br><br>John W. Pettengill<br>Jim Burke<br>William E. Bandon, III<br>Lead Executive Counsel – Operations, IT and Sourcing | <br><br><br>John.Pettengill@ge.com<br>Jim.Burke@ge.com<br>William.Bandon@ge.com |

| Party and title of individual | Address | Email |
|---|---|---|
| Recipient Attention:<br><br>General Manager | Homer City Generation, L.P. 1750 Power Plant Road Homer City, PA 15748 Attn: Anthony J. Garaventa, General Manager NRG Homer City Services LLC | Anthony.Garaventa@nrg.com |
| and | | |
| Nick Rahn | Competitive Power Ventures, Inc. 8403 Colesville Road Suite 915 Silver Spring, MD 20910 Attn: Nick Rahn | nrahn@cpv.com |

10.2    A Party may change its Notice details on giving Notice to the other Party of the change in accordance with this <u>Clause 10</u>.  Such Notice shall only be effective on the third (3rd) business day after the date Notice has been received in accordance with this <u>Clause 10</u> or such later date as may be specified in the Notice. Any Notice shall, in the absence of earlier receipt, be deemed to have been duly given as follows: (i) if sent by registered courier, on delivery; or (ii) if emailed, (a) when the sender receives an automated message confirming delivery or (b) four (4) hours after the time sent (as recorded on the device from which the sender sent the email) unless the sender receives an automated message that the email has not been delivered, whichever happens first.  Any Notice given outside business hours in the place to which it is addressed shall be deemed not to have been given until the start of the next period of business hours in such place.  Each such Notice shall be deemed not to have been given unless it is sent to and by the Parties' Representatives designated by <u>Clause 10.1</u> and otherwise in accordance with this <u>Clause 10</u>.

**11.    General**

11.1    Except as otherwise expressly provided in this Agreement, this Agreement supersedes all prior discussions and agreements (whether oral or written, including all correspondence) if any, between the Parties with respect to the subject matter of this Agreement, and this Agreement contains the entire agreement between the Parties with respect to the subject matter hereof.  Nothing in this Clause shall, however, operate to limit or exclude any liability for fraud or willful default.

11.2    Supplier may only assign (including by operation of law), transfer, novate or otherwise deal with its rights under this Agreement or allow any interest in them to be varied, whether in whole or in part, to, or in favor of, any Affiliate without the consent of Recipient, but no such assignment, transfer, novation or other dealing shall excuse or limit any obligation of Supplier.   Recipient shall not assign, transfer, novate or otherwise deal with its rights under this Agreement or allow any interest in them to arise or be varied, whether in whole or in part.   Supplier may sub-contract or procure the performance of any of its obligations under this Agreement by any third party without the consent of Recipient.   Supplier shall be responsible to Recipient for all acts and omissions of any contractors, sub-contractors and other persons directly employed by Supplier to provide the Transitional Arrangements under this Agreement.

11.3    Upon and after the Effective Date, each Party shall bear its own legal, accounting, professional and advisory fees, commissions and other costs and expenses incurred by it in connection with this Agreement.

11.4    This Agreement may be amended, supplemented or modified by the mutual consent of the Parties expressed in writing, but not otherwise.

11.5    No waiver of any part of this Agreement or consent to any departure from it by any Party shall be effective unless it is in writing.   A waiver or consent shall be effective only for the purpose for which such waiver is given.   No default or delay on the part of any Party in exercising any rights, powers or privileges operates as a waiver of any right, nor does a single or partial exercise of a right preclude any exercise of other rights, powers or privileges.

11.6    Any provision of this Agreement which is invalid or unenforceable shall be ineffective only to the extent of such invalidity or unenforceability, without affecting in any way the validity, legality and enforceability of the remaining provisions hereof. Should any provision of this Agreement be or become ineffective for reasons beyond the control of the Parties, the Parties shall use commercially reasonable efforts to agree upon a new provision which shall as nearly as possible have the same commercial effect as the ineffective provision.   This Clause has no effect if the severance of a provision of this Agreement (or a portion thereof) alters the basic nature of this Agreement or is contrary to public policy.

11.7    This Agreement does not create a relationship of employment, trust, agency or partnership between the Parties, and Supplier, or its Affiliates, or other persons as the case may be, are acting as independent contractors of Recipient in performing the Transitional Arrangements.

11.8    This Agreement, any disputes and any other Claims, controversy, causes of action or disputes that may be based upon, arise out of or relate hereto, to the transactions contemplated hereby, to the negotiation, execution or performance, or the validity, interpretation, enforceability (e.g., that all or any part of this Agreement is void or voidable), formation, breach or termination hereof, or to the inducement of any party to enter herein, whether for breach of contract, tortious conduct or otherwise and whether predicated on common law, statute or otherwise, including Claims seeking redress or asserting rights under any Applicable Law, shall in all respects be

RLF1 16563366V.1

governed by, and construed in accordance with, the laws of the State of New York in each case without reference to any conflict of law rules that might lead to the application of the laws of any other jurisdiction. Each Party submits to the non-exclusive jurisdiction of the courts of the State of New York sitting in the County of New York or the United States District Court for the Southern District of New York and the appellate courts having jurisdiction of appeals in such courts, including if necessary to grant interlocutory relief pending the outcome of that process.

11.9    Notwithstanding anything to the contrary herein, this Agreement shall not become effective or binding on the Parties unless and until the Plan is confirmed and approved by the Bankruptcy Court and the Effective Date has occurred.

11.10   This Agreement shall be binding upon the Parties and their respective permitted successors and permitted assigns, and shall inure to the benefit of the Parties and their respective permitted successors and permitted assigns.

11.11   Supplier's rights and remedies contained in this Agreement are cumulative and not exclusive of rights or remedies provided by law, except as expressly set out in this Agreement.

11.12   Except as provided in Clauses 8.1 and 8.2 with respect to the Supplier Indemnified Parties and Recipient Indemnified Parties, nothing in this Agreement, express or implied, is intended to or shall confer upon any other person, including any union or any employee or former employee of Supplier or its Affiliates or Recipient or its Affiliates, any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

11.13   EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS CLAUSE 11.13.

11.14   No past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of Supplier or its Affiliates shall have any liability for any obligations or liabilities of Supplier under this Agreement of or for any Claim (whether in contract or in tort, in law or in equity) based on, in respect of, or by reason of, the transactions contemplated hereby and thereby and all of such parties are expressly intended as third party beneficiaries of this provision of this Agreement.

11.15  Notwithstanding anything to the contrary contained in this Agreement or in the Schedule hereto, none of Supplier or any of its Affiliates, or any of their respective Representatives, shall be obligated, pursuant to this Agreement or the Schedule hereto, as part of or in connection with the services provided hereunder, as a result of storing or maintaining any data referred to herein or in the Schedule hereto, or otherwise, to prepare or deliver any notification or report to any Government Authority or other person on behalf of Recipient or any of its Affiliates, or any of their respective Representatives.

## 12.  Definitions and Interpretation

12.1  Capitalized terms used in this Agreement have the meanings given to them below.  Capitalized terms used in this Agreement without definition have the meaning ascribed to such terms in the Restructuring Support Agreement.

**Affiliate** of a Party means any party directly or indirectly Controlling or Controlled by, or under direct or indirect common Control with, that Party at the applicable time.

**Agreement** has the meaning set forth in the preamble.

**Applicable Law** means any law, treaty, statute, ordinance, code, rule, regulation, normative act, standard, guideline, policy, decree, order, writ, award, injunction, determination or other pronouncement, in each case having the effect of law of any Government Authority, as currently interpreted and administered.

**Charges** has the meaning set forth in Clause 5.

**Claim** means any allegation, debt, cause of action, liability, claim, proceeding, suit or demand of any nature howsoever arising and whether present or future, fixed or unascertained, actual or contingent, whether at law, in equity, under statute or otherwise, including any action by a Government Authority.

**Confidential Information** of a Party means all confidential, non-public or proprietary information relating to the business, technology or other affairs of that Party, or of that Party's customers, suppliers or Affiliates, regardless of how the information is stored or delivered, that is exchanged or made available to a Party in connection with this Agreement, regardless of whether that information is exchanged before, on or after the Effective Date, but excludes information which: (a) is in, or becomes part of, the public domain other than through breach of this Agreement or an obligation of confidence owed to the Disclosing Party to whom that Disclosing Party owes a duty of confidence in relation to such information; (b) the Receiving Party can prove by contemporaneous written documentation was already known to it at the time of disclosure by the Disclosing Party; or (c) the Receiving Party acquires from a third party entitled to disclose it to the Receiving Party with no restrictions on the Receiving Party as to its further disclosure, or that the Receiving Party could not reasonably have known was confidential.

**Control** means the possession, directly or indirectly, of, or the entitlement to acquire: (a) the power to direct or cause the direction of the management or policies of an entity whether by contract, ownership of voting shares (or other ownership interests) or otherwise; or (b) the ability of a person to ensure that the activities and business of that company are conducted in accordance with the wishes of that person; or (c) the majority of the issued share capital or the voting rights in an entity or the right to receive the majority of the income of that company on any distribution by it of all of its income or the majority of its assets on a

winding-up, and **Controlled by, under common Control with**, and **Controlling** shall be construed accordingly.

**Data Protection Legislation** means Title V, Subtitle A of the federal Gramm-Leach-Bliley Act 15 USC § 6801 et seq., (the "**GLB Act**"), its implementing regulations and the guidelines issued pursuant to § 501 of the GLB Act (including the requirements of Sections 114 and 315 of the Fair and Accurate Credit Transaction Act of 2003 (15 USC § 1681m and § 1681c, respectively)) and all other applicable national, federal, state, and local laws and regulations relating to processing of personal data, data security breaches and privacy, in the jurisdiction in which any of the Transitional Arrangements are being provided.

**Dependency** has the meaning set forth in <u>Clause 2.3</u>.

**Disclosing Party** has the meaning set forth in <u>Clause 7.1</u>.

**Effective Date** means the date on which the Plan has become effective pursuant to its terms and the order of the bankruptcy court confirming the Plan.

**Force Majeure Event** means any event or circumstance beyond the reasonable control of a Party, including: (a) failure of public infrastructure or energy sources; (b) accident or breakage of any machinery or apparatus of the other Party or a third party through no fault of the affected Party or its sub-contractors; (c) epidemics, storms, floods, fires or acts of God; (d) explosion, sabotage, war or terrorist action; (e) riots or civil disorders; (f) strikes, lockouts or other labor difficulties; (g) collapse (local, regional, national or global) of organized civil society due to pandemic or radiation-based reanimation of the exanimate; (h) failure in the other Party's infrastructure or third-party services through no fault of the affected Party or its sub-contractors; (i) unavailability of IT parts through no fault of the affected Party or its sub-contractors; and (j) governmental or regulatory intervention of any kind, including interference by civil or military authorities or the passage of regulations or laws or amendments to them and the making or amendment of any law (including an Applicable Law), that makes unlawful the provision of any Transitional Arrangement.

**Government Authority** means any applicable local, municipal, state, national, foreign or other governmental, semi-governmental, administrative, fiscal or judicial body, department, commission, authority, tribunal, agency, self-regulating organization or entity in any other state or country with jurisdiction over the Parties or the transactions contemplated hereby.

**GP Services** has the meaning set  forth in <u>Clause 1.1</u>.

**Intellectual Property Rights** or **IP Rights** means: (a) all trademarks, service marks, trade dress, trade names, logos, domain names, and corporate names and registrations and applications for registration thereof together with all of the goodwill associated therewith; (b) copyrights (registered or unregistered) and copyrightable works and registrations and applications for registration thereof; (c) mask works and registrations and applications for registration thereof; (d) trade secrets and Confidential Information, plans, proposals, technical data, marketing plans, customer data, prospect lists and information; (e) patents; and (f) other intellectual property rights.

**Notice** has the meaning set forth in <u>Clause 10.1</u>.

**Omitted Arrangement** has the meaning set forth in <u>Clause 2.2</u>.

**Parties** means the parties to this Agreement and **Party** means any one of them.

**Plan** means the joint chapter 11 plan of reorganization for Recipient that is referred and attached to the Restructuring Support Agreement.

**Pre-Plan Form** means, in relation to each Transitional Arrangement: (a) if a service or access right substantially equivalent to that Transitional Arrangement was provided by Supplier's Affiliate to Recipient in the one year- period prior to the Effective Date by itself, the other Party or any one of their Affiliates, the same or reasonably equivalent form in which that service or access right was last provided before the Effective Date; or (b) if a service or access right substantially equivalent to that Transitional Arrangement was provided by Supplier's Affiliate to Recipient in the one-year period prior to the Effective Date by a third party that is not an Affiliate of either Party, the form that is consistent with the contract under which that Transitional Arrangement was last provided by that third party; "form" for this purpose being taken to include the configuration, version, patch-levels and other implementation-specific details of the applicable software and systems for any Transitional Arrangement, or its equivalent service or access right.

**Receiving Party** has the meaning set forth in Clause 7.1.

**Recipient** has the meaning set forth in the Preamble hereof.

**Recipient Indemnified Parties** has the meaning set forth in Clause 8.2.

**Representative** of a Party includes an employee, agent, officer, director, auditor, adviser, partner, or consultant or contractor (other than the other Party) of that Party.

**Restructuring Support Agreement** has the meaning set forth in the Recitals hereof.

**Specified Recipient** has the meaning set forth in Clause 7.2.

**Steering Committee** has the meaning set forth in Clause 4.

**Supplier** means that Party set forth in the Preamble hereof.

**Supplier Indemnified Parties** has the meaning set forth in Clause 8.1.

**Transitional Arrangement** has the meaning set forth in Clause 1.1.

**U.S. Dollars** means the lawful currency from time to time of the United States of America.

12.2    Unless the contrary intention appears, a reference in this Agreement to: (i) (internal references) the terms "hereof", "herein", "hereby", "hereto", and derivative or similar words refer to this Agreement, including the Schedule; (ii) (person) the word "person" includes an individual, a firm, a body corporate, a partnership, joint venture, an unincorporated body or association, or any Government Authority; (iii) (meaning not limited) the words "include", "including", "for example" or "such as" are not to be interpreted as words of limitation, and when such words introduce an example, they do not limit the meaning of the words to which the example relates, or to examples of a similar kind, and the word "or" shall not be exclusive.

12.3    The rule of construction, if any, that a contract should be interpreted against the parties responsible for the drafting and preparation thereof, shall not apply.

12.4    Headings are included for convenience only and are not to affect the interpretation of this Agreement.

12.5    The Schedule forms part of this Agreement, and shall have the same effect as if it had been set out herein.

12.6    If there is an inconsistency between these general terms of this Agreement and the Schedule, or a document attached to the Schedule, then the provision in these general terms prevails to the extent of the inconsistency.

12.7    Except to the extent expressly contemplated in this Agreement, the rights and obligations of the Parties set forth herein shall not affect, or be affected by, the rights and obligations set forth in the Restructuring Support Agreement (e.g., the indemnification provisions in this Agreement shall not be subject to the limitations on indemnification set forth in the Restructuring Support Agreement), and no breach under this Agreement shall constitute a breach under the Restructuring Support Agreement unless the breach under this Agreement also constitutes a breach under the Restructuring Support Agreement by the terms thereof.

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be executed as of the Effective Date.

**GE CAPITAL US HOLDINGS, INC.**

_____
Name:
Title:

**HOMER CITY GENERATION, L.P.**

_____
Name:
Title:

## Schedule 1: Transitional Arrangements

| No. | Transitional Arrangement | Description of Transitional Arrangement |
|-----|-------------------------|----------------------------------------|
| 1. | Operational Management | Supplier shall, if requested by Recipient's new asset manager, provide advice regarding the hiring of consultants, brokers, attorneys, accountants and such other agents for the Recipient as it may deem necessary or advisable to operate and/or provide services at the Project (including energy management, power marketing, fuel procurement and transportation, and operation services and legal services, permit, environmental and regulatory compliance, government and community relations) (collectively "**Advisors**").  All Advisors shall be engaged by the new asset manager and the Supplier has no responsibility or obligation with respect to the engagement of any such Advisors. |
| 2. | Maintenance of Debt | Supplier monitors the outstanding exit facility debt balances in excel for Recipient.  Period payments are issued by Supplier via manual wires thru Gbank. |
| 3. | Booking | 1) Supplier shall maintain the accounting books and records for Recipient.<br><br>2) Supplier shall reconcile balance sheet accounts quarterly in accordance with Supplier's Account Reconciliation standards. |
| 4. | Fuel tracking Service – General | Supplier shall continue to provide inventory system and access to "Comtrac" Fuel system to track vendors and costs incurred, inventory, and deliveries. |
| 5. | Cash and Collection of Payments | Supplier shall undertake efforts consistent with Supplier's existing standard operating procedures to collect all monthly payments.<br><br>Supplier shall process all cash receipts for Homer City Hedge, Capacity and Generation using Supplier's existing standard operating procedures.  Supplier shall disburse funds as required using Supplier's existing standard operating procedures. |

| 6. | Technical Support | Supplier shall assist the Recipient's new asset manager so that it may maintain the current routine oversight program that includes: |
| | | - Weekly Plant Status Call Participation |
| | | - Weekly Environmental Call Participation |
| | | - Monthly Report Review Calls (when held) |
| | | - Review of Annual and Outage Budgets (when requested) |
| | | - Review of Major Outage Budgets and Scope (when requested) |
| | | - Review of Capital Projects Justification (when requested) |
| | | - Review of Major Outage Progress |
| | | Supplier shall participate, as requested by the Recipient's new asset manager, in non-routine programs that may include: |
| | | - Review of Root Cause Analysis of critical equipment failures |
| | | - Review of Safety Incidents and corrective actions |
| | | - Review of Environmental permitting, regulatory, and compliance issues |
| | | Supplier could participate, as requested by the Recipient's new asset manager, in NOx Emission project work to include: |
| | | - Consultation on options and engineering reports |
| | | - Consultation on submissions of Plan Approval Application to PADEP |
| 7. | Operations Energy Management | Supplier shall assist the Recipient's new asset manager so that it may maintain standard operating procedures in formulation of investment policies and strategies for the Recipient (including formulating bid strategy for PJM capacity auctions, directing energy hedging and energy management activities, developing and executing fuel procurement and transportation strategies |

|  |  | and developing risk management policies). |
|---|---|---|
| 8. | Access to Records | Upon the request of Recipient, during normal business hours, Supplier shall provide Recipient with reasonable access to all books, records, files, papers, and data (whether in hard copy or computer format) that are held by Supplier or that are under its control. |
| 9. | Maintenance of Insurance | At the direction of the Recipient's new asset manager, to advise on the purchase of insurance policies on behalf of the General Partner and the Recipient, including for director and officer liability and other liabilities of the General Partner and the Recipient. |
| 10. | Reporting | Supplier shall assist the Recipient's new asset manager to make tax, regulatory, and other filings with, and to render periodic and other reports to, governmental agencies having jurisdiction over the assets or business of the Recipient. |

**Exhibit E**

**FORM OF JOINDER AGREEMENT FOR CONSENTING NOTEHOLDERS**

   This joinder agreement (the "Joinder Agreement") to the Restructuring Support Agreement dated January 9, 2017 (as amended, supplemented or otherwise modified from time to time, the "Agreement"), between Homer City Generation, L.P. (the "Company"), EFS Homer City LLC , EFS HC GP, LLC, EFS-N LLC, General Electric Company, General Electric Capital Corporation, GE Capital US Holdings, Inc., and any GE affiliate that is a holder of the Notes, and the holders of the principal amounts outstanding under the indenture dated December 14, 2012 (together with their respective successors and permitted assigns, the "Consenting Noteholders" and each, a "Consenting Noteholder") is executed and delivered by _____ (the "Joining Party") as of _____, 2017. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

   1. Agreement to be Bound.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as Annex I (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Consenting Noteholder" and a "Party" for all purposes under the Agreement and with respect to any and all Claims held by such Joining Party.

   2. Representations and Warranties.  With respect to the aggregate principal amount of 8.137% Senior Secured Notes, and the aggregate principal amount of 8.734% Senior Secured Notes, in each case, set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Noteholders set forth in Section 9 of the Agreement to each other Party to the Agreement.

   3. Governing Law.  This Joinder Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder Agreement to be executed as of the date first written above.

**[CONSENTING NOTEHOLDER]**

By:_____
      Name:
      Title:

Aggregate Principal Amount of Notes Beneficially Owned or Over Which the Above Signed Entity has the Power to Direct on Behalf of the Beneficial Owners:

**8.137% Senior Secured Notes**: $_____

**8.734% Senior Secured Notes**: $_____

Notice Address:

_____
_____
_____
Fax: _____
Attention:_____
E-mail:_____

Acknowledged:

**Homer City Generation, L.P.**
By: EFS HC GP, LLC, its General Partner

By:_____
      Name:
      Title:

2