## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

---------------------------------------------------------x
:
In re                                                 :        **Chapter 11**
:
**HOMER CITY**                                        :        **Case No. 17-[_____] (___)**
**GENERATION, L.P.**                                  :
:
Debtor.[1]                          :
---------------------------------------------------------x

## DISCLOSURE STATEMENT FOR PREPACKAGED CHAPTER 11 PLAN OF
## REORGANIZATION OF HOMER CITY GENERATION, L.P.

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Facsimile:  (302) 651-7701

*Proposed Attorneys For The Debtor And*
*Debtor In Possession*

Dated:  January 9, 2017
        Wilmington, Delaware

---

[1] The last four digits of the Debtor's federal tax identification number are 3693.  The location of the Debtor's principal place of business is 1750 Power Plant Road, Homer City, Pennsylvania 15748.

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE PLAN (AS DEFINED HEREIN) BEFORE THE FILING OF A VOLUNTARY CASE (THE "CHAPTER 11 CASE") UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE"). BECAUSE THE CHAPTER 11 CASE HAS NOT YET BEEN COMMENCED, THIS DISCLOSURE STATEMENT HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING ADEQUATE INFORMATION WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. FOLLOWING THE COMMENCEMENT OF THE CHAPTER 11 CASE, THE DEBTOR EXPECTS TO PROMPTLY SEEK (I) BANKRUPTCY COURT APPROVAL OF (A) THIS DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, AND (B) THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(b) OF THE BANKRUPTCY CODE, AND (II) CONFIRMATION OF THE PLAN.

**DISCLOSURE STATEMENT, DATED JANUARY 9, 2017**

Solicitation of Votes on the
Plan of Reorganization of

**HOMER CITY GENERATION, L.P.**

from the holders of outstanding

**NOTES CLAIMS**

---

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., EASTERN STANDARD TIME, ON FEBRUARY 6, 2017, UNLESS EXTENDED BY THE DEBTOR. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS JANUARY 5, 2017 (THE "VOTING RECORD DATE").

---

**RECOMMENDATION BY THE DEBTOR,
CONSENTING NOTEHOLDERS AND GE**

Homer City Generation, L.P. ("**Homer City**" or the "**Debtor**") recommends that all creditors whose votes are being solicited submit ballots to accept the Plan. Holders of approximately eighty-six percent (86%) of the outstanding principal amount of the Notes Claims (defined herein) have already agreed to vote in favor of the Plan. This includes the approximately sixteen percent (16%) in outstanding principal amount of the Notes Claims (defined herein) held by General Electric Company, together with its affiliates other than the Debtor (collectively, "**GE**"), which also is the sponsor of the Debtor, and which supports the Plan.

---

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN OF NEWCO INTERESTS TO HOLDERS OF ALLOWED NOTES CLAIMS (DEFINED HEREIN) SHALL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE OR PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM REGISTRATION. THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE NEWCO INTERESTS TO BE ISSUED ON THE EFFECTIVE DATE HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE SOLICITATION OF VOTES ON THE PLAN WITH RESPECT TO THE NOTES CLAIMS IS BEING MADE PURSUANT TO SECTION 4(A)(2) AND REGULATION D OF THE SECURITIES ACT AND ONLY FROM HOLDERS OF SUCH CLAIMS WHO ARE ELIGIBLE NOTEHOLDERS (I.E., "ACCREDITED INVESTORS" AS DEFINED IN RULE 501 OF THE SECURITIES ACT OR "QUALIFIED INSTITUTIONAL BUYERS" AS DEFINED IN RULE 144A OF THE SECURITIES ACT); *PROVIDED*, *HOWEVER*, THAT ALL HOLDERS OF ALLOWED NOTES CLAIMS WILL BE ENTITLED TO RECEIVE DISTRIBUTIONS UNDER THE PLAN.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING STATEMENTS INCORPORATED BY REFERENCE), PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING THOSE IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

**NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.   THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.   NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.**

**ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................................... 1

II. OVERVIEW OF THE DEBTOR ........................................................................................... 5
    A.    The Debtor's Business ............................................................................................. 5
    B.    The Debtor's Organizational Structure .................................................................... 7
    C.    Management and the Chief Restructuring Officer ................................................... 9
    D.    Regulation of the Debtor's Business ....................................................................... 9
    E.    The 2012 Restructuring ........................................................................................... 9
    F.    The Debtor's Capital Structure ............................................................................... 9

III. KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE ............. 11
    A.    Shift in Merchant Generation Energy Market Economics for Coal-Fired Facilities ........... 11
    B.    Increased Natural Gas Supply and Lower Energy Prices ...................................... 11
    C.    Market Volatility and Associated Impact on Financial Performance and Sustainability ................................................................................................... 12
    D.    Government Regulations and Compliance Costs .................................................. 12
    E.    Implementation of Cost Reduction and Liquidity Management Initiatives ......... 13
    F.    Attempted Sale Process ......................................................................................... 14
    G.    Restructuring Support Agreement ........................................................................ 14

IV. ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE ......................................... 15
    A.    Commencement of Chapter 11 Case and First Day Motions ............................... 15
    B.    Other Procedural Motions and Retention of Professionals ................................... 17
    C.    Confirmation Hearing ........................................................................................... 17

V. PENDING LITIGATION .................................................................................................... 17

VI. SUMMARY OF THE PLAN .............................................................................................. 18
    A.    Administrative Expense and Priority Claims ....................................................... 18
    B.    Classification of Claims and Interests .................................................................. 19
    C.    Treatment of Claims and Interests ....................................................................... 20
    D.    Means for Implementation .................................................................................... 22
    E.    Distributions ......................................................................................................... 28
    F.    Procedures for Disputed Claims ........................................................................... 32
    G.    Executory Contracts and Unexpired Leases ........................................................ 33
    H.    Conditions Precedent to Confirmation of Plan and Effective Date ..................... 37

I. Effect of Confirmation of Plan.................................................................. 38

J. Retention of Jurisdiction ...................................................................... 43

K. Miscellaneous Provisions...................................................................... 45

VII. FINANCIAL INFORMATION AND PROJECTIONS.................................... 48

VIII. VALUATION ANALYSIS .......................................................................... 54

IX. TRANSFER RESTRICTIONS AND CONSEQUENCES
UNDER FEDERAL SECURITIES LAWS .................................................... 56

X. CERTAIN U.S. TAX CONSEQUENCES OF THE PLAN ................................ 57

XI. CERTAIN RISK FACTORS TO BE CONSIDERED .................................... 63

A. Certain Bankruptcy Law Considerations ................................................ 64

B. Risks Relating to Homer City's Business and Financial Condition............ 65

C. Factors Relating to Securities To Be Issued under the Plan, Generally........ 66

D. Risks Related to an Investment in the NewCo Interests ............................ 67

E. Additional Factors................................................................................ 67

XII. VOTING PROCEDURES AND REQUIREMENTS .................................... 68

A. Voting Instructions and Voting Deadline ................................................ 68

B. Tabulation Procedures........................................................................... 69

C. Agreements Upon Furnishing Ballots .................................................... 70

D. Change of Vote ..................................................................................... 70

E. Waivers of Defects, Irregularities, etc .................................................... 70

F. Miscellaneous ...................................................................................... 71

XIII. CONFIRMATION OF THE PLAN............................................................. 71

A. Confirmation Hearing ........................................................................... 71

B. Objections to Confirmation.................................................................... 71

C. Requirements for Confirmation of Plan.................................................. 73

XIV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN................ 77

A. Alternative Plan of Reorganization ....................................................... 77

B. Sale Under Section 363 of the Bankruptcy Code..................................... 77

C. Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law........... 77

XV. CONCLUSION AND RECOMMENDATION ............................................. 79

RLF1 16564873v.1

Exhibit A        Plan
Exhibit B        Liquidation Analysis

RLF1 16564873v.1

# I.
## INTRODUCTION

Homer City Generation, L.P. submits this Disclosure Statement in connection with the solicitation of votes (the "**Solicitation**") on the *Chapter 11 Plan of Reorganization of Homer City Generation, L.P.*, dated January 9, 2017 (the "**Plan**," attached hereto as **Exhibit A**).  Capitalized terms used in this Disclosure Statement, but not herein defined, have the meanings ascribed to such terms in the Plan.  To the extent of any inconsistency between this Disclosure Statement and the Plan, the Plan governs.

The Debtor is commencing this Solicitation after extensive discussions over the past several months with holders of the Debtor's outstanding secured notes (the "**Notes**"; the holders thereof, the "**Noteholders**"; the Claims of the Noteholders, the "**Notes Claims**"), which represent the Debtor's only outstanding funded debt and the only class of impaired creditors under the Plan.  As a result of these negotiations, the Debtors entered into that certain Restructuring Support Agreement, dated as of January 9, 2017 (the "**Restructuring Support Agreement**"), with holders of approximately seventy percent (70%) of the Notes (the "**Consenting Noteholders**") and the GE Parties (defined below), the Debtor's equity sponsor and a holder of an additional approximately sixteen percent (16%) of the Notes, for total support of approximately 86% of the holders of Notes Claims.  A copy of the Restructuring Support Agreement is attached to the Plan as **Exhibit A**.

Under the Plan, in full satisfaction of the Notes Claims, the Noteholders (other than GE, as described below) will receive, on the Effective Date or as soon as practicable thereafter, a Pro Rata share of one hundred percent (100%) of limited liability company interests in New Holdco (the "**NewCo Interests**"), the sole equity owner of the Reorganized Debtor.  In addition, each holder of a Notes Claims (other than GE) shall receive its Pro Rata share of the "**GE Remainder**," which refers to the percentage of NewCo Interests GE has agreed to contribute, pursuant to the Restructuring Support Agreement, to the pool of Distributions to all holders of Notes Claims other than GE.  GE will receive, on account of its Notes Claims, its Pro Rata share of the NewCo Interests other than the GE Remainder.  All existing partnership interests in Homer City will be cancelled on the Effective Date.

Pursuant to Plan, GE's obligations under any guaranty, indemnification or credit support currently provided to or for the benefit of Homer City (the "**GE Guaranties**") will be released and replaced through exit financing (the "**Exit Facility**") incurred by the Reorganized Debtor on the Effective Date.  The Debtor expects to have commitments for $150 million of financing under the Exit Facility, on terms and conditions to be set forth in the Plan Supplement.  Homer City has engaged a financial services institution to serve as lead arranger for the Exit Facility.  As a condition to the effectiveness of the Plan, all beneficiaries of the GE Guaranties must deliver to GE an irrevocable release of GE's obligations under the GE Guaranties.

Additionally, as discussed in Section V of this Disclosure Statement, Homer City is party to a state court action, referred to herein as the "**Consol Litigation**," commenced by a contract counterparty in connection with a coal sale agreement, referred to herein as the "**Consol Agreement**."  The Debtor has recently entered into an agreement with Consol, which upon becoming effective, will resolve the Consol Litigation and set forth the terms on which the Reorganized Debtor with purchase coal from Consol for a period commencing on the Effective Date (the "**Consol Contract**").  In light of the Consol Contract, the Debtor, the Consenting Noteholders and GE have agreed pursuant to the Restructuring Support Agreement that all General Unsecured Claims will be unimpaired under the Plan.  Accordingly, General Unsecured Claims will be presumed to accept the Plan and, thus, will not be entitled to vote on the Plan.

The Plan also contemplates that GE will transition the services it performs for the Facility and its other assets and operations pursuant to the terms of a transitional services agreement (the "**Transitional**

**Services Agreement**").  The Transitional Services Agreement provides, among other things, that GE Capital US Holdings, Inc. or an engaged subcontractor will provide to Reorganized Homer City certain services for a transitional period not to exceed five (5) months.  In exchange, Homer City will pay GE Capital Global Holdings, LLC ("**GECC**") a monthly fee of $250,000 per month for the three (3) months following the Effective Date (unless the Transitional Services Agreement is terminated in accordance with the terms thereof) and, in Reorganized Homer City's discretion, Reorganized Homer City may elect to extend transition services for two (2) additional months at a rate of $300,000 per month for the fourth and fifth month following the Effective Date, and any associated taxes and similar charges due in connection with performance of the transitional arrangements during the term of the Transitional Services Agreement.  A copy of the Transitional Services Agreement is attached as **Exhibit D** to the Restructuring Support Agreement.

The purpose of this Disclosure Statement is to provide holders of Claims entitled to vote to accept or reject the Plan with adequate information about: (i) the Debtor's business and certain historical events, (ii) the Chapter 11 Case, (iii) the Plan, (iv) the rights of holders of Claims and Interests under the Plan, and (v) other information necessary to enable each holder of a Claim to make an informed judgment as to whether to vote to accept or reject the Plan.

> **THE DEBTOR, THE CONSENTING NOTEHOLDERS, AND GE URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE IN FAVOR OF THE PLAN.**

**WHO IS ENTITLED TO VOTE**: Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

There is one Class of creditors entitled to vote on the Plan and whose acceptances of the Plan are being solicited: the holders of Notes Claims.

THE PLAN PROVIDES THAT THE FOLLOWING ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN: (1) EACH OTHER RELEASED PARTY; (2) HOLDERS OF IMPAIRED CLAIMS OR INTERESTS THAT ARE NOT RELEASED PARTIES, EXCEPT ANY SUCH HOLDER THAT VOTED TO REJECT, OR ABSTAINED FROM VOTING ON, THE PLAN AND HAVE ALSO CHECKED THE BOX ON THE APPLICABLE BALLOT OR NOTICE INDICATING THAT THEY OPT OUT OF GRANTING THE RELEASES PROVIDED IN THE PLAN; (3) EACH HOLDERS OF AN UNIMPAIRED CLAIM THAT DOES NOT TIMELY OBJECT TO THE RELEASES PROVIDED FOR IN THE PLAN; AND (4) WITH RESPECT TO ANY ENTITY IN THE FOREGOING CLAUSES (1) THROUGH (3), SUCH ENTITY'S PREDECESSORS, SUCCESSORS AND ASSIGNS, SUBSIDIARIES, AFFILIATES, MANAGED ACCOUNTS OR FUNDS, CURRENT OR FORMER OFFICERS, DIRECTORS, PRINCIPALS, SHAREHOLDERS, MEMBERS, PARTNERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, MANAGEMENT COMPANIES, FUND ADVISORS AND OTHER PROFESSIONALS, AND SUCH ENTITY'S RESPECTIVE HEIRS, EXECUTORS, ESTATES, SERVANTS AND NOMINEES.

The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan see Section VI—Summary of the Plan, below.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Valuation Analysis in Section VIII.

| Class | Claim or Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery[2] |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | In full satisfaction of its Claim, cash equal to the full amount of its Claim or other such treatment rendering such claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No (Presumed to Accept) | 100% |
| 2 | Other Secured Claims | In full satisfaction of its Claim: (a) payment in full in cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No (Presumed to Accept) | 100% |
| 3 | Notes Claims | Except to the extent that a holder of an Allowed Notes Claim agrees to a less favorable treatment of such Claim, (i) each such holder (other than GE) shall receive, in exchange for the contribution of such Notes Claim to New Holdco, such holder's Pro Rata share of one hundred percent (100%) of the NewCo Interests, plus such holder's Pro Rata share of the GE Remainder and (ii) GE, on account of the GE Notes Claims, shall receive in exchange for the contribution of the GE Notes Claims to New Holdco, 66.67% of its Pro Rata share of the NewCo Interests and no share of the GE Remainder. | Impaired | Yes | Notes Claims 36.7% - 46.5% GE Notes Claims 23.0% - 29.2% |
| 4 | General Unsecured Claims | In full satisfaction of its Claim, each holder of an Undisputed General Unsecured Claim who was not paid pursuant to the All Trade Order shall | Unimpaired | No (Presumed to Accept) | 100% |

---

[2] The ranges set forth under Approximate Percentage Recovery are based on the range of reorganized equity value of the Debtor as described in the Valuation Analysis.

| | | | | | |
|---|---|---|---|---|---|
| | | receive (i) payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after such General Unsecured Claim becomes Allowed, in each case, or as soon as reasonably practicable thereafter, or (ii) such other treatment so as to render such holder's General Unsecured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | | | |
| 5 | Intercompany Claims | Each Holder of an Intercompany Claim,[3] if any, shall not receive any consideration or recovery under the Plan on account of its Intercompany Claim, and on the Effective Date, all Intercompany Claims shall be cancelled and discharged. | Impaired | No (Deemed to Reject) | 0% |
| 6 | Homer City Interests | On the Effective Date, all Homer City Interests shall be cancelled, extinguished, and discharged. | Impaired | No (Deemed to Reject) | 0% |

**WHERE TO FIND ADDITIONAL INFORMATION:**  Homer City publishes quarterly and annual financial statements (each a "**Financial Statement**") and furnishes other information on its website (www.homercitygeneration.com) under the "Financial & Operational Reports" link.  Each of the following reports is incorporated as if fully set forth herein and is a part of this Disclosure Statement. Reports filed on Homer City's website on or after the date of this Disclosure Statement are also incorporated by reference herein.

- Financial Statement for the fiscal years ended December 31, 2014 and December 31, 2015,  published on Homer City's website;

- Financial Statement for the fiscal quarter ended March 31, 2016 (unaudited), published on Homer City's website;

- Financial Statement for the fiscal quarter ended June 30, 2016 (unaudited), published on Homer City's website;

- Update Materials, published on Homer City's website on August 17, 2016; and

- Financial Statement for the fiscal quarter ended September 30, 2016 (unaudited), published on Homer City's website.

---

[3] For the avoidance of doubt, this term does not include Notes Claims held by GE or the GE Ordinary Course Claims.

**THE DEBTOR'S PROFESSIONALS**: The Debtor's professionals are: (i) Richards, Layton & Finger, P.A., counsel; (ii) PJT Partners Inc. ("**PJT**"), investment bankers; (iii) Zolfo Cooper LLC, restructuring advisors ("**Zolfo**"); and (v) Epiq Bankruptcy Solutions, LLC, claims agent and administrative advisor. The contact information for these professionals is set forth below:

| | |
|---|---|
| **RICHARDS, LAYTON & FINGER, P.A.**<br>One Rodney Square<br>920 North King Street<br>Wilmington, Delaware 19801<br>Attn: Mark D. Collins (No. 2981)<br>      Russell C. Silberglied (No. 3462)<br>      Paul N. Heath (No. 3704)<br>      Joseph C. Barsalona II (No. 6102)<br>Telephone: (302) 651-7700 | **PJT PARTNERS INC.**<br>280 Park Avenue<br>New York, New York 10017<br>Attn: Mark Buschmann<br>      John Singh<br>Telephone: (212) 364-7800 |
| **ZOLFO COOPER LLC**<br>865 South Figueroa Street, Suite 2310<br>Los Angeles, CA 90017<br>Attn: John Boken<br>Telephone: (213) 234-3800 | **EPIQ BANKRUPTCY SOLUTIONS, LLC**<br>777 Third Avenue, 12th Floor<br>New York, New York 10017<br>Telephone: (646) 282-2500 |

**PLEASE TAKE NOTE OF THE FOLLOWING KEY DATES AND DEADLINES FOR THE CHAPTER 11 CASE:**

| | |
|---|---|
| Commencement of Solicitation | **On or before January 11, 2017** |
| Deadline to file the Plan Supplement with respect to the Plan (the "**Plan Supplement Deadline**"): | **January 30, 2017** |
| Deadline for completed ballots to be received by the Voting Agent (the "**Voting Deadline**"): | **February 6, 2017 at 5:00 p.m. (EST)** |
| Deadline to file and serve any objection or response to the Disclosure Statement, the Plan or the Plan Supplement (the "**Objection Deadline**"): | **February 8, 2017 at 4:00 p.m. (EST)** |
| Proposed date and time for the commencement of the hearing to (i) determine the sufficiency of the Disclosure Statement and (ii) consider confirmation of the Plan (the "**Combined Hearing**"): | **Week of February 15, 2017** |

## II.
## OVERVIEW OF THE DEBTOR

### A.    The Debtor's Business

Homer City is a coal-fired, independent power production plant located in Homer City, Pennsylvania, about forty-five (45) miles east of Pittsburgh (the "**Facility**"). Homer City is a Delaware limited partnership which was formed in connection with a prior chapter 11 restructuring involving the Facility, as discussed below. The Facility was originally constructed in the 1960s and consists of three separate electric generating units and related equipment. Unit 1 has a capacity of 620 megawatts, Unit 2 has a capacity of 614 megawatts, and Unit 3 has a capacity of 650 megawatts, for an aggregate production capability of 1,884 megawatts. Units 1 and 2 initiated operations in 1969 and Unit 3 was launched in

1977.  The Facility, which occupies approximately 2,500 acres (including the 1,800 acre Two Lick Dam, a reservoir for water supply), has been upgraded and overhauled on numerous occasions over its nearly 50 year existence, primarily for purposes of meeting evolving emissions standards, satisfying environmental regulations, modernizing equipment, and implementing advances in power production technology.

The Facility is an integral component of a network of power plants that services the energy needs of individual, commercial, and industrial consumers in its region.  The Facility has direct transmission access to the primary markets for its energy production, the PJM Interconnection, LLC ("**PJM**") west hub and, subject to certain restrictions, the New York Independent System Operator ("**NYISO**").  PJM and NYISO are regional transmission organizations that coordinate the transmission of electricity in all or parts of Delaware, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, the District of Columbia, and New York.  The Facility transmits its electricity production through high voltage lines that interconnect through a switchyard located on the Facility site.  As a result of its location in the mid-Atlantic region, Homer City has access to approximately 80 million consumers and can generate sufficient electricity to supply two million households.

Homer City generates revenue through a combination of energy sales such as forward contract auctions, spot market (day ahead) demand, and the PJM annual capacity auction.

The Debtor does not have employees.  Instead, it contracts with NRG, which operates and maintains the Facility under an Operation and Maintenance Agreement, dated as of September 21, 2012 (the "**O&M Agreement**").  Pursuant to the O&M Agreement, NRG employs approximately 245 individuals to perform the day-to-day business operations of the Facility such as entering into contracts, training employees, and monitoring, testing and maintaining the plant and its equipment.  Most of Homer City's operating expenses are paid by NRG (including vendor payments and payroll) and then NRG is reimbursed by Homer City on a monthly basis.  NRG's compensation under the O&M Agreement is on a "cost plus" basis.

In addition to the O&M Agreement, Homer City's daily operations depend on various vendor agreements for the supply of goods and services.  For example, Homer City is a party to an energy management agreement with Boston Energy Trading and Marketing, LLC, a wholly-owned subsidiary of NRG formerly known as Edison Mission Marketing & Trading, Inc., a third-party marketing firm, to provide scheduling of energy from the Facility into PJM and NYISO and other related services.  Homer City is also a party to an asset management agreement (the "**Asset Management Agreement**") with PurEnergy Management Services, LLC ("**PurEnergy**") to provide certain asset management, fuel procurement and transportation services.  PurEnergy employs three (3) non-unionized employees to perform its duties under the Asset Management Agreement.  Homer City depends on these and other agreements and services to perform its daily operations and will assume them under the Plan.

In addition, under the L.P. Agreement (defined below), EFS GP -- Homer City's general partner and part of GE -- contractually provides certain financial, tax, analytical, and management services to Homer City.  Under the Plan, EFS GP will no longer provide these services to Homer City, but GE will continue to provide certain services for a limited period of time to the Reorganized Debtor under the Transitional Services Agreement.

For the fiscal year ended December 31, 2015, Homer City's total operating revenues were approximately $480 million, representing a 28% decrease in operating revenues as compared to the fiscal year ending December 31, 2014.  The decrease was driven by historically low natural gas prices, lower power generation, and unseasonably mild weather.  Operating income decreased to approximately $7.6 million

for the fiscal year ended December 31, 2015 compared to approximately $162 million for the fiscal year ended December 31, 2014.

**B.        The Debtor's Organizational Structure**

Homer City was formed on July 5, 2012 as a Delaware limited partnership and is a party to that certain Amended and Restated Agreement of Limited Partnership of Homer City Generation, L.P., dated December 14, 2012 (as amended, the "**L.P. Agreement**"). Homer City has one (1) general partner and two (2) limited partners. Homer City's general partner is non-Debtor EFS GP and Homer City's limited partners are non-Debtor EFS Homer City, LLC ("**EFS LP**") and non-Debtor Metropolitan Life Insurance Company ("**MetLife**").

EFS GP is a Delaware limited liability company which owns less than one percent (1%) of the partnership interests of Homer City. EFS GP was formed on or around May 4, 2006 and became the general partner of Homer City on or around July 5, 2012. EFS LP is a Delaware limited liability company which owns approximately ninety five-percent (95.04%) of the partnership interests of Homer City. EFS LP was formed on or around November 16, 2010 and became a limited partner of Homer City on or around December 14, 2012. The existing partnership interests in Homer City are hereinafter referred to as the "**Homer City Interests**."

Both EFS GP and EFS LP are wholly owned by EFS-N LLC, a Delaware limited liability company, which is wholly owned by GE.

MetLife is a New York corporation and owns less than five percent (4.96%) of the partnership interests of Homer City. MetLife became a limited partner of Homer City on or around December 14, 2012 following a chapter 11 restructuring involving the Facility.

A chart illustrating the Debtor's corporate organizational structure, as of the date hereof, is set forth below:



C.     **Management and the Chief Restructuring Officer**

Pursuant to the L.P. Agreement, EFS GP has the full, exclusive and complete right, power and discretion to operate, manage and control the affairs of Homer City and, with certain exceptions for material transactions, make all decisions affecting Homer City's affairs as deemed proper, convenient or advisable by EFS GP in pursuit of Homer City's business purpose.

On January 10, 2017, EFS GP, as general partner of the Debtor, adopted resolutions by written consent approving and authorizing the engagement of Zolfo as restructuring advisors for the Debtor and appointing John Boken, a Senior Managing Director of Zolfo, to serve as the Chief Restructuring Officer (the "**CRO**") of the Debtor.

EFS GP and the CRO are authorized and empowered to take actions necessary to prosecute the Chapter 11 Case and to effectuate the restructuring of the Homer City's debt and organizational form and structure, subject to the terms of the Debtor's engagement agreement with Zolfo.

The composition of the initial board of directors or managers and officers of the Reorganized Debtor will be disclosed prior to the entry of the order confirming the Plan in accordance with section 1129(a)(5) of the Bankruptcy Code.

D.     **Regulation of the Debtor's Business**

The Debtor's operations are subject to the local, state, and federal laws and regulations in the jurisdictions in which it operates.  The laws and regulations that impact the Debtor's operations include those relating to the operation of coal-fired electric generating units, environmental protection, and health and safety. The Pennsylvania Department of Environmental Protection ("**PADEP**") and the United States Environmental Protection Agency ("**EPA**") are among Homer City's primary regulators.

E.     **The 2012 Restructuring**

This Chapter 11 Case represents the second restructuring for Homer City.  Homer City Funding LLC ("**Old Homer**") restructured its debts in 2012 (the "**2012 Restructuring**"), consisting primarily of bonds issued in connection with the lease of the Facility from its then-current owners (the "**Old Owners**"). Pursuant to the 2012 Restructuring, the Old Owners and Old Homer merged into a new entity, Homer City Generation L.P. (the Debtor).  This new entity acquired certain lease rights, fee interests, and other property relating to the Facility, and also assumed a number of obligations and liabilities with respect thereto.  Pursuant to the 2012 Restructuring, the newly-created Homer City issued the Notes (as described in further detail below).  The Notes are all of the Debtor's pre-petition indebtedness in the Chapter 11 Case other than Trade Claims and other ordinary course accounts payable.

F.     **The Debtor's Capital Structure**

1.     **Equity Ownership**

As discussed in Section II.B, the partnership interests of Homer City are owned by EFS GP (less than 1%), EFS LP (approximately 95.04%), and MetLife (approximately 4.96%).

2.     **Prepetition Indebtedness**

As of the Commencement Date, Homer City had outstanding Notes obligations in the aggregate principal amount of approximately $607 million, comprised of (i) approximately $140 million in principal amount

of 2019 Secured Notes and (ii) $467 million in principal amount of 2026 Secured Notes (each defined below), issued pursuant to that certain Indenture, dated as of December 14, 2012 (as amended, modified, or otherwise supplemented, the "**Indenture**"), by and between Homer City, as issuer, and The Bank of New York Mellon, as trustee and collateral agent (the "**Prepetition Trustee**").  Homer City also has Trade Claims (defined herein) in the amount of approximately $15 million as of the date hereof.

(a)    2019 Secured Notes

Pursuant to the Indenture, Homer City issued 8.137% secured first lien notes due 2019 in the aggregate principal amount of $174 million (the "**2019 Secured Notes**").  The 2019 Secured Notes were issued at par and mature on October 1, 2019.  As of the date hereof, the aggregate amount outstanding under the 2019 Notes was approximately $140 million in unpaid principal, plus interest, fees, and other expenses.

(b)    2026 Secured Notes

Pursuant to the Indenture, Homer City also issued 8.734% secured first lien notes due 2026 in the aggregate principal amount of $466 million (the "2026 Secured Notes," and with the 2019 Secured Notes, the "**Notes**").  The 2026 Secured Notes were issued at par and mature on October 1, 2026.  As of the date hereof, the aggregate amount outstanding under the 2026 Secured Notes was approximately $467 million in unpaid principal, plus interest, fees, and other expenses.

The Notes are secured by a valid and perfected first priority lien on substantially all of the assets and property of the Debtor. The 2019 Secured Notes and the 2026 Secured Notes rank *pari passu*.

(c)    Other Secured Claims

Homer City engages with certain service providers that, as a matter of various state and local laws, may be entitled to assert statutory liens against Homer City's assets if Homer City fails to pay for amounts it owes to them.  To the extent such parties have not been timely paid, which Homer City does not expect, they may have statutory lien rights against Homer City's assets.  In addition, Homer City has, in some cases, provided cash deposits, for the benefit of certain of its vendors.

(d)    Trade Claims

In the ordinary course of business, Homer City incurs various payment obligations (the "**Trade Claims**") to various third-party providers of goods and services (the "**Trade Creditors**") that facilitate its business operations.  As of the date hereof, Homer City estimates that the aggregate amount of Trade Claims outstanding is approximately $15 million.  As discussed below, consistent with the unimpaired treatment of General Unsecured Claims under the Plan, the Debtor will seek to pay all Trade Claims in the ordinary course of business pursuant to the All Trade Motion.

(e)    Sureties and Guaranties

(i)    The Surety Bonds and Surety Indemnity Agreements

To operate its business, Homer City is required to provide surety bonds (the "**Surety Bonds**") to PADEP to secure its obligations under various state environmental laws.  These obligations relate to compliance with, among other things, clean stream and air pollution laws, coal refuse disposal and waste management removal requirements, and other environmental obligations.  As of the date hereof, Homer City had approximately $42.2 million in outstanding Surety Bonds.

10

The issuance of a surety bond shifts the risk of a debtor's nonperformance of its environmental obligations to the surety. However, unlike an insurance policy, if a surety incurs a loss on a surety bond, it is entitled to recover the full amount of that loss from the principal, in this case, Homer City. To minimize the risk of a surety seeking to recover from Homer City, GE entered into indemnity agreements with the Debtor's sureties pursuant to which it will hold Homer City's sureties harmless from costs and damages in connection with the Surety Bonds. A condition to the effectiveness of the Plan requires that GE's obligations under these indemnity agreements, and certain other obligations, be replaced and GE be irrevocably released by the beneficiary from any existing or future obligations arising thereunder.

(ii)      The O&M Letter of Credit

On January 6, 2017, Homer City and NRG executed an amendment to the O&M Agreement (the "**O&M Amendment**"), revising certain of its terms to facilitate Homer City's restructuring. The O&M Amendment provides for, *inter alia*, Homer City to furnish a letter of credit in the amount of $5.5 million (the "**O&M Letter of Credit**") to support Homer City's obligations under the O&M Agreement. The O&M Letter of Credit replaces the requirement in the original O&M Agreement that Homer City cause GE to provide and maintain a guaranty for the benefit of NRG under certain circumstances. Further, the amount of the O&M Letter of Credit will be increased to $7 million if, by October 31, 2017, (i) the parties have not agreed to an extension of the O&M Agreement beyond its initial term or (ii) have not entered into a new agreement to commence on January 1, 2018. The O&M Letter of Credit will be in effect until April 30, 2018 unless earlier terminated in accordance with the O&M Amendment.

**III.**
**KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE**

There have been a number of external factors and energy market developments over the past several years that have combined to severely impact Homer City's financial performance and adversely impair the value of the enterprise. The following is a brief summary of the material issues and developments that ultimately culminated in the Debtor commencing this Chapter 11 Case.

**A.      Shift in Merchant Generation Energy Market Economics for Coal-Fired Facilities**

Homer City was originally designed and constructed to produce energy to meet baseload power requirements in its region. A baseload power plant typically operates at constant production levels to satisfy continuous demand needs, with periodic planned outages for repairs and maintenance. For most of its history, both during its ownership by a regulated utility and, subsequently, as an independent power producer or merchant generator, the Facility did produce and transmit constant power output into the grid to satisfy baseload energy needs in its markets. In recent years, increasing accessibility and supply of natural gas, more stringent environmental regulations, and improving technologies, in renewable production in particular, have combined to create competitive challenges for legacy coal-fired facilities. Though no longer always operating as a baseload generator, the Facility remains a well-located, integral component of the power production system in its region.

**B.      Increased Natural Gas Supply and Lower Energy Prices**

Over the past several years, activities in both upstream exploration and production, and midstream delivery within the natural gas industry has resulted in significant increases in reserves, inventories, and accessibility of natural gas. This has contributed to record low prices for delivered natural gas, which in turn has disrupted the historical dynamics and economics in electricity generation markets. This disruption has allowed, in many instances, natural gas-fueled plants, which historically had higher

11

marginal costs than coal-fired plants, to run less expensively and offer more favorable electricity pricing to the system than Homer City and similar facilities.

### C.    Market Volatility and Associated Impact on Financial Performance and Sustainability

Absent the predictability benefits associated with operating as a baseload generator, a portion of Homer City's revenue stream and cash flows have become subject to the volatility of real time and day ahead market requirements and pricing in its region. Market demand and dispatch opportunities for the Facility are generally good in the winter (December through February) and summer months (June through August), driven by the generally higher energy consumption in those seasonal time periods. However, milder winter or summer conditions have a direct impact on demand, and by association, Homer City energy production, financial results, and liquidity.

### D.    Government Regulations and Compliance Costs

Homer City is subject to extensive federal, state, and local regulations and laws in connection with the operation of the Facility and its use and sale of electric energy, capacity, and related products, including ancillary services. These legislative and regulatory standards impose numerous restrictions and requirements on Homer City and affect the timing, design, construction, and magnitude of capital improvement investments to the Facility, as well as the cost of mitigating the environmental impact of past operations. Over the past several years, significant investments have been made in the Facility to ensure that Homer City can meet these regulatory standards, restrictions, and requirements relating to, principally, conventional and hazardous air pollutants, coal combustion wastes, water discharge, and groundwater monitoring. Most notably, approximately $750 million was invested by EFS LP to install Novel Integrated Desulphurization Systems ("**NIDs**," or commonly referred to as "scrubbers") in Units 1 and 2.

Within the next several years, Homer City will need to invest substantial additional sums to meet incremental regulatory requirements relating to nitrogen oxide emissions, coal ash residue, and other consequences of the energy production process, a number of which are unique to coal-fired facilities. In addition to the upgrade investments required to allow the Facility to comply with measurable standards, these regulations generate additional ongoing operating costs for Homer City to meet monitoring and reporting requirements. A description of the key regulations impacting the Facility is set forth below, and the costs of complying with such regulations is also reflected in the Financial Information and Projections in Section VII hereof.

### 1.    Changes in Emission Allowances

The Facility's emission of NOx is regulated by the government. On December 3, 2015, the EPA proposed the Cross-State Air Pollution Rule Update for the 2008 Ozone National Ambient Air Quality Standards ("**EPA NOx Rule Update**"). This proposed rule reduces Pennsylvania's emissions cap from 52,201 tons of NOx during the "ozone season" (May 1-Oct 1) to 14,387 tons and will reduce Homer City's allowance allocation under that cap from 5,532 tons to 1,678 tons. The final rule, which was promulgated on September 7, 2016 and has a May 1, 2017 effective date, will require Homer City either to reduce its capacity during the ozone season or install additional NOx emission controls on Units 1 and 2.[4] The Debtor estimates that compliance with the final rule will cost approximately $14 million. The

---

[4] The Debtors also participate in cap and trade activities, which may further affect these numbers (the "**Cap and Trade Activities**"). Under the Cap and Trade Activities, Homer City may sell a portion of its excess NOx

Unit 1 upgrade is scheduled to take place during the planned 51-day outage in 2018 and the Unit 2 upgrade is scheduled for the planned 51-day outage in 2019.

### 2. Change in Groundwater Monitoring and Reporting Requirements

The Facility's groundwater monitoring and reporting requirements are also regulated by governmental authorities. On December 19, 2014, the EPA finalized the Coal Combustion Residue ("**CCR**") rule, which became effective on October 14, 2015. The CCR rule confirmed that coal ash would continue to be regulated as a non-hazardous waste product under Subtitle D of the Resource Conservation Recovery Act. The CCR rule applies Subtitle D standards to landfill and surface impoundments that manage coal ash. The rule imposes robust groundwater monitoring and reporting requirements, which are required to be posted to a public database.

Homer City uses a contractor to assist the Facility with the monitoring and recordkeeping requirements of the CCR rule and has taken steps to meet those CCR requirements. The Facility is currently in compliance with the CCR Rule. Therefore, no capital expenditures are planned with respect thereto.

However, the CCR rule has faced a number of legal challenges from industry groups who fault several of its provisions and from advocates who claim the rule is not strong enough. Thus, there are no assurances that, in the future, the regulations will not be even more stringent.

### 3. Changes in RACT Limits

Another area in which the Facility is subject to regulation is the Facility's reasonably available control technology ("**RACT**") limits. The PADEP issued a final NOx RACT Rule on November 17, 2015, which was later published in the April 23, 2016 edition of the Pennsylvania Bulletin. *See* 46 Pa. Bull. 2036 (April 23, 2016). The rule establishes a presumptive RACT limit for Homer City (and other coal-fired facilities with similar boilers) at 0.4 lbs/MMBtu when the inlet temperature at the pollution control device is less than 600 degrees Fahrenheit and at 0.12 lbs/MMBtu when the inlet temperature is at 600 degrees Fahrenheit or higher. Homer City was required to comply with the rule by January 1, 2017.

In December 2015, Homer City retained Sargent & Lundy to perform a preliminary engineering study to evaluate what upgrades to Units 1 and 2 will be needed to meet this rule. According to the Sargent & Lundy report, certain plant components needed upgrades. The Debtor estimates this will cost $25 million. The Unit 1 upgrade is scheduled to take place during the planned 51-day outage in 2018 and the Unit 2 upgrade is scheduled for the planned 51-day outage in 2019. Homer City requested an extension from PADEP for compliance with this Rule, which PADEP granted.

### E. Implementation of Cost Reduction and Liquidity Management Initiatives

In recognition of the shifting energy market and economic landscape for Homer City, in early 2016 the Facility's leadership team assessed various operational restructuring alternatives and implemented a number of measures to reduce ongoing costs and more closely manage liquidity. The priorities in this assessment and implementation were to minimize any potential impact on plant availability, preserve the ability to respond timely to favorable market dispatch opportunities, allow NRG to retain experienced personnel, and maintain high levels of safety, operational performance, and environmental compliance. As a result of these operational initiatives, Homer City estimates it achieved approximately $3 million in annual savings and approximately $5 million in enhanced liquidity.

---

and/or SO2 emission allowances to other energy companies, and/or purchase additional NOx and/or SO2 allowances in order to meet its government-mandated emission limits.

### F.      Attempted Sale Process

In February 2016, Homer City and PJT launched a targeted process to sell Homer City, focusing outreach on relevant potential strategic acquirors and financial sponsors with significant experience in the energy and power sectors.  During that process, PJT contacted twenty-three (23) potential bidders, of which seven (7) signed nondisclosure agreements in order to receive access to confidential information and to facilitate open communications with Homer City's representatives.  The bids that resulted from this process differed significantly in their structure, such as the amounts and terms of the debt instruments, capital contributions, other investment considerations, and conditions to close.  The implied total enterprise value of the bids received ranged from $230 million to $505 million, inclusive of potential capital and other contributions to be made to Homer City by the bidders.  All of the bids were subject to certain conditions and supplemental due diligence that would impact the probability or likelihood of closing without material change to the implied total enterprise value of each bid.

Beginning in June 2016, Homer City consulted with an ad hoc group of noteholders which collectively hold more than two-thirds of the outstanding principal amount of the Notes (the "**Ad Hoc Group**") and received input from those noteholders regarding the sale process.  The Ad Hoc Group was provided confidential information, including information relating to the bids received during the process.  Ultimately, Homer City elected to pursue a restructuring on the terms set forth in the Restructuring Support Agreement described below rather than proceed with any of the bids received in connection with the sale process.

### G.      Restructuring Support Agreement

In light of the conclusion of the sales process without a transaction, Homer City, the Consenting Noteholders, and certain affiliates of GE (the "**GE Parties**,"[5] and collectively with Homer City and the Consenting Noteholders, the "**RSA Parties**") focused their efforts on a standalone restructuring transaction.  On January 9, 2017, the RSA Parties entered into the Restructuring Support Agreement.

Under the Restructuring Support Agreement, the Consenting Noteholders and the GE Parties have agreed to, among other things:  (a) vote any claim they hold against the Debtor to accept the Plan and issue a release of their third party claims against a Released Party,[6] (b) not change or withdraw (or cause to be changed or withdrawn) their vote to accept the Plan or release of their third party claims against a Released Party, (c) not object to, delay, impede, or take any other action to interfere with acceptance or implementation of the Plan, or directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, or plan of reorganization for the Debtor other than the Plan, and (d) take commercially reasonable actions to facilitate the confirmation and consummation of the Plan.  Each RSA Party has the right to terminate the Restructuring Support Agreement based on certain events.

The Debtor believes that the deleveraging transaction contemplated by the Restructuring Support Agreement and implemented through the Plan is the best approach for relieving it from the constraints that currently restrict the profitability and success of the business.  The proposed transaction will allow Homer City to focus on stabilizing the business and reaching profitability rather than on managing burdensome debt and debt service payments.  And most importantly, Homer City expects to have the capital needed to invest in its business, effectively compete in the energy market, and preserve jobs.

---

[5] The GE Parties are GE; EFS LP; EFS GP; EFS-N LLC; GE Capital US Holdings, Inc.; and GPFS Securities Inc.

[6] "**Released Party**" has the meaning set forth in Section 1.88 of the Plan.

**IV.**
**ANTICIPATED EVENTS DURING THE CHAPTER 11 CASE**

Pursuant to the Restructuring Support Agreement, the Debtor has agreed to file its voluntary petition (the "**Petition**") for relief under chapter 11 of the Bankruptcy Code on or before January 13, 2017 (the "**Commencement Date**") and to file the Plan and Disclosure Statement on the Commencement Date. The filing of the Petition will commence the Chapter 11 Case, at which time the Debtor will be afforded the benefits, and become subject to the limitations, of the Bankruptcy Code.

**A.**   **Commencement of Chapter 11 Case and First Day Motions**

The Debtor intends to continue to operate its business in the ordinary course during and after the pendency of the Chapter 11 Case as it had prior to the Commencement Date. To facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Case, and to minimize disruptions to the Debtor's operations on the Commencement Date, the Debtor intends to file various motions (the "**First Day Motions**") seeking important immediate relief from the Bankruptcy Court that would allow the Debtor to continue to operate in chapter 11 and avoid immediate and irreparable harm due to the commencement of the Chapter 11 Case.

The following is a brief overview of certain of the First Day Motions.

**1.**   **Use of Cash Collateral**

To address its working capital needs and fund its reorganization efforts, the Debtor requires the use of cash subject to liens (the "**Cash Collateral**") granted in favor of the Noteholders, including the Consenting Noteholders and GE (in its capacity as a Noteholder). Accordingly, the Debtor intends to seek authority from the Bankruptcy Court to continue to use the Cash Collateral in the ordinary course, subject to certain restrictions. In exchange for the continued use of the Cash Collateral, the Debtor intends to provide the Noteholders with customary forms of adequate protection for any diminution in value of their interest in the Cash Collateral during the Chapter 11 Case.

**2.**   **Cash Management System**

In the ordinary course of business, the Debtor employs a cash management system (the "**Cash Management System**") to collect funds generated by its operations and disburse those funds to satisfy obligations required to operate its business. Pursuant to the Cash Management Motion, the Debtor will seek authority to continue its Cash Management System, including the use of existing bank accounts and business forms.

**3.**   **All Trade**

The Debtor's Trade Creditors provide necessary goods and services that allow the Facility to function properly. The Trade Creditors consist of a number of vendors and suppliers, including construction and maintenance providers, specialty materials suppliers, and environmental consultants who are critical to maintaining operations without disruption. Pursuant to the All Trade Motion, the Debtor will seek interim and final authority to pay the prepetition claims of its Trade Creditors, conditioned upon the agreement of each applicable Trade Creditor to continue supplying goods and services to the Debtor on the same or better trade terms than such Trade Creditor offered the Debtor immediately prior to the Commencement Date. Given the fact that that Trade Claims will be Unimpaired under the Plan, this motion affects the timing, rather than the amount, that each Trade Creditor will be paid.

### 4.    Taxes

In the ordinary course of business, the Debtor must pay certain sales and use taxes, and fees and charges related thereto (collectively, the "**Taxes and Fees**"), to various federal, state, and/or local authorities.  By this motion, the Debtor will seek an order authorizing it to pay the Taxes and Fees in the ordinary course as they become due.

### 5.    Utilities

By this motion, the Debtor will request that the Court determine adequate assurance of payment for future utility services, establish procedures for determining adequate assurance of payment, and prohibit utility providers from altering, refusing, or discontinuing utility services.

### 6.    Insurance and Surety Bonds

The Debtor maintains several insurance policies in the ordinary course of business, including property and business interruption insurance, automobile liability insurance, pollution liability insurance and various other policies (collectively, the "**Insurance Policies**").    Moreover, as described in Section II(F)(2)(e)(i) of this Disclosure Statement, the Debtor also maintains a surety bond program with insurers (the "**Sureties**"), pursuant to which the Sureties issue Surety Bonds to secure the performance of Homer City's obligations under various environmental laws and regulations (the "**Surety Bond Program**").  GE has entered into two indemnity agreements with the Sureties to indemnify them for all costs relating to the Surety Bonds.    A condition of the Restructuring Support Agreement and Plan requires that GE's obligations under these indemnity agreements, and certain other obligations, be replaced and GE be irrevocably released of any existing or future obligations arising thereunder by the beneficiary.  By this motion, the Debtor will request authority to continue its Insurance Programs and the Surety Bond Program, which and authority to post new or replacement collateral to secure its obligations with respect to the Surety Bonds during the Chapter 11 Case.

### 7.    Motion for Combined Hearing on Disclosure Statement and Plan

The Debtor will request that the Court enter an order scheduling a combined hearing to: approve this Disclosure Statement, approve the procedure used to solicit votes on the Plan, confirm the Plan, defer the meeting of creditors provided for by section 341 of the Bankruptcy Code, and set other dates and deadlines.  Allowing these matters to go forward at a combined hearing will allow the Debtor to prosecute the Chapter 11 Case in an expeditious manner, thereby minimizing the costs, delay, and potential operational disruptions posed by a prolonged period in bankruptcy.

### 8.    Motion to Assume the Restructuring Support Agreement

The Debtor will also request that the Court allow the Debtor to assume the Restructuring Support Agreement.  As described above, the Debtor believes that the deleveraging transaction contemplated by the Restructuring Support Agreement and implemented through the Plan is the best approach for relieving it from the constraints that currently restrict the profitability and success of its business.  The proposed transaction will allow Homer City to focus on stabilizing the business and reaching profitability rather than on managing burdensome debt and debt-service payments.    And most importantly, the Debtor expects to have the capital needed to invest in its business, effectively compete in the energy market, and preserve jobs.  Accordingly, by this motion the Debtor will seek authority to assume the Restructuring Support Agreement pursuant to sections 105(a), 363(b), and 365(a) of the Bankruptcy Code.  It is a condition of the Restructuring Support Agreement that the Debtor file this motion on the Commencement

Date, however, the Debtor will seek consideration of the motion on shortened notice within the first fourteen (14) days after the Commencement Date.

### B.    Other Procedural Motions and Retention of Professionals

The Debtor also intends to file various motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Case, including applications to retain the professionals identified in Section I of this Disclosure Statement.

### C.    Confirmation Hearing

Contemporaneously with the filing of its voluntary petition, the Debtor will seek an order of the Bankruptcy Court scheduling a combined hearing to consider (i) the adequacy of the Disclosure Statement and the Solicitation in connection therewith and (ii) confirmation of the Plan.  The Debtor anticipates that notice of these hearings and applicable deadlines will be published and mailed to all known holders of Claims and Interest at least twenty-eight (28) days before the date by which objections to the Disclosure Statement and Plan must be filed with the Bankruptcy Court.

In addition, objections and responses to confirmation of the Plan, if any, must be served and filed as to be received on or before the deadline and in the manner described in the order scheduling a combined hearing on the Disclosure Statement and Plan.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## V.
## PENDING LITIGATION

On July 8, 2016, Consol filed a complaint (the "**Complaint**") against Homer City, GE Capital Global Holdings, LLC ("**GE Capital**"), certain affiliates of GE Capital and several John Doe entities (the **"GE Entities"**), in the Court of Common Pleas of Allegheny County, Pennsylvania (Case No. GD-16-012415). Consol and Homer City are parties to a Coal Sales Agreement, dated January 6, 2014 (the "**Consol Agreement**"), pursuant to which Homer City was to purchase bituminous steam coal from Consol for use at the Facility.  The Consol Agreement was to expire on December 31, 2015.  On October 1, 2015, the parties entered into an extension agreement (the "**Extension Agreement**") which amended the terms on which sales and purchases of coal were to be made during the period from October 1, 2015 to December 1, 2015 and extended the period for purchases and sales on such amended terms through December 31, 2017.

Pursuant to certain letter agreements entered into by Homer City and Consol in 2016, the parties agreed that Consol would sell Homer City coal under the agreements at a price below the contract price (the "**Interim Price**"), but Consol reserved its right to seek to recover the difference between the Interim Price and the contract price under the Extension Agreement.  In the Complaint, Consol alleges, among other things, that Homer City anticipatorily breached and/or breached the Extension Agreement.  Consol further alleges that the GE Entities are liable for Homer City's obligations under the Extension Agreement for tortiously interfering with the contract between Consol and Homer City by allegedly instructing Homer City to breach the Extension Agreement.  Consol has asserted monetary damages and requested injunctive relief prohibiting Homer City from entering into any contract that would interfere with due and timely performance under the Extension Agreement and from making purchases of coal under alternate supply agreements.  Monetary relief sought by Consol includes the difference between an Interim Price and the contract price for all of the tonnage required by the Extension Agreement, plus punitive damages for the alleged tortious conduct by the GE Entities, interest, and costs in an amount to be determined.  Consol has

not specified a dollar amount of its alleged damages, but such damages could be substantial.  **Publicly available case documents may be found at Allegheny County Court website:** https://dcr.alleghenycounty.us/.

On January 6, 2017, Homer City and Consol reached a settlement arrangement with respect to the Consol Litigation (the "**Settlement Arrangement**") and executed a new coal supply agreement (the "**New Coal Agreement**").  The New Coal Agreement provides for the specified minimum monthly delivery of coal by Consol to Homer City, with certain aggregate minimum tons per year through the end of 2018 at a specified price, subject to Homer City's right to purchase additional tons during each of 2017 and 2018 at such specified price.  Under certain financial conditions, Homer City will be required to provide Consol a letter of credit.  The New Coal Agreement will become effective upon the effectiveness of the Plan and the assumption of the New Coal Agreement by Homer City in connection with the Plan and the occurrence of certain other events; provided, however, each event must occur on or before May 13, 2017.  Prior to the effectiveness of the New Coal Agreement, Consol will continue to provide coal to Homer City pursuant to terms consistent with Homer City's current arrangement with Consol.  Further, pursuant to the Settlement Arrangement, upon the effectiveness of the New Coal Agreement, Consol will (a) dismiss its claims regarding the Consol Litigation and (b) release any and all claims that it may have against Homer City, with respect to the Consol Litigation or any arrangements between or among the parties through the effective date of the New Coal Agreement.  Upon the effective date of the New Coal Agreement, Homer City and the GE Entities will also release any and all claims that they may have against Consol, with respect to the Consol Litigation or any arrangements between or among the parties through the effective date of the New Coal Agreement.

## VI.
## SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.

### A.    Administrative Expense and Priority Claims

#### 1.    Administrative Claims

Except to the extent that a holder of an Allowed Administrative Claim agrees to different treatment, each holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim payment in Cash in an amount equal to such Allowed Administrative Claim, payable on the later of the Effective Date and the date that is thirty (30) Business Days after such Administrative Claim becomes Allowed; *provided*, *however*, that Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtor, as Debtor in Possession, shall be paid by the Debtor or the Reorganized Debtor in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

#### 2.    Fee Claims

All Entities seeking an award by the Bankruptcy Court of Fee Claims shall (a) file, on or before forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full in Cash in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) two (2)

Business Days after the order relating to any such Allowed Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtor or the Reorganized Debtor.

The Reorganized Debtor is authorized to pay or reimburse its professionals for services performed or expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.  On or about the Effective Date, holders of Fee Claims shall provide an estimate of their Fee Claims to the Debtor or the Reorganized Debtor, and the Reorganized Debtor shall separately reserve for such estimated amounts for the benefit of the holders of the Fee Claims until the fee applications related thereto are resolved by Final Order or agreement of the parties.  For the avoidance of doubt, Section 2.2 of the Plan shall not be applicable to any Restructuring Expenses, which shall be paid pursuant to Section 2.4 of the Plan.

### 3.      Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim who was not paid pursuant to the Tax Order shall receive, in full and final satisfaction, settlement, release and discharge of such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtor, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, if such Claim is an Allowed Priority Tax Claim on the Effective Date, (ii) the first Business Day after the date that is thirty (30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course as such obligation becomes due, or (b) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Commencement Date; *provided*, *that*, the Reorganized Debtor reserves the right to prepay all or a portion of any such amounts at any time under this option.

### 4.      Restructuring Expenses

On the Effective Date, the Reorganized Debtor shall pay in full in Cash any outstanding Restructuring Expenses in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Case, and without the requirement for further notice or Bankruptcy Court review or approval.

### B.      <u>Classification of Claims and Interests</u>

### 1.      Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *that*, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only if such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled before the Effective Date.

### 2.     Summary of Classification

The following table designates the Classes of Claims against and Interests in the Debtor and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, and Priority Tax Claims have not been separately classified.  All of the potential Classes for the Debtor are set forth herein.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Notes Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (presumed to accept) |
| 5 | Intercompany Claims | Impaired | No (deemed to reject) |
| 6 | Homer City Interests | Impaired | No (deemed to reject) |

### 3.     Special Provision Governing Unimpaired Claims

Unless specifically stated, nothing under the Plan shall affect the rights of the Debtor or the Reorganized Debtor, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 4.     Elimination of Vacant Classes

Any Class of Claims against or Interests in the Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### C.     Treatment of Claims and Interests

### 1.     Other Priority Claims (Class 1)

Class 1 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Other Priority Claims.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to different treatment, each holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction, settlement, release and discharge of such Claim, (i) payment in Cash in an amount equal to such Allowed Other Priority Claim, payable on the later of the Effective Date and the date that is thirty (30) Business Days after such Other Priority Claim becomes Allowed, or (ii) the Reinstatement of such holder's Allowed Other Priority Claim, or (iii) such other treatment so as to render such holder's Allowed Other Priority Claim Unimpaired pursuant to Section 1124 of the Bankruptcy Code.

20

### 2.     Other Secured Claims (Class 2)

Class 2 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment of such Claim, in full and final satisfaction, settlement, release and discharge of such Allowed Other Secured Claim, at the sole option of the Debtor or the Reorganized Debtor, each such holder shall receive (i) payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after such Other Secured Claim becomes Allowed, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, (iii) the Reinstatement of such holder's Allowed Other Secured Claim, or (iv) such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

### 3.     Notes Claims (Class 3)

Class 3 is Impaired, and the holders of Notes Claims in Class 3 are entitled to vote to accept or reject the Plan.  Noteholders and the Prepetition Trustee shall not be required to file proofs of Claim on account of their Notes Claims.  Except to the extent that a holder of an Allowed Notes Claim agrees to a less favorable treatment of such Claim, (i) each such holder (other than GE) shall receive, in exchange for the contribution of such Notes Claim to New Holdco, such holder's Pro Rata share of one hundred percent (100%) of the NewCo Interests, plus such holder's Pro Rata share of the GE Remainder[7] and (ii) GE, on account of the GE Notes Claims,[8] shall receive in exchange for the contribution of the GE Notes Claims to New Holdco, 66.67% of its Pro Rata share of the NewCo Interests and no share of the GE Remainder.  Immediately thereafter, New Holdco shall receive, in full and final satisfaction, release and discharge of the Notes Claims contributed by each holder, Reorganized Homer City Interests.

### 4.     General Unsecured Claims (Class 4)

Class 4 is Unimpaired, and holders of General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.  Except to the extent that a holder of a General Unsecured Claim agrees to a less favorable treatment of such Claim in full and final satisfaction, settlement, release and discharge of such General Unsecured Claim, each such holder of an Undisputed General Unsecured Claim who was not paid pursuant to the All Trade Order shall receive (i) payment in Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date that is ten (10) Business Days after such General Unsecured Claim becomes Allowed, in each case, or as soon as reasonably practicable thereafter, or (ii) such other treatment so as to render such holder's General Unsecured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

---

[7] "**GE Remainder**" means 33.33% of the GE Notes Claims' Pro Rata share of the NewCo Interests.

[8] "**GE Notes Claims**" means any Claim on account of the Notes held by GE.

### 5. Intercompany Claims (Class 5)

Class 5 is Impaired, and the holders of Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.[9]  Therefore, the holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.  On the Effective Date, all Intercompany Claims shall be deemed canceled, extinguished and discharged, and the holders of Intercompany Claims shall not receive or retain any distribution or property on account of such Claims.

### 6. Homer City Interests (Class 6)

Class 6 is Impaired, and the holders of Homer City Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, the holders of Homer City Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Homer City Interests.  On the Effective Date, prior to the release and discharge of the Notes Claims, all Homer City Interests shall be converted into Reorganized Homer City Interests.  Immediately following the release and discharge of the Notes Claims held by New Holdco (following the GE Contribution as described in Section 5.13 of the Plan and the contribution of such Notes Claims to New Holdco, as described in Section 4.3 of the Plan) all of the Reorganized Homer City Interests, other than any Reorganized Homer City Interests owned by New Holdco at such time shall be cancelled, extinguished and discharged.

### D. Means for Implementation

#### 1. Continued Existence

(a)    Except as otherwise provided in the Plan, on the Effective Date, the Debtor will be converted, pursuant to Section 18-214 of the Delaware Limited Liability Company Act, into, and the Reorganized Debtor shall be, a Delaware limited liability company and the Debtor shall continue existing after the Effective Date as the Reorganized Debtor in accordance with the applicable laws of the jurisdiction in which it is organized and pursuant to the Amended Organizational Documents.

(b)    The Reorganized Debtor shall become a wholly owned subsidiary of New Holdco, with limited liability company interests in New Holdco distributed in accordance with the Plan.  Upon the conversion of the Debtor to a Delaware limited liability company, all of the partnership interests of the Debtor shall be converted into membership interests therein.

(c)    On or after the Effective Date, the Reorganized Debtor may, in its sole discretion, take such action that may be necessary or appropriate as permitted by applicable law and the Amended Organizational Documents, and that the Reorganized Debtor determines is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, without limitation, causing: (i) the legal name of the Reorganized Debtor to be changed; and/or (ii) the closure of the Chapter 11 Case on or after the Effective Date.

#### 2. Exit Facility

(a)    On the Effective Date, in accordance with, and subject to, the terms and conditions of the Exit Facility Credit Agreement, the Reorganized Debtor will enter into the Exit Facility.

---

[9] The GE Notes Claims and the GE Ordinary Course Claims are not considered Intercompany Claims under the Restructuring Support Agreement, the Plan or this Disclosure Statement.

Authority to enter into the Exit Facility shall be deemed granted by the Confirmation Order without the need for any further consents or documents by Homer City, its partners, GE or the holders of Claims or Interests.  The proceeds issued or deemed issued under the Exit Facility shall be used to (i) fund Distributions, costs, and expenses contemplated by the Plan, (ii) provide letters of credit or other credit support to replace the GE Guaranties in their entirety, including with respect to the O&M Agreement and with respect to any Surety Bond, and (iii) fund general working capital and for general corporate purposes of the Reorganized Debtor.

(b)     On the Effective Date, the Exit Facility Credit Agreement shall be executed and delivered substantially on the terms and conditions set forth in the Exit Facility Term Sheet, with such modifications to which the Debtor or Reorganized Debtor and the Exit Lenders, the Exit Administrative Agent, the Exit Collateral Agent, and the Exit Arranger may agree, with the consent of the Requisite Noteholders and, solely with respect to any GE Provision of the Exit Facility Credit Agreement, the consent of GE, which modifications shall not affect the treatment of Claims under the Plan.

Without limiting the generality of the foregoing, all Liens and security interests granted pursuant to the Exit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.  The Debtor, Reorganized Debtor, and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such Liens and security interests under any applicable law, and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3.     Authorization and Issuance of Securities

(a)     *Issuance of Reorganized Homer City Interests*.   Homer City or Reorganized Homer City, as applicable, is authorized to issue or cause to be issued and shall issue the Reorganized Homer City Interests to New Holdco in accordance with the terms of the Plan and the Amended Organizational Documents without the need for any further limited liability company action and without action by holders of Claims or Interests.  On the Effective Date, the Reorganized Homer City Interests will be owned by New Holdco in accordance with the Amended Organizational Documents.

(b)     *Issuance of NewCo Interests*.   On the Effective Date, New Holdco is authorized to issue or cause to be issued and shall issue the NewCo Interests, in accordance with the Plan to the holders of Allowed Notes Claims, subject to the applicable NewCo Agreement without the need for any further limited liability company action and without action by holders of Claims or Interests.

On the Effective Date, all applicable holders of NewCo Interests and New Holdco shall be deemed to be parties to the NewCo Agreements without the need for further corporate, or other entity, action or execution by any such holder.  The applicable NewCo Agreement shall be binding on all Entities receiving or holding NewCo Interests; *provided*, *that*, regardless of whether such Entities execute the applicable NewCo Agreement, such Entities will be deemed to have signed the applicable NewCo Agreement, which shall be as binding on such Entities as if they had actually signed it.

Any direct or beneficial recipient of the NewCo Interests, including all Entities to whom such recipients may sell their NewCo Interests in the future and all Entities who purchase or acquire such Interests in future transactions, shall be party to, or shall be deemed to be bound by, the applicable NewCo Agreement.

In the period following the Effective Date and pending distribution of the NewCo Interests to any holder of Allowed Notes Claims, any such holder will be entitled to exercise any rights and receive any distributions paid with respect to such holder's NewCo Interests and exercise all of the rights with respect of the NewCo Interests.

### 4.    Registration Exemptions

(a)    To the maximum extent provided by section 1145(a) of the Bankruptcy Code and applicable non-bankruptcy law, the issuance or distribution of the securities under the Plan, including the NewCo Interests and the Reorganized Homer City Interests, shall be exempt from, among other things, the registration and prospectus delivery requirements of section 5 of the Securities Act, and any other applicable state and federal law requiring registration or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities, pursuant to section 1145 of the Bankruptcy Code or pursuant to another applicable exemption from registration requirements of the Securities Act.  To the extent that section 1145 is not available to exempt the securities issued under the Plan, including, without limitation, the offer or sale under the Plan of such securities from registration under section 5 of the Securities Act, other provisions of the Securities Act, including, without limitation, section 3(a)(9), section 4(a)(2) or Regulation S of the Securities Act, and state securities laws, shall apply to exempt such issuance from the registration requirements of the Securities Act.

(b)    The offer, issuance, and distribution of the NewCo Interests under the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code without further act or action by any entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities. In addition, under section 1145 of the Bankruptcy Code, any securities issued under the Plan that are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, unless the holder of the security is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code with respect to such security, and subject to (i) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, including Rule 144 of the Securities Act, which provides that securities will not be freely tradable if, at the time of transfer, the holder thereof is an "affiliate" of the issuer of such securities as defined in Rule 144(a)(1) under the Securities Act or had been such an "affiliate" within 90 days of such transfer; (ii) the restrictions, if any, on the transferability of such securities contained in the Amended Organizational Documents or NewCo Agreements; and (iii) applicable regulatory approval.

Whether any particular person would be deemed to be an "underwriter" with respect to the NewCo Interests would depend upon various facts and circumstances applicable to that person.  Given the complex nature of the question of whether a particular person may be an underwriter and other issues arising under applicable securities laws, accordingly, the Debtor expresses no view as to whether any person would be deemed an "underwriter" with respect to the NewCo Interests.

(c)    The offer, issuance, and distribution under the Plan of the Reorganized Homer City Interests hereunder to New Holdco and the NewCo Interests not issued under section 1145 of the Bankruptcy Code to holders of Allowed Notes Claims who are eligible holders (i.e., "accredited investors" as defined in Rule 501 of the Securities Act or "qualified institutional buyers" as defined in Rule 144A of the Securities Act) shall be exempt, pursuant to section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, without further act or action by any entity, from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder.  Persons who are issued Reorganized Homer City Interests and NewCo Interests pursuant to these exemptions will hold "restricted securities," subject to resale restrictions and may be resold, exchanged, assigned or

otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law.

### 5. Cancellation of Existing Securities and Related Agreements

(a)    Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtor, on the Effective Date, all instruments or other documents evidencing any Claim or Interest, and any rights of any holder in respect thereof, shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtor thereunder shall be deemed fully satisfied, released, and discharged.

(b)    On the Effective Date, any outstanding Hedge Agreements with Homer City that do not have any open transactions or outstanding obligations shall be deemed terminated and of no further force or effect.  If Reorganized Homer City enters into any new transactions with the counterparties to the Hedge Agreements on or after the Effective Date, any GE Guaranty previously provided to such counterparty shall not continue supporting such new transactions.

(c)    Notwithstanding such cancellation and discharge, the Indenture shall continue in effect solely to the extent necessary to allow the Debtor, Reorganized Debtor, Noteholders, and Prepetition Trustee, as applicable, (i) to receive Distributions under the Plan and (ii) to make post-Effective Date Distributions or take such other action pursuant to the Plan on account of the Notes and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims; *provided*, *however*, that nothing in Section 5.5 of the Plan shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtor.  Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtor or its interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in Section 5.5 of the Plan shall be deemed null and void and shall be of no force and effect, and the Debtor shall be entitled to continue using (in accordance with the remaining provisions of such document, instrument, lease, or other agreement) any land, facilities, improvements, or equipment financed with the proceeds of the Indenture.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtor or any of its counterparties under any executory contract or lease if such executory contract or lease has been assumed by the Debtor pursuant to a Final Order of the Bankruptcy Court or hereunder.

### 6. Officers and Boards of Directors

The composition of the board of directors, officers, managers, or partners of the Reorganized Debtor and New Holdco shall be disclosed before the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

### 7. Transitional Services Agreement

Upon the Effective Date, Reorganized Homer City shall be authorized to enter into and perform under the Transitional Services Agreement without the need for any further corporate action and without further action by the holders of Claims or Interests.

## 8.    Effectuating Documents; Further Transactions

(a)    On or as soon as practicable after the Effective Date, the Reorganized Debtor and New Holdco, as applicable, with the consent of the Requisite Noteholders and GE, shall take such actions as may be (or may become) necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, liquidation, or cancellation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates or articles of incorporation, formation, limited partnership reincorporation, merger, consolidation, conversion, dissolution, or cancellation and the Amended Organizational Documents pursuant to applicable state law, (iv) the issuance of securities, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, and (v) all other actions that the Reorganized Debtor and New Holdco, as applicable, determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

(b)    Each officer, director, partner, member, or manager of the Debtor, Reorganized Debtor, or New Holdco, as applicable, is authorized and directed to issue, execute, deliver, file, or record such contracts, certificates, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by any directors, members, managers, partners, or officers of the Debtor or the Reorganized Debtor) except for those expressly required pursuant to the Plan.

(c)    All matters provided for in the Plan involving the corporate structure of the Debtor or Reorganized Debtor, or any corporate or related action required by the Debtor or Reorganized Debtor in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by New Holdco, or any partners, directors, members, managers, or officers of the Debtor or Reorganized Debtor, and with like effect as though such action had been taken unanimously by New Holdco, or any partners, directors, managers, members, or officers, as applicable of the Debtor or Reorganized Debtor.

## 9.    Cancellation of Liens

Except as otherwise specifically provided herein, upon the Effective Date and concurrently with the applicable Distributions made pursuant to the Plan, any Lien securing a Secured Claim (including any Notes Claim) shall be deemed released, and the holder of such Secured Claim (or any agent for such holder) shall be authorized and directed to release any collateral or other property of the Debtor (including any Cash Collateral) held by such holder and to take such actions as may be requested by the Debtor, Reorganized Debtor, or Exit Agent to cancel, extinguish, and release such Liens, if they have been or will be satisfied or discharged in full pursuant to the Plan.

## 10.    Nonconsensual Confirmation

The Debtor reserves its right to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code with respect to Classes 5 and 6.  Because Classes 5 and 6 are deemed to reject the Plan, the Debtor may confirm the Plan under section 1129(b) of the Bankruptcy Code.

### 11.    Closing of the Chapter 11 Case

After the Estate has been fully administered, the Reorganized Debtor shall seek authority from the Bankruptcy Court to close the Chapter 11 Case in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

### 12.    Notice of Effective Date

As soon as practicable, but not later than three (3) Business Days after the Effective Date, the Reorganized Debtor shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

### 13.    GE Contribution

On the Effective Date, GE shall make the GE Contribution in partial consideration for GE's treatment under the Plan.

### 14.    Tax Reporting

Subject to definitive guidance from the Internal Revenue Service or from a court of competent jurisdiction to the contrary, all parties (including the Reorganized Homer City, New Holdco, the Noteholders and the holders of Homer City Interests) shall treat, for U.S. Federal income tax purposes, the implementation of the Plan on the Effective Date as follows, and shall not assert a contrary position in any tax filing with the IRS:

(a)    New Holdco shall have filed a valid election to be treated as an association taxable as a corporation for federal income tax purposes effective prior to the Effective Date and the exchange of Notes Claims for NewCo Interests shall be treated as a contribution under section 351 of the Tax Code, unless the Requisite Noteholders provide written consent at least five (5) Business Days prior to the Effective Date to structure the transaction so as to cause the contribution to be excluded from section 351 of the Tax Code;

(b)    The GE Contribution to Homer City as a contribution under section 721 of the Tax Code;

(c)    The exchange of Allowed Notes Claims for Reorganized Homer City Interests by New Holdco as a contribution under Section 721 of the Code;

(d)    The cancellation of the Allowed Notes Claims and allocation of cancellation of indebtedness income by Homer City to the holders of Reorganized Homer City Interests other than New Holdco; and

(e)    The cancellation of the Reorganized Homer City Interests other than those held by New Holdco as the termination of Homer City under section 708(b)(1)(A) of the Tax Code.

### E.    Distributions

#### 1.    Distributions Generally

The Disbursing Agent (as defined in Section VI(E)(4) below) shall make all Distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

#### 2.    Distribution Record Date

At 5:00 p.m. (prevailing Eastern Time) on the Effective Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or its agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Debtor or the Reorganized Debtor shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Effective Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtor nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

#### 3.    Date of Distributions

Unless specifically stated, any Distributions and deliveries to be made under the Plan shall be made on, or as soon as reasonably practicable after, the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan; *provided*, *that*, other than with respect to the Distributions to holders of Allowed Notes Claims, the Reorganized Debtor may implement periodic distribution dates if it determines them to be appropriate.

#### 4.    Disbursing Agent

All Distributions under the Plan shall be made by the Reorganized Debtor, as disbursing agent (the "**Disbursing Agent**"), on or as soon as reasonably practicable after the Effective Date or as otherwise provided herein; *provided*, *however*, that the Prepetition Trustee shall be the Disbursing Agent for the Allowed Notes Claims in accordance with Section 6.9 of the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by the Disbursing Agents directly related to Distributions hereunder shall be reimbursed by the Reorganized Debtor.  The Reorganized Debtor shall cooperate in good faith with the Prepetition Trustee to comply with the reporting and withholding requirements outlined in Section 6.18 of the Plan.

#### 5.    Rights and Powers of Disbursing Agent

(a)    From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtor and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon the Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of the Disbursing Agent.

(b)     The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all distributions contemplated hereby and (iii) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.     Expenses of Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtor in the ordinary course of business.

### 7.     No Postpetition Interest Return on Claims

Except as otherwise provided in the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims on or after the Commencement Date; *provided*, *however*, if interest is payable pursuant to the preceding sentence, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.

### 8.     Delivery of Distributions

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim shall be made to the Disbursing Agent, who shall transmit such Distribution to the applicable holders of Allowed Claims, or, in the case of Allowed Notes Claims, as set forth in Section 6.9 of the Plan.

Undeliverable Distributions shall remain in the possession of the Disbursing Agent until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such Undeliverable Distribution becomes an Unclaimed Distribution.

Until such time as an Undeliverable Distribution becomes an Unclaimed Distribution, within 30 days after the end of each calendar quarter following the Effective Date, or upon such other interval as the Bankruptcy Court may order, but in no event less frequently than annually, the Disbursing Agent shall make Distributions of all Cash and property that has become deliverable during the preceding quarter.

The Disbursing Agent shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions; *provided*, *however*, that nothing contained in the Plan shall require the Disbursing Agent to locate any Holder of an Allowed Claim.

### 9.     Delivery of Distributions on Notes Claims

Except as otherwise provided in the Plan or reasonably requested by the Prepetition Trustee, all Distributions to holders of Allowed Notes Claims shall be deemed completed when made to the Prepetition Trustee pursuant to the terms of the Plan, which shall be deemed to be the holder of all Allowed Notes Claims for purposes of Distributions to be made under the Plan.  The Prepetition Trustee shall hold or direct such Distributions for the benefit of the holders of Allowed Notes Claims.  As soon as practicable and in accordance with the terms set forth in Article VI of the Plan, the Prepetition Trustee shall arrange to deliver such Distributions to or on behalf of the actual holders of Allowed Notes Claims. If the Prepetition Trustee is unable to make, or consents to the Reorganized Debtor making, such

Distributions, the Reorganized Debtor, with the Prepetition Trustee's cooperation, shall make such Distributions to the extent reasonably practicable to do so.

As to any holder of an Allowed Notes Claim that is held in the name of, or by a nominee of the Depository Trust Company ("**DTC**"), the Debtor or the Reorganized Debtor, as applicable, shall seek the cooperation of DTC so that Distributions under the Plan shall be made through the facilities of DTC to such holders on or as soon as practicable on or after the Effective Date; *provided*, *that*, to the extent such NewCo Interests are not eligible for distribution in accordance with DTC's customary practices, the Debtor or the Reorganized Debtor will take all such reasonable actions as may be required to cause such Distributions of the NewCo Interests to be made by delivery of one or more certificates representing such NewCo Interests as described herein or by means of book-entry registration on the books of the transfer agent for the NewCo Interests.  In the period following the Effective Date and pending Distribution of the NewCo Interests to any holder entitled pursuant to this Plan to receive NewCo Interests, any such Holder will be entitled to exercise any voting rights and receive any dividends, distributions or Distributions paid with respect to such Holder's NewCo Interests and exercise all of the rights with respect of the NewCo Interests.

The Reorganized Debtor shall reimburse the Prepetition Trustee for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with the implementation of the Plan, including but not limited to, making Distributions pursuant to and in accordance with the Plan.

### 10. Unclaimed Property

Undeliverable Distributions or Unclaimed Distributions shall remain in the possession of the Disbursing Agent until such time as a Distribution becomes deliverable or the holder accepts such Distribution, or such distribution reverts back to the Reorganized Debtor and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred eighty (180) days from the date of distribution.  After such date all unclaimed property or interest in property shall revert to the Reorganized Debtor, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 11. Time Bar to Cash Payments

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtor, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check prior to the expiration of the one hundred eighty (180) day period shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

### 12. Manner of Payment under Plan

Except as otherwise specifically provided in the Plan, at the option of the Debtor or the Reorganized Debtor, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

### 13.    Satisfaction of Claims

Except as otherwise specifically provided in the Plan, any Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 14.    Fractional Interests

No fractional NewCo Interests shall be distributed.  If any Distributions of NewCo Interests pursuant to the Plan would result in the issuance of a fractional share of a NewCo Interest, then the number of shares of NewCo Interests to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of NewCo Interests to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in Section 6.14 of the Plan.  No consideration shall be provided in lieu of fractional shares that are rounded down.  The Reorganized Debtor, New Holdco, and the Disbursing Agent shall not have any obligation to make a Distribution that is less than one (1) share of NewCo Interest.

### 15.    Setoffs

The Debtor and the Reorganized Debtor, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any Distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Reorganized Debtor or their successor or successors of any claims, rights, or Causes of Action that the Debtor or Reorganized Debtor or their successor or successors or assigns may possess against the holder of such Claim.

### 16.    Allocation of Distributions between Principal and Interest

Except as otherwise required by law (as reasonably determined by the Debtor or Reorganized Debtor), Distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 17.    No Distribution in Excess of Amount of Allowed Claim

Except as provided in Section 4.3 of the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim.

### 18.    Withholding and Reporting Requirements

(a)    *Withholding Rights*.  Any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld

property.   Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, not to make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)      *Forms*.  Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtor (which Entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Entity) Form W-8, unless such Entity is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtor, the Disbursing Agent, or such other Entity designated by the Reorganized Debtor or Disbursing Agent and the holder fails to comply before the date that is one hundred eighty (180) days after the request is made, the amount of such Distribution shall irrevocably revert to the Reorganized Debtor and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against the Reorganized Debtor or its property.

### F.      Procedures for Disputed Claims

#### 1.      Disputed Claims Process

Notwithstanding section 502(a) of the Bankruptcy Code, holders of Claims shall not be required to file proofs of Claim.  If a holder of a Claim elects to file a proof of Claim with the Bankruptcy Court, such holder shall be deemed to have consented to the jurisdiction of the Bankruptcy Court for all purposes with respect to the Claim, and the Bankruptcy Court shall retain nonexclusive jurisdiction over all such Claims, which shall be resolved on a case-by-case basis through settlements, Claim objections (or, if necessary, through adversary proceedings), or by withdrawal of the Claims by the holders of such Claims.  From and after the Effective Date, the Reorganized Debtor may satisfy, dispute, settle, or otherwise compromise any Claim without approval of the Bankruptcy Court.

#### 2.      Objections to Claims

Any objections to proofs of Claims shall be served and filed (a) on or before the ninetieth (90th) day after the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtor or the Reorganized Debtor.  Nothing herein shall limit or affect the Debtor's or Reorganized Debtor's rights to dispute Claims asserted other than through a proof of Claim.

#### 3.      Expungement or Adjustment to Paid, Satisfied, Superseded, or Discharged Claims

Any Claim that has been or will be paid, satisfied, superseded, or discharged, may be expunged or adjusted on the claims register by the Debtor or Reorganized Debtor, as applicable, without a claims objection having to be filed and without further notice to any other party or action, order, or approval of the Bankruptcy Court.

### 4.      Estimation of Claims

The Debtor or the Reorganized Debtor, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.   If the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.   If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtor may pursue supplementary proceedings to object to the allowance of such Claim.

### 5.      No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until, and only to the extent that such Claim becomes Allowed.

### 6.      Distributions after Allowance

If a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, including the treatment provisions provided in Article IV of the Plan.

### 7.      Claim Resolution Procedures Cumulative

The objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.   Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

### 8.      Claim Resolutions Non-Binding Until Effective Date

No resolution, settlement, or compromise of any Claim pursuant to the terms of the Plan prior to the Effective Date shall be binding on any party unless and until the Effective Date occurs.

### G.      Executory Contracts and Unexpired Leases

### 1.      General Treatment

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure amount, all executory contracts and unexpired leases to which the Debtor is a party, including, for the avoidance of doubt, the O&M Agreement, the Consol Contract, and the GE Ordinary Course Contracts, which have not expired by their own terms or have not been assumed on or before the Confirmation Date, shall be deemed assumed except for any executory contract or unexpired lease that (a) has been identified on the Schedule of Rejected Contracts, (b) has been rejected pursuant to a Final Order of the Bankruptcy Court, (c) is the subject of a separate assumption, assignment, or rejection motion filed by the Debtor, with the consent of the Requisite Noteholders, under section 365 of the Bankruptcy Code before the Confirmation Date, or (d) is the subject of a pending Cure Dispute.   For the avoidance of doubt, the GE Ordinary Course Contracts shall be assumed pursuant to the Plan.   Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or

33

rejections provided for in the Plan or the Schedule of Rejected Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by any provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

## 2.    Determination of Cure Disputes and Deemed Consent

(a)    Any monetary amounts by which any executory contract or unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Reorganized Debtor promptly upon assumption thereof.  Following the Commencement Date, the Debtor shall serve a notice, in form and substance acceptable to the Requisite Noteholders, on parties to executory contracts and unexpired leases to be assumed reflecting the Debtor's intention to assume the contract or unexpired lease in connection with the Plan.  If the counterparty believes any Cure amounts are due by the Debtor in connection with the assumption, it shall assert such Cure amounts against the Debtor either in the ordinary course of business or by objection to the notice of the proposed assumption within ten (10) days of service thereof.

(b)    Upon assumption, Cure amounts shall be paid by the Reorganized Debtor in the ordinary course, subject to all defenses and disputes the Debtor or the Reorganized Debtor may have with respect to such executory contracts or unexpired leases, which the Reorganized Debtor may assert in the ordinary course.  If there is a Cure Dispute pertaining to assumption of an executory contract or unexpired lease, such dispute shall be heard by the Bankruptcy Court before such assumption becomes effective; *provided*, *however*, before the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may (with the consent of the Requisite Noteholders) settle any dispute regarding the Cure amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(c)    Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption of such executory contract or unexpired lease or the relevant Cure amount within ten (10) days of the service thereof, shall be (i)  deemed to have assented to assumption of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (A) prohibit, restrict, or condition the transfer or assignment of such contract or lease, or (B) terminate or permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtor or terminating or modifying such contract or lease on account of transactions contemplated by the Plan, and (ii) forever barred, estopped, and enjoined from challenging the validity of such assumption or the Allowed amount of such Cure amount thereafter.  For the avoidance of doubt, all counterparties to assumed contracts and leases shall retain their right to contend that Cure amounts are owed or that defaults are outstanding under such contracts and leases.

## 3.    Payments Related to Assumption of Contracts and Leases

Subject to resolution of any Cure Dispute, all Cures shall be satisfied by the Debtor or Reorganized Debtor, as the case may be, upon assumption of the underlying contracts and unexpired leases. Assumption of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption.  Any proofs of Claim

filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

### 4. Rejection Claims

If the rejection of an executory contract or unexpired lease by the Debtor results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be classified and treated in Class 4 (General Unsecured Claims).

### 5. Indemnification by the Reorganized Debtor

The Reorganized Debtor shall indemnify and hold harmless and pay all judgments and claims against EFS GP, any of its affiliates, and their respective officers, directors, members, partners, shareholders, employees, managers, consultants, or agents (each an "**Indemnified Party**" and collectively, the "**Indemnified Parties**"), from and against any loss or damage incurred by an Indemnified Party or the Debtor for any act or omission by any Indemnified Party in connection with a claim that is released or barred against the applicable Indemnified Party pursuant to the Plan, including costs and reasonable attorneys' fees and any amount expended in the settlement of any claims or loss or damage, shall not be discharged or impaired by confirmation of the Plan; *provided*, *that*, the Reorganized Debtor shall not indemnify the Indemnified Party for any act or omission (i) not taken or omitted by the Indemnified Party in the good faith belief that such act or omission was in or not opposed to the Debtor's best interest, (ii) with respect to which a court of competent jurisdiction (or other similar tribunal) has issued a final decision, judgment, or order that such Indemnified Party committed intentional fraud or criminal conduct, or (iii) that is not released or barred against the Indemnified Party pursuant to the Plan. Notwithstanding anything to the contrary herein, the maximum amount of the obligations payable by the Reorganized Debtor to all Indemnified Parties pursuant to this Section 8.5 shall not exceed the difference between $1,250,000.00 and the amount of the fees and expenses paid to Weil, Gotshal & Manges LLP and Reed Smith LLP as Restructuring Expenses.

### 6. Insurance Policies

All insurance policies pursuant to which the Debtor has any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtor and Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtor.

### 7. Surety Bonds

Subject to Section 8.7 of the Plan, each Surety Bond (if not replaced and cancelled by the Surety) shall be deemed assumed effective as of the Effective Date, and Reorganized Homer City shall pay all premium and other obligations due on or after the Effective Date with respect to any Surety Bond so assumed; *provided that* on the Effective Date, any collateral or guarantee provided by GE to any Surety for the benefit of the Debtor shall be replaced by Exit Letters of Credit issued under the Exit Facility Credit Agreement. Upon delivery to the beneficiary of any GE Guaranty of such Exit Letters of Credit, any Claim for indemnity or contribution against GE relating to the Surety Bonds, including Claims arising from any obligations of the Debtor to any governmental units, shall be deemed released, discharged, precluded, and enjoined by the Plan and the Confirmation Order.

### 8.    Intellectual Property Licenses and Agreements

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtor has any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the Debtor and Reorganized Debtor and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to this Plan, a separate order of the Bankruptcy Court, or is the subject of a separate rejection motion filed by the Debtor (with the consent of the Requisite Noteholders) in accordance with Section 8.1 of the Plan.  Unless otherwise noted hereunder or in the Plan, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtor, and the Reorganized Debtor may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

### 9.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed, shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

### 10.    Reservation of Rights

(a)    Neither the exclusion nor inclusion of any contract or lease by the Debtor on the Schedule of Rejected Contracts, any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtor that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtor or the Reorganized Debtor or their respective Affiliates have any liability thereunder.

(b)    Unless specifically stated otherwise, nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtor and the Reorganized Debtor under any executory or non-executory contract or any unexpired or expired lease.

(c)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor or the Reorganized Debtor under any executory or non-executory contract or any unexpired or expired lease.

(d)    If there is a Cure Dispute or a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtor or Reorganized Debtor, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such Cure Dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

(e)    No resolution or settlement of a Cure Dispute pursuant to the terms of the Plan, and no proposal by the Debtor of any Cure amount in connection with the Plan, prior to the Effective Date shall be binding on any party unless and until the Effective Date occurs.

36

### H.    Conditions Precedent to Confirmation of Plan and Effective Date

#### 1.    Conditions Precedent to Confirmation of the Plan

The following are conditions precedent to confirmation of the Plan:

(a)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed;

(b)    the Restructuring Support Agreement shall not have been terminated; and

(c)    the Bankruptcy Court shall have entered the Confirmation Order.

#### 2.    Conditions Precedent to the Effective Date

The following are conditions precedent to the Effective Date of the Plan:

(a)    the Amended Organizational Documents shall have been filed with the appropriate governmental authority, as applicable;

(b)    all governmental and third-party approvals and consents, including, but not limited to, Bankruptcy Court approval and approval from the Federal Energy Regulatory Commission as required under section 203 of the Federal Power Act, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

(c)    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto;

(d)    the Definitive Documents shall contain terms and conditions consistent in all material respects with the Plan and the Restructuring Support Agreement and shall otherwise be acceptable to the Debtor and the Requisite Noteholders; *provided*, *that*, any provision of a Definitive Document that is a GE Provision must also be in form and substance acceptable to GE;

(e)    all conditions precedent to the effectiveness of the Exit Facility Documents shall have been satisfied or waived in accordance with the terms thereof, and the Exit Facility Documents shall be in full force and effect and binding on all parties thereto;

(f)    all professional fees and expenses of retained professionals of the Debtor and its Estate that are approved by the Bankruptcy Court shall have been paid in full or estimated amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow pending approval by the Bankruptcy Court;

(g)    all beneficiaries of the GE Guaranties shall have delivered to GE full and irrevocable releases of all of the GE's obligations under the GE Guaranties (including releases of any existing or future claims against GE) effective as of the Effective Date;

(h)    the Bankruptcy Court shall have entered the Confirmation Order;

(i)      the Restructuring Expenses shall have been paid in full;

(j)      the Restructuring Support Agreement shall remain in force and effect; and

(k)      GE shall have made the GE Contribution.

### 3.      Waiver of Conditions Precedent

(a)      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred before the taking of any other such action.  Each condition precedent in Section 9.1 and Section 9.2 of the Plan may be waived in writing by the Debtor with the prior written consent of (i) the Requisite Noteholders, (ii) solely to the extent a waiver of such condition precedent would adversely affect a GE Provision, GE; and (iii) solely with respect to the condition precedent in Section 9.2(e), the Exit Arranger, the Exit Agents and the Exit Lenders; *provided that* the Debtor shall file a notice of such waivers above with the Bankruptcy Court within three (3) Business Days of obtaining the consent of the Requisite Noteholders and GE, as applicable, for such waiver.  If any such condition precedent is waived pursuant to this Section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied.

(b)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 4.      Effect of Failure of a Condition

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtor in a notice filed with the Bankruptcy Court before the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement or any Definitive Document shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtor, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtor, any of the Consenting Noteholders, GE or any other Entity.

## I.      Effect of Confirmation of Plan

### 1.      Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Estate shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, or the Exit Facility Documents.  On and after the Effective Date, the Reorganized Debtor may take any action, including, without limitation, the operation of its business, the use, acquisition, sale, lease and disposition of property, and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no

38

pending case under any chapter or provision of the Bankruptcy Code, except as expressly provided herein. Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 2.    Binding Effect

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) presumed to accept or deemed to reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

### 3.    Discharge of Claims and Termination of Interests

Upon the Effective Date and in consideration of the Distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any Affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose before the Effective Date. Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtor.

### 4.    Term of Injunctions or Stays

Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case, including under section 105 or 362 of the Bankruptcy Code or otherwise, and in effect on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 5.    Injunction

(a)    **Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, shareholders, managers, members, partners, and Affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.**

(b)    **Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold or may hold Claims against or Interests in the Debtor (regardless of whether proof of such Claims or Interests has been filed) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, shareholders, managers, members, partners, and Affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether**

directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

(c)      By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.5 of the Plan.

(d)      The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtor and the Reorganized Debtor and their respective property and interests in property.

6.      **Releases**

(a)      **Releases by the Debtor**

As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents or an assumed contract that remain in effect or become effective after the Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtor, the Reorganized Debtor, and the Estate from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor, the Reorganized Debtor, the Estate or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party (except for future or continuing performance obligations in connection with such business or contractual arrangement), the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Plan (including the Plan Supplement), the Definitive Documents, the Exit Facility Engagement Letter, the NewCo Agreements, the Amended Organizational Documents, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, and upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *that*, nothing in Section 10.6(a) of the Plan shall be construed to release the Released Parties from (a) intentional fraud or criminal conduct as determined by a Final Order or (b) any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Facility Documents, the NewCo Agreements, and the Plan Supplement) executed by such party to implement the Plan.

(b)        **Releases by Holders of Claims or Interests**

**As of the Effective Date, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, in exchange for good and valuable consideration, including the obligations of the Debtor under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, the Debtor, Reorganized Debtor, and Released Parties shall be deemed conclusively, absolutely, unconditionally, irrevocably and forever, released, and discharged by:**

(i)        **each other Released Party;**

(ii)        **each holder of an Impaired Claim or Interest that is not a Released Party, except any such holder that voted to reject, or abstained from voting on, the Plan <u>and</u> also checked the box on the applicable ballot or notice indicating that they opt out of granting the releases provided in the Plan;**

(iii)        **each holder of an Unimpaired Claim that does not timely object to the releases provided for in the Plan; and**

(iv)        **with respect to any Entity in the foregoing clauses (i)-(iii), such Entity's predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such Entity's respective heirs, executors, estates, servants and nominees;**

**in each case, from any and all Claims, interests, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative Claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on, relating to, or arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Chapter 11 Case, purchase, sale or rescission or the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtor and any Released Party (except for future or continuing performance obligations in connection with such business or contractual arrangement), the restructuring of Claims and Interests before or during the Chapter 11 Case, the negotiation, formulation, preparation, or consummation of the Restructuring Support Agreement, the Plan (including the Plan Supplement), the Definitive Documents, the Exit Facility Engagement Letter, or any related agreements, instruments, or other documents, the solicitation of votes with respect to the Plan, and upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; *provided*, *that*, nothing in Section 10.6(b) of the Plan shall be construed to release the Released Parties from (a) intentional fraud or criminal conduct as determined by a Final Order or (b) any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Exit Facility Documents, the NewCo Agreements, and the Plan Supplement) executed by such party to implement the Plan.**

41

7.      **Exculpation**

**Notwithstanding anything herein to the contrary, and to the maximum extent permitted by applicable law, the Exculpated Parties shall neither have nor incur any liability to any holder of a Claim or Interest or any other party in interest in the Chapter 11 Case, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or direct or indirect Affiliates, or any of their successors or assigns, for any act or omission (both before and after the Commencement Date) in connection with, related to, or arising out of, the Chapter 11 Case, the Restructuring Support Agreement, the Plan (including, without limitation, the Plan Supplement), the Definitive Documents, the Indenture, any settlement or agreement in the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan and the Definitive Documents, the offer, issuance, and distribution of any securities issued or to be issued pursuant to the Plan, whether such distribution occurs after the Effective Date, the administration of the Plan or property to be distributed thereunder, or agreements, instruments, other documents, or negotiations regarding or concerning any of the foregoing; *provided*, *that*, nothing in Section 10.7 of the Plan shall be construed to exculpate the Exculpated Parties from intentional fraud or criminal conduct as determined by a Final Order.  The Exculpated Parties have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.**

8.      **Retention of Causes of Action/Reservation of Rights**

Except as otherwise provided in the Plan, including in Sections 10.5, 10.6, and 10.7 of the Plan, (a) nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately before the Effective Date on behalf of the Estate or itself in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law and (b) the Reorganized Debtor shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Case had not been commenced, and all of the Debtor's legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date as if the Chapter 11 Case had not been commenced.  Notwithstanding the foregoing, the Debtor shall not retain any Claims or Causes of Action released pursuant to Sections 10.5, 10.6, and 10.7 of the Plan against the Released Parties or arising under chapter 5 of the Bankruptcy Code (except that such Claims or Causes of Action may be asserted as a defense to a Claim in connection with the claims reconciliation and objection procedures pursuant to section 502(d) of the Bankruptcy Code or otherwise).

9.      **Solicitation of Plan**

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtor shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtor and each of its directors, officers, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the

42

offer and issuance of any securities under the Plan, and therefore is not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

## 10. Corporate Action

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects by the Confirmation Order, including (a) the selection of any partners, members, managers, directors, or officers for New Holdco or the Reorganized Debtor, (b) the Distribution of the Reorganized Homer City Interests, (c) the entry into the Exit Facility Documents, (d) the amendment of the Amended Organizational Documents, (e) the distribution of NewCo Interests, (f) the entry into the NewCo Agreements, (g) the entry into and performance under the Restructuring Support Agreement, and (h) all other actions contemplated by or reasonably necessary to effectuate the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate, limited partnership or limited liability company structure of the Debtor or the Reorganized Debtor, and any corporate, limited partnership, or limited liability company action required by New Holdco, the Debtor or the Reorganized Debtor in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the partners, members, Interest holders, directors, managers or officers of the Debtor or the Reorganized Debtor.

On or before the Effective Date, the appropriate partners, members, managers, directors, or officers of New Holdco, the Debtor, or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, certificates, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor, including (w) the Amended Organizational Documents, (x) the NewCo Agreements, (y) the Exit Facility Documents, and (z) any and all other agreements, documents, certificates, securities and instruments relating to the Plan or the foregoing.  The authorizations and approvals contemplated by Section 10.10 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

## J. Retention of Jurisdiction

### 1. Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Case for, among other things, the following purposes:

(a)     to hear and determine motions or applications for the assumption, assignment, or rejection of executory contracts or unexpired leases, including Cure Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)     to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)     to ensure that Distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to Distributions under the Plan;

(d)    to consider the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    to enter, implement, or enforce such orders as may be appropriate if the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Fee Claims;

(i)    to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Plan;

(k)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)    to hear, enforce, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)    to resolve disputes concerning Disputed Claims or the administration thereof;

(o)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)    to enter a final decree closing the Chapter 11 Case;

(q)    to recover all assets of the Debtor and property of the Estate, wherever located;

(r)    to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(s)     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1).

## 2.     Courts of Competent Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## K.     Miscellaneous Provisions

### 1.     Payment of Statutory Fees

On the Effective Date and thereafter as may be required, the Reorganized Debtor shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code for the Chapter 11 Case, or until such time as a final decree is entered closing the Chapter 11 Case case, a Final Order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing the Chapter 11 Case is entered.

### 2.     Substantial Consummation of the Plan

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 3.     Plan Supplement

The Plan Supplement shall be filed with the Bankruptcy Court.  Documents included in the Plan Supplement will also be posted at the website of the Debtor's notice, claims, and solicitation agent.

### 4.     Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any Securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtor pursuant to, in implementation of or as contemplated in the Plan (whether to the Reorganized Debtor or otherwise), (d) the grant of collateral under the Exit Facility Documents and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and

directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

5.      **Amendments**

(a)      *Plan Modifications*.  Subject to the consent of the Requisite Noteholders, the Plan may be amended, modified, or supplemented by the Debtor in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided*, *that*, the provisions of the Plan that are GE Provisions may only be amended, modified, or supplemented with the consent of GE.

(b)      *Other Amendments*.  Notwithstanding Section 12.6(a) of the Plan, before the Effective Date, the Debtor may amend, modify, or supplement the Plan and the documents contained in the Plan Supplement to cure any ambiguity, defect (including any technical defect), or inconsistency without further order or approval of the Bankruptcy Court; *provided*, *that*, any amendments, modifications, or supplements pursuant to Section 12.6(b) do not materially adversely affect the rights, interest, or treatment of the Consenting Noteholders or GE, as applicable, under the Plan.

6.      **Revocation or Withdrawal of the Plan**

The Debtor reserves the right to revoke or withdraw the Plan before the Effective Date with the consent of the Requisite Noteholders; *provided*, *however*, that the Debtor may revoke or withdraw the Plan without such consents as permitted under the Restructuring Support Agreement or in the exercise of the Debtor's fiduciary duties.  If the Plan has been revoked or withdrawn before the Effective Date, or if confirmation or the occurrence of the Effective Date does not occur on the Effective Date, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, the Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtor or any other Entity; or (iii) constitute an admission of any sort by the Debtor, any of the Consenting Noteholders, or any other Entity.

7.      **Governing Law**

Except if the Bankruptcy Code, federal law, the Plan Supplement, or an exhibit hereto provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

8.      **Dates of Actions to Implement the Plan**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

9.      **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable

and deemed binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtor.

### 10.    Notices

All notices, requests, and demands prior to the Effective Date to or upon the Debtor to be effective shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

      (a)      to the Debtor:

Homer City Generation, L.P.
1750 Power Plant Road,
Homer City, PA 15748
Attn:    Matthew L. Weidner, Esq.
Email: matthew.weidner@ge.com

- and -

Richards, Layton & Finger, P.A. (as counsel to the Debtor)
920 North King Street
Wilmington, DE 19801
Attn:    Mark D. Collins, Esq.
      Russell C. Silberglied, Esq.
Telephone:    (302) 651-7700
Facsimile:    (302) 651-7701
E-mail:    Collins@rlf.com
      Silberglied@rlf.com

      (b)      to GE:

Weil, Gotshal & Manges LLP (as counsel to GE)
767 Fifth Avenue
New York, NY 10153
Attn:    Robert J. Lemons, Esq.
      Sunny Singh, Esq.
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007
E-mail:    Robert.Lemons@weil.com
      Sunny.Singh@weil.com

      (c)      to the Consenting Noteholders:

O'Melveny & Myers LLP (as counsel to the Consenting Noteholders)
7 Times Square
New York, NY 10036
Attn:    George A. Davis, Esq.
      Andrew M. Parlen, Esq.
Telephone:    (212) 236-2000

RLF1 16564873v.1

| | |
|---|---|
| Facsimile: | (212) 236-2061 |
| E-mail: | GDavis@omm.com |
| | AParlen@omm.com |

After the Effective Date, the Debtor has authority to send a notice informing Entities that, to continue receiving documents pursuant to Bankruptcy Rule 2002, such Entities must file renewed requests to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtor is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

## VII.
## FINANCIAL INFORMATION AND PROJECTIONS

## FINANCIAL PROJECTIONS

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtor analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

In connection with the Disclosure Statement, the Debtor's contractual asset manager (the "**Asset Manager**") prepared financial projections (the "**Projections**") for the years 2017 through 2019 (the "**Projection Period**").  The Projections rely upon input from PA Consulting Group ("PA Consulting"), a third party power market expert.  PA Consulting projected revenues and variable cost based on market forward curves and expert knowledge of commodity market fundamentals.  The projections for 2017 and 2018 are based upon market forward curves, while 2019 projections are based upon a fundamental view of future commodity prices.  Fixed cost and capital expenditures projections were prepared by the contractual O&M manager ("**O&M Manager**") and are based on a number of assumptions made by the O&M Manager with respect to the future performance of the Reorganized Debtor's operations.  The Debtor's partners, including its general partner, were not asked to, and thus did not, approve the Projections or evaluate or endorse the Projections or the assumptions underlying the Projections.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED BALANCE SHEETS REFLECT ASSUMPTIONS FOR FRESH START ACCOUNTING, WHICH COULD DIFFER MATERIALLY FROM THE FINAL BALANCE SHEET.

THE DEBTOR'S INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, DO NOT ASSUME RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.

ALTHOUGH THE ASSET MANAGER HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTOR OR THE REORGANIZED DEBTOR CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTOR'S FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

**Key Income Statement Assumptions:**

I.    *Key Assumptions –*

| Forecast Assumptions | 2017F | 2018F | 2019F |
|---|---|---|---|
| Merchant Capacity (MW) | 1,878 | 1,878 | 1,878 |
| Merchant Generation (GWh) | 10,721 | 8,703 | 12,833 |
| Capacity Factor | 65.2% | 52.9% | 78.0% |
| Realized Merchant Power Price ($ / MWh) | $34.34 | $34.09 | $34.78 |
| Delivered Fuel Cost ($/mmBtu) | $2.19 | $2.15 | $2.20 |

II.   *Total Revenue –* Comprises revenue from merchant generation, capacity margin, reactive power, NYISO sales and accumulated allowances. Anticipated revenues are based on PA Consulting's view of the Homer City facility's capacity factor and generation, as well as market forward looking price curves and a fundamental view of power prices. Reflects existing hedges during the first quarter of 2017.

III.  *Variable Cost –* Variable production costs associated with the Debtor's generation of power, which is primarily the cost of coal.

IV.   *Total Fixed Cost –* Total fixed cost includes labor expense, materials, routine maintenance, major maintenance, and SG&A expenses.

V.    *Depreciation and Amortization ("D&A") –* D&A expenses relate to declines in long-lived assets, including plant and equipment.

VI.   *Other Operating Expenses –* Represents accretion of asset retirement obligation.

VII.  *Non-Operating Expenses –* Represents professional fees and exit financing fees incurred prior to the Chapter 11 case and expected to be incurred during and immediately after the Chapter 11 case. Assumes emergence on February 1, 2017.

VIII. *Net Interest Expense –* Includes cash interest paid on post-emergence debt, amortization of original issue discount, and other interest income and expense. Assumptions are subject to the result of the exit financing marketing process.

IX.   *Income Taxes –* Assumes a 35% tax rate and 20 year MACRS for tax depreciation. Assumes no NOLs at the Reorganized Debtor. Tax basis is subject to final Fresh Start Accounting treatment.

## Key Cash Flow Statement Assumptions

I.      *Cash Interest* – Includes cash interest and fees paid on post-emergence debt. Assumptions are subject to the result of the exit financing marketing process.

II.     *Professional and Other Fees* – Represents professional fees incurred and expected to be incurred during the Chapter 11 cases.

III.    *Change in Net Working Capital and Other* – Reflects changes in working capital accounts and accruals, based upon historical working capital ratios.

IV.     *Capital Expenditures* – Capital expenditures comprise cash outflows primarily for continued investment in plant development, generation equipment and maintenance costs.

V.      *Issuance of Long-Term Debt* – Represents the issuance of the exit financing term loan upon emergence from the Chapter 11 cases.

VI.     *Change in Restricted Cash* – Reflects cash proceeds from post-emergence financing used to cash collateralize estimated letters of credit and estimated hedging collateral requirements.

## Key Balance Sheet Assumptions

I.      Fresh start accounting applied assuming the valuation per the Disclosure Statement.

II.     *Restricted Cash* – Reflects estimate of cash collateralized letters of credit, hedging collateral requirements, and a debt service reserve.

III.    *Long-Term Debt* – Reflects exit financing term loan issued at emergence, net of original issue discount.

IV.     *Other Long-Term Obligations* – Consists of asset retirement obligations.

RLF1 16564873v.1

**Summary Income Statement**

| ($ in millions) | 2017F | 2018F | 2019F |
|---|---|---|---|
| Total Revenue | $475 | $418 | $542 |
| Less: Variable Cost | (270) | (220) | (328) |
| **Gross Margin** | **$204** | **$198** | **$214** |
| *% Margin* | *43%* | *47%* | *39%* |
| | | | |
| Less: Total Fixed Cost | ($149) | ($162) | ($176) |
| **EBITDA** | **$55** | **$36** | **$38** |
| *% Margin* | *12%* | *9%* | *7%* |
| | | | |
| Less: Depreciation & Amortization | ($4) | ($5) | ($5) |
| Less: Other Operating (Expenses) / Income | (2) | (2) | (2) |
| **Operating Income** | **$49** | **$29** | **$31** |
| *% Margin* | *10%* | *7%* | *6%* |
| | | | |
| Less: Non-Operating Expenses | ($18) | – | – |
| Less: Net Interest Expense | (13) | (12) | (11) |
| **Pre-Tax Income** | **$18** | **$17** | **$20** |
| *% Margin* | *4%* | *4%* | *4%* |
| | | | |
| Less: Income Taxes | (6) | (4) | (5) |
| **Net Income** | **$12** | **$13** | **$15** |
| *% Margin* | *3%* | *3%* | *3%* |

**Summary Cash Flow Statement**

| ($ in millions) | 2017F | 2018F | 2019F |
|---|---|---|---|
| Cash from Operating Activities: | | | |
| EBITDA | $55 | $36 | $38 |
| Cash Interest | (13) | (12) | (11) |
| Professional and Other Fees | (18) | – | – |
| Change in Net Working Capital and Other | 3 | 5 | (10) |
| Income Taxes | (6) | (4) | (5) |
| **Cash from Operating Activities** | **$21** | **$25** | **$12** |
| | | | |
| Cash From Investing Activities: | | | |
| Capital Expenditures | ($11) | ($3) | ($1) |
| **Cash from Investing Activities** | **($11)** | **($3)** | **($1)** |
| | | | |
| Cash From Financing Activities: | | | |
| Issuance of Long-Term Debt | $150 | – | – |
| Original Issuance Discount | (2) | – | – |
| Repayment of Long-Term Debt | (19) | (17) | (9) |
| Change in Restricted Cash | (104) | – | – |
| Dividends | – | – | – |
| **Cash from Financing Activities** | **$26** | **($17)** | **($9)** |
| | | | |
| Beginning Cash | $15 | $52 | $57 |
| Change in Cash | 36 | 5 | 2 |
| **Ending Cash** | **$52** | **$57** | **$59** |

RLF1 16564873v.1

**Summary Balance Sheet**

| ($ in millions) | 2017F | 2018F | 2019F |
|---|---|---|---|
| Assets: | | | |
| Cash and Cash Equivalents | $52 | $57 | $59 |
| Restricted Cash | 104 | 104 | 104 |
| Accounts Receivable | 24 | 21 | 27 |
| Inventory | 78 | 73 | 83 |
| Other Current Assets | 31 | 27 | 35 |
| **Total Current Assets** | **$288** | **$282** | **$308** |
| | | | |
| Net PP&E | $150 | $148 | $144 |
| **Total Long-Term Assets** | **$150** | **$148** | **$144** |
| | | | |
| **Total Assets** | **$438** | **$430** | **$453** |
| | | | |
| Liabilities and Shareholders' Equity: | | | |
| Accounts Payable | $21 | $17 | $26 |
| Accrued Liabilities | 14 | 12 | 18 |
| Current Portion of Long-Term Debt | 2 | 2 | 2 |
| **Total Current Liabilities** | **$37** | **$30** | **$45** |
| | | | |
| Long-Term Debt | $128 | $111 | $103 |
| Other Long-Term Obligations | 17 | 19 | 21 |
| **Total Long-Term Liabilities** | **$145** | **$131** | **$124** |
| | | | |
| **Total Liabilities** | **$183** | **$161** | **$169** |
| | | | |
| Shareholders' Equity | $255 | $269 | $284 |
| **Total Liabilities plus Shareholders' Equity** | **$438** | **$430** | **$453** |
| | | | |
| Credit Metrics: | | | |
| Total Debt / EBITDA | 2.4x | 3.1x | 2.8x |
| Net Debt / EBITDA[1] | 1.4x | 1.5x | 1.2x |
| EBITDA / Interest | 4.2x | 2.9x | 3.4x |
| EBITDA - Capex / Interest | 3.4x | 2.7x | 3.3x |

(1) Net Debt equals Total Debt minus Cash and Cash Equivalents.

# VIII.
## VALUATION ANALYSIS

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR SOLD PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTOR.

Solely for purposes of the Plan and this Disclosure Statement, PJT has estimated the total enterprise value (the "**Total Enterprise Value**") and implied equity value (the "**Equity Value**") of the Reorganized Debtor on a going concern basis and pro forma for the transactions contemplated by the Plan.

In estimating the Total Enterprise Value of the Reorganized Debtor, PJT (i) met with the contractual asset manager (the "Asset Manager") and the contractual O&M manager ("**O&M Manager**") to discuss the Debtor's operations and future prospects, (ii) reviewed the Debtor's historical financial information, (iii) reviewed certain of the Debtor's internal financial and operating data, (iv) reviewed the Financial Projections in Section VII hereof, (v) reviewed analyses prepared by PA Consulting Group ("**PA Consulting**"), a third party power market expert, (vi) reviewed the detailed business plan underlying the Financial Projections, and (vii) reviewed publicly-available third-party information.

The valuation information set forth in this Section represents a valuation of the Reorganized Debtor based on the application of standard valuation techniques. The estimated values set forth in this Section: (a) do not purport to constitute an appraisal of the assets of the Reorganized Debtor; (b) do not constitute an opinion on the terms and provisions or fairness to any Person, from a financial point of view, of the consideration to be received by such Person under the Plan; (c) do not constitute a recommendation to any holder of Allowed Claims as to how such holder should vote or how such holder otherwise should act with respect to the Plan; and (d) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Debtor.

In preparing the estimates set forth below, PJT has relied upon the accuracy, completeness, and fairness of the financial and other information furnished by the Debtor, the Asset Manager, the O&M Manager, and PA Consulting. PJT did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the Assets or liabilities of the Debtor.

The Financial Projections for the Reorganized Debtor are included in Section VII hereof. The estimated values set forth herein assume that the Reorganized Debtor will achieve their Financial Projections in all material respects. Projections are forward looking statements and, by their nature, (i) are dependent on assumptions that might or might not come to fruition, and (ii) are estimates rather that precise numeric statements of past results. PJT has relied on the Debtor's representation that the Financial Projections (a) have been prepared in good faith; (b) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (c) reflect the Debtor's best currently available estimates; and (d) reflect the good faith judgments of the Debtor. PJT does not offer an opinion as to the attainability of the Financial Projections. As discussed in Section XI herein, the future results of the Reorganized Debtor are dependent upon various factors, many of which are beyond the control or knowledge of the Debtor and PJT, and consequently are inherently difficult to project.

This valuation contemplates facts and conditions known and existing as of January 9, 2016. Events and conditions subsequent to this date, including updated projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value. For purposes of this valuation, PJT has assumed that no material changes that would affect value will occur between January 9, 2016 and the contemplated Effective Date. For convenience of modeling, we have assumed a valuation date of January 1, 2017.

## Valuation Methodology

PJT prepared its valuation analysis based upon the following methodologies:

### 1. Discounted Cash Flow Analysis

The discounted cash flow analysis is a forward looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. The total enterprise value is determined by calculating the present value of unlevered after-tax free cash flows over the course of the projection period plus an estimate for the value of a reorganized debtor beyond the projection period, known as the terminal value.

### 2. Precedent Transactions Analysis

The precedent transactions analysis estimates the value of a company by examining public and private M&A transactions involving other power generation assets with similar operating and financial characteristics. Such transaction values are commonly expressed as a multiple of generation capacity on a dollar per kilowatt basis. The selection of precedent transactions for this purpose was based upon recent coal power plant transactions that are geographically relevant.

In addition to the valuation methodologies above, PJT considered the amount and terms of bids received for the Debtor in 2016. The Debtor engaged PJT in early 2016 to assist in pursuing a potential sale of substantially all of the Debtor's assets. In connection with the marketing process, the Debtor executed confidentiality agreements with numerous strategic and financial buyers, conducted multiple in-person diligence meetings between the Asset Manager and the prospective purchasers, and received formal and informal bids from a number of prospective purchasers. Beginning in June 2016, the Debtor consulted with the Ad Hoc Group and received input from those noteholders regarding the sale process. The Ad Hoc Group was provided confidential information, including information relating to the bids received during the process. Ultimately, the Debtor, GE, and the Ad Hoc Group elected to pursue a restructuring on the terms set forth in the RSA rather than proceed with any of the bids received in connection with the sale process.

PJT did not estimate the value of any tax attributes nor did it estimate the impact of any cancellation of indebtedness income on the Reorganized Debtor's projections. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtor's projections could materially impact PJT's valuation analysis.

**Total Enterprise Value and Equity Value**

As a result of the analysis described above, PJT estimates the Total Enterprise Value of the Reorganized Debtor to be approximately $290 - $350 million.  PJT projects pro forma net debt of $66 million upon the Effective Date.  This consists of $150 million of gross debt and cash of $84 million.  The Total Enterprise Value implies an Equity Value range of $224 - $284 million.

# IX.
## TRANSFER RESTRICTIONS AND CONSEQUENCES
## UNDER FEDERAL SECURITIES LAWS

The solicitation of votes on the Plan with respect to the Notes Claims is being made only to holders of such claims who are eligible noteholders (i.e., "accredited investors" as defined in Rule 501 of the Securities Act or "qualified institutional buyers" as defined in Rule 144A of the Securities Act).

The issuance of and the distribution under the Plan of the NewCo Interests issued to holders of Allowed Notes Claims shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code, or, if applicable, Section 4(a)(2) of the Securities Act.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right.  In reliance upon this exemption, the NewCo Interests issued to holders of Allowed Notes Claims generally will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

To the extent that any securities under the Plan are issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act, such securities will be considered "restricted securities" and

may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. Holders of restricted securities would, however, be permitted to resell NewCo Interests without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, or another applicable exemption from the securities laws, or if such securities are registered with the Securities and Exchange Commission.

In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

*Listing.* Upon the Effective Date of the Plan, the NewCo Interests will not be publicly traded or listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

*Legends.* To the extent certificated, certificates evidencing the NewCo Interests held by holders of ten percent (10%) or more of the outstanding NewCo Interests, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE DEBTOR RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## X.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain intended U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to holders of Notes Claims. The following summary does not address the U.S. federal income tax consequences to holders whose Claims are not impaired or to holders of Claims or Equity Interests that are deemed to reject the Plan (*e.g.*, Administrative, Priority Tax and Other Priority Claims, General Unsecured Claims, Intercompany Claims, and Homer City Interests).

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtor has not requested an opinion of counsel or a ruling from the IRS or any other tax authority with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers (except where specifically referenced), small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual

retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes, nor does it apply to any person that acquires NewCo Interests in the secondary market.

This discussion assumes that the Notes Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and, unless otherwise indicated below, that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. All holders of Notes Claims or Equity Interests are urged to consult their tax advisor as to the U.S. federal, state, local and other tax consequences applicable under the Plan.***

### 1.    Consequences to Holders of Notes Claims

On the Effective Date, pursuant to the Plan, the following restructuring transactions shall occur in the following order:

(i) Except to the extent that a holder of an Allowed Notes Claim agrees to a less favorable treatment of such Claim, each such holder (other than GE) shall receive, in exchange for the contribution of such Notes Claim to New Holdco (which shall file an election to be treated as an association taxable as a corporation for federal income tax purposes to be effective prior to the date of such contribution), such holder's Pro Rata share of one hundred percent (100%) of the NewCo Interests, plus such holder's Pro Rata share of the GE Remainder and GE, on account of the GE Notes Claims, shall receive in exchange for the contribution of the GE Notes Claims to New Holdco, 66.67% of its Pro Rata share of the NewCo Interests and no share of the GE Remainder;

(ii) GE shall make the GE Contribution in partial consideration for GE's treatment under the Plan;

(iii) All Homer City Interests shall be converted into the Reorganized Homer City Interests and New Holdco shall receive, in full and final satisfaction, release and discharge of the Notes Claims contributed by each holder, Reorganized Homer City Interests; and

(iv) Immediately following the release and discharge of the Notes Claims held by New Holdco, all of the Reorganized Homer City Interests, other than any Reorganized Homer City Interests owned by New Holdco at such time shall be cancelled, extinguished and discharged.  The owners of Reorganized Homer City Interests, other than New Holdco, are referred to herein as the "**Historic Homer City Partners**."

For U.S. federal income tax purposes, these transactions are expected to be treated as an exchange by the contributing holders of their Notes Claims for NewCo Interests (see "—Contribution of Notes Claims to New Holdco" below), followed, in part, by the GE Contribution and an exchange of such Notes Claims by New Holdco for Reorganized Homer City Interests, (see "—Contribution of Notes Claims to Reorganized Homer City" below), followed by the cancellation of Reorganized Homer City Interests

other than those held by New Holdco causing Homer City to become a disregarded entity wholly owned by New Holdco. Consistent with the forgoing, and subject to definitive guidance from the Internal Revenue Service or from a court of competent jurisdiction to the contrary, the Plan requires all parties (including Reorganized Homer City, New Holdco, the Noteholders and the holders of Homer City Interests) to treat, for U.S. Federal income tax purposes, the implementation of the Plan on the Effective Date as set forth in Section 5.14 of the Plan and to not assert a contrary position in any tax filing with the IRS.

Unless otherwise indicated, the following discussion assumes that the intended treatment of the restructuring transactions is correct and the restructuring transactions will be characterized as described above for U.S. federal income tax purposes.

### 2.    Contribution of Notes Claims to New Holdco

In general, the exchange of Notes Claims for NewCo Interests is expected to qualify as a tax-free contribution under section 351 of the Tax Code to the extent NewCo Interests are received, unless the Requisite Noteholders provide written consent at least five (5) Business Days prior to the Effective Date to structure the transaction so as to cause the exchange to be excluded from section 351 of the Tax Code. In a tax-free contribution under section 351 of the Tax Code, a holder's tax basis in the NewCo Interests received should equal the holder's aggregate adjusted tax basis in the Notes Claims exchanged. A holder's holding period in the NewCo Interests received is expected to include such holder's holding period in the Notes Claims exchanged therefor. Holders are urged to consult their own tax advisors regarding the exchange of Notes Claims for NewCo Interests, including the potential consequences of the receipt of value, if any, attributable to the GE Remainder and the tax treatment to holders in the event that, upon consent of the Requisite Noteholders, the transaction is structured so as to cause the exchange to be excluded from section 351 of the Tax Code.

### 3.    Contribution of Notes Claims to Reorganized Homer City

The exchange of Notes Claims for Reorganized Homer City Interests is expected be treated as a tax-free contribution under section 721 of the Tax Code to the extent Reorganized Homer City Interests are received (other than in respect of accrued but unpaid interest on the Notes Claims). In a tax-free contribution under section 721 of the Tax Code, New Holdco's tax basis in the Reorganized Homer City Interests received (other than in respect of accrued but unpaid interest on the Notes Claims) should equal New Holdco's aggregate adjusted tax basis in the Notes Claims exchanged therefore, increased by such holder's allocable share of any liabilities of Reorganized Homer City. New Holdco's adjusted tax basis in the Reorganized Homer City Interests received in respect of accrued but unpaid interest on the Notes Claims should be equal to the amount of such accrued but unpaid interest that is recognized as interest income. New Holdco's holding period in the Reorganized Homer City Interests received (other than in respect of accrued but unpaid interest on the Notes Claims) is expected to include New Holdco's holding period in the Notes Claims exchanged therefor. New Holdco's holding period in the Reorganized Homer City Interests received in respect of accrued but unpaid interest on the Notes Claims is expected to begin on the Effective Date.

In general, to the extent that any consideration is received by New Holdco in satisfaction of accrued interest with respect to any Notes Claims, such amount will be taxable as interest income to New Holdco (if not previously included in gross income).

The Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for

example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). See Section 6.16 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes and a reallocation by the IRS could result in additional interest income recognized by New Holdco.

### 4.    Cancellation of the Notes Claims

Immediately following the GE Contribution and contribution of the Notes Claims to Reorganized Homer City, the Notes Claims will be cancelled. Homer City will be treated as if it satisfied the Notes Claims with an amount of money equal to the fair market value of the Reorganized Homer City Interests issued to New Holdco. Cancellation of indebtedness income realized by Homer City will be allocated to the Historic Homer City Partners and not to New Holdco.

### 5.    Termination and Liquidation of Reorganized Homer City

Immediately following the cancellation of Notes Claims, the Reorganized Homer City Interests owned by the Historic Homer City Partners will be cancelled. As such, Reorganized Homer City will become a wholly owned subsidiary of New Holdco treated as a disregarded entity and will terminate for U.S. federal income tax purposes. For U.S. federal income tax purposes, this is expected to be treated as a distribution of the assets and liabilities of Reorganized Homer City to New Holdco in complete liquidation of its interest in Reorganized Homer City. New Holdco generally will not recognize gain or loss on such distribution, and New Holdco's tax basis in the assets of Reorganized Homer City should equal New Holdco's aggregate adjusted tax basis in the Reorganized Homer City Interests prior to the distribution, decreased to the extent of any cash or the fair market value of marketable securities to be received in such distribution.

### 6.    Ownership and Disposition of NewCo Interests

#### (a)    *New Holdco Classification*

It is intended that New Holdco will be treated as a "C" corporation for U.S. federal income tax purposes, effective prior to the contribution of Notes Claims to New Holdco described above. In order to effectuate such classification, New Holdco will be required to timely file an election to be treated as an association taxable as a corporation for federal income tax purposes. New Holdco will be subject to tax at the New Holdco-level at applicable corporate rates.

The following discussion addresses certain federal income tax consequences to beneficial owners of NewCo Interests acquired pursuant to the Plan.

For purposes of this discussion, a "U.S. holder" means a beneficial owner of NewCo Interests which, for U.S. federal income tax purposes is:

- an individual who is a citizen or resident of the United States;

- a corporation (or any entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state of the United States, or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if (a) a court within the United States can exercise primary supervision over its administration, and one or more United States persons have the authority to control all of the substantial decisions of that trust or (b) it has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

For purposes of this discussion, a "non-U.S. holder" is a beneficial owner of NewCo Interests (other than a partnership or an entity or arrangement treated as a partnership for U.S. federal income tax purposes) that is not a U.S. holder and is not a former citizen or former long-term resident of the United States.

(b) **_U.S. Holders_**

(i) Distributions

If, after a U.S. holder acquires NewCo Interests pursuant to the Plan, New Holdco makes a distribution in respect of such NewCo Interests from its current or accumulated earnings and profits (as determined under U.S. federal income tax principles), the distribution will be treated as a dividend and will be includible in a U.S. holder's income when paid. If the distribution exceeds New Holdco's current and accumulated earnings and profits, the excess will be treated first as a tax-free return of the U.S. holder's investment, up to the U.S. holder's tax basis in its NewCo Interests, and any remaining excess will be treated as capital gain from the sale or exchange of the NewCo Interests. Dividends received by a U.S. corporation may be eligible for a dividends received deduction, subject to limitations. Dividends received by non-corporate U.S. holders, including individuals, will generally be subject to a reduced rate of tax, provided that certain holding period requirements are met.

(ii) Sale or Other Disposition

A U.S. holder generally will recognize capital gain or loss on a sale, exchange or other disposition of NewCo Interests. Such U.S. holder's gain or loss will equal the difference between the proceeds received by the U.S. holder and the U.S. holder's tax basis in the NewCo Interests. The proceeds received by the U.S. holder will include the amount of any cash and the fair market value of any other property received for the stock. The gain or loss recognized by a U.S. holder on a sale or exchange of NewCo Interests will be long-term capital gain or loss if the U.S. holder's holding period in the NewCo Interests is more than one year, or short-term capital gain or loss if the U.S. holder's holding period in the NewCo Interests is one year or less, at the time of the transaction. Long-term capital gains of non-corporate taxpayers, including individuals, will generally be subject to a reduced rate of tax. Short-term capital gains are taxed at ordinary income rates. The deductibility of capital losses is subject to limitations.

U.S. holders should consult their own tax advisors with respect to the U.S. federal income tax consequences of the ownership and disposition of NewCo Interests.

(c) **Non-U.S. Holders**

The following discussion is limited to the U.S. federal income tax consequences relevant to a non-U.S. holder (as defined above). Special rules may apply to certain non-U.S. holders, such as "controlled foreign corporations," "passive foreign investment companies," and corporations that accumulate earnings to avoid U.S. federal income tax, among others, that are subject to special treatment under the Code. Such non-U.S. holders should consult their own tax advisors to determine the U.S. federal, state, local and other tax consequences that may be relevant to them.

(i)        Distributions

In the event New Holdco makes a distribution to a non-U.S. holder, the distribution will constitute a dividend for U.S. federal income tax purposes to the extent of New Holdco's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). To the extent that a non-U.S. holder receives distributions on NewCo Interests that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed New Holdco's current and accumulated earnings and profits (as determined under U.S. federal income tax principles), such distributions will be treated first as a non-taxable return of capital reducing the non-U.S. holder's basis in the NewCo Interests. Any such distributions in excess of the non-U.S. holder's basis in the NewCo Interests generally will be treated as gain from the sale or exchange of such NewCo Interests, the treatment of which is described below.

Generally, distributions on NewCo Interests that are treated as dividends will be subject to a 30% U.S. withholding tax, or such lower rate as may be specified by an applicable tax treaty. In order to claim the benefit of an applicable tax treaty, a non-U.S. holder will be required to provide a properly executed IRS Form W-8BEN or W-8BEN-E certifying its entitlement to benefits under a treaty.

Dividends that are effectively connected with a non-U.S. holder's conduct of a trade or business in the United States and, if required by an applicable income tax treaty, attributable to a U.S. permanent establishment maintained by the non-U.S. holder, will generally be subject to U.S. federal income tax on a net basis at applicable individual or corporate rates. In that case, New Holdco will not have to withhold U.S. federal withholding tax if the non-U.S. holder provides a properly executed IRS Form W-8ECI (or other applicable form) in accordance with the applicable certification and disclosure requirements. A non-U.S. holder that is a corporation may also be subject to a "branch profits tax" at a 30% rate (or such lower rate as may be specified by an applicable income tax treaty) on the deemed repatriation from the United States of its "effectively connected earnings and profits," subject to certain adjustments.

(ii)        Sale or Other Disposition

A non-U.S. holder will generally not be subject to U.S. federal income or withholding tax on any gain realized on the sale or exchange of NewCo Interests unless:

- the gain is effectively connected with a U.S. trade or business of the non-U.S. holder (and, if a tax treaty applies, the gain is attributable to a U.S. permanent establishment maintained by such non-U.S. holder);

- in the case of a nonresident alien individual, such individual is present in the United States for 183 or more days in the taxable year of the sale or disposition and certain other conditions are met; or

- New Holdco is or has been a United States real property holding corporation (a "**USRPHC**") at any time within the five-year period preceding the disposition or the non-U.S. holder's holding period, whichever period is shorter (the "**Test Period**"), and either NewCo Interests are not regularly traded on an established securities market or the non-U.S. holder owns or has owned a threshold amount of NewCo Interests, as described below.

It is expected that New Holdco will likely be a USRPHC because the fair market value of its U.S. real property interests, as defined in the Tax Code and applicable regulations, is expected to equal or exceed 50% of the aggregate fair market value of its worldwide real property interests and other assets used or held for use in a trade or business. Assuming this is and remains the case, a non-U.S. holder will be subject to U.S. federal income and withholding tax on income or gain realized on the sale or exchange

of NewCo Interests unless: (i) NewCo Interests are regularly traded (within the meaning of applicable U.S. Treasury regulations) and (ii) such non-U.S. holder of NewCo Interests has not owned and is not deemed to have owned more than 5% of the aggregate NewCo Interests during the test period prior to the disposition of any of the NewCo Interests.

Non-U.S. holders should consult their own tax advisors with respect to the U.S. federal income tax consequences of the ownership and disposition of NewCo Interests.

### 7.   Consequences to Homer City and Reorganized Homer City

Homer City is not subject to federal income tax since Homer City is treated as a partnership for U.S. federal income tax purposes. Accordingly, the U.S. federal income tax consequences of the Plan will generally not be borne by the Homer City, and instead will be borne by the equity holders (for U.S. federal income tax purposes).

Reorganized Homer City will become a wholly owned subsidiary of New Holdco treated as a disregarded entity and will terminate for U.S. federal income tax purposes upon the cancellation of the Reorganized Homer City Notes owned by the Historic Homer City Partners. For U.S. federal income tax purposes, this will be treated as a distribution of the assets and liabilities of Reorganized Homer City to New Holdco in complete liquidation of its interest in Reorganized Homer City. New Holdco generally will not recognize gain or loss on such distribution, and New Holdco's tax basis in the assets of Reorganized Homer City should equal New Holdco's aggregate adjusted tax basis in the Reorganized Homer City Interests prior to the distribution, decreased to the extent of any cash or the fair market value of marketable securities to be received in such distribution.

### 8.   Information Reporting and Withholding

Payments with respect to Claims under the Plan and distributions on or gains on a future disposition of NewCo Interests may be subject to applicable information reporting and backup withholding (at the applicable rate). Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

**The foregoing summary has been provided for informational purposes only. All holders of Claims or Equity Interests are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences applicable under the Plan.**

## XI.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation. Financial and operational reports and other documents published on Homer City's website may contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure Statement.  Copies of any financial or operational report or other document published on Homer City's website may be obtained by visiting http://www.homercitygeneration.com under the "Financial & Operational Reports" link.

A.     **Certain Bankruptcy Law Considerations**

1.     **General**

Although the Plan is designed to minimize the length of the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtor's business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtor's relationships with its key vendors, employees, and customers.  The proceedings will also involve additional expense and may divert some of the attention of the Debtor's management away from business operations.

2.     **Risk of Non-Confirmation of the Plan**

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtor can make no assurances that it will receive the requisite acceptances to confirm the Plan, and even if all voting Classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

3.     **Risk of Non-Occurrence of the Effective Date**

Although the Debtor believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan -- such as the Debtor raising the Exit Facility -- have not occurred before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtor in a notice filed with the Bankruptcy Court before the expiration of such period or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtor and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtor's obligations with respect to Claims and Interests would remain unchanged.

4.     **Risk of Termination of the Restructuring Support Agreement**

The Restructuring Support Agreement contains certain provisions that provide the Consenting Noteholders, the Debtor, and the GE Parties the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  As noted above, termination of the Restructuring Support Agreement could result in a protracted Chapter 11 Case, which could significantly and detrimentally impact the Debtor's relationships with vendors, suppliers, employees, and major customers.

5.     **Conversion to Chapter 7 Case**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtor's assets for distribution in accordance with the priorities established by the

Bankruptcy Code.  See Section XIV hereof, as well as the Liquidation Analysis attached hereto as **Exhibit B**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### B.     Risks Relating to Homer City's Business and Financial Condition

#### 1.     Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions that might ultimately prove to be incorrect, and contains projections that may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.

#### 2.     Risks Associated with Homer City's Business and Industry

The risks associated with Homer City's business and industry are more fully described in Homer City's financial and operational reports, including:  xx

- Financial Statement for the fiscal years ended December 31, 2014 and December 31, 2015, published on Homer City's website;

- Financial Statement for the fiscal quarter ended March 31, 2016 (unaudited), published on Homer City's website; and

- Financial Statement for the fiscal quarter ended June 30, 2016 (unaudited), published on Homer City's website.

Such risks include, but are not limited to, the following:

- Performance of the Facility below expected levels of efficiency and output;

- Shutdowns of the Facility due to the breakdown or failure of equipment or processes;

- Violations of permit requirements;

- Operator error;

- Market risk exposure associated with the sale of electricity and capacity from, and the procurement of fuel for, the Debtor's electric generating facilities;

- The risks to the Debtor's operations posed by a jeopardized relationship with Consol, the largest supplier of coal to the Debtor, in the event the Consol Litigation cannot be resolved and no ready alternative supplier can be located;

- Energy price risk, including the risk of price fluctuations of electricity;

- Capacity price risk and future capacity commitments;

- Basis risk and fluctuation of forward market prices due to, among other things, natural gas prices, transmission congestion, changes in market rules, electricity demand (which in turn is

affected by weather, economic growth, and other factors), plant outages in the region, and the amount of existing and planned power plant capacity;

- Coal price risk for purchases of coal that are not under contract;

- Labor disputes;

- Weather interferences;

- Environmental risks and catastrophic events such as fires, earthquakes, floods, explosions, or similar occurrences affecting a power generation facility or its power purchasers;

- The possibility that the industry may be subject to future regulatory or legislative actions (including additional taxes and changes in environmental regulations such fuel and emission allowances); and

- General economic conditions.

### 3.    Post-Effective Date Indebtedness

Following the Effective Date, Reorganized Homer City expects to have aggregate outstanding secured indebtedness of approximately $150 million under the Exit Facility.  Reorganized Homer City's ability to service its debt obligations will depend on, among other things, its future operating performance, which depends partly on economic, financial, competitive, and other factors beyond Reorganized Homer City's control.  Reorganized Homer City may not be able to generate sufficient cash from operations to meet its debt service obligations as well as fund necessary capital expenditures.  In addition, if Reorganized Homer City needs to refinance its debt, obtain additional financing, or sell assets or equity, it may not be able to do so on commercially reasonable terms, if at all.

### C.    <u>Factors Relating to Securities To Be Issued under the Plan, Generally</u>

### 1.    No Current Public Market for Securities

There is currently no market for the NewCo Interests, and there can be no assurance as to the development or liquidity of any market for any such securities.  The Reorganized Debtor is under no obligation to list any securities on any national securities exchange.  Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtor.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

### 2.    Potential Dilution

The ownership percentage represented by the NewCo Interests distributed on the Effective Date under the Plan will be subject to dilution from any other membership interests of common stock, as applicable, that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtor could adversely affect the value of the NewCo Interests issuable upon such conversion. The amount and dilutive effect of any of the foregoing could be material.

### D.   Risks Related to an Investment in the NewCo Interests

#### 1.   Significant Holders

Certain holders of Allowed Notes Claims are expected to acquire a significant ownership interest in the NewCo Interests pursuant to the Plan. If such holders were to act as a group, such holders would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of Reorganized Homer City and, consequently, have an impact upon the value of the NewCo Interests.

#### 2.   Equity Interests Subordinated to the Reorganized Debtor's Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtor, the NewCo Interests would rank below all debt claims against Reorganized Homer City, including claims under the Exit Facility. As a result, holders of the NewCo Interests would not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtor until after all the Reorganized Debtor's obligations to its debt holders have been satisfied, including payments to holders of the securities under the Exit Facility.

#### 3.   Implied Valuation of NewCo Interests Not Intended to Represent the Trading Value of the NewCo Interests

The valuation of the Reorganized Debtor is not intended to represent the trading value of NewCo Interests in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the NewCo Interests is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtor's actual operating performance and other factors not possible to predict, could cause the market price of the NewCo Interests to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the NewCo Interests in the public or private markets.

#### 4.   No Intention to Pay Dividends or Make Distributions

New Holdco does not anticipate paying any dividends or making any distributions with respect to its NewCo Interests as it expects to retain any future cash flows for debt reduction and to support its operations. As a result, the success of an investment in the NewCo Interests will depend entirely upon any future appreciation in the value of the NewCo Interests. There is, however, no guarantee that the NewCo Interests will appreciate in value or even maintain their initial value.

### E.   Additional Factors

#### 1.   Debtor Could Withdraw Plan

Subject to the terms of the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtor.

### 2.    Debtor Has No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3.    No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.    No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Creditor or Interest holder should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.    No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtor or holders of Claims or Interests.

### 6.    Certain Tax Consequences

For a discussion of certain tax considerations to the Debtor and certain holders of Claims in connection with the implementation of the Plan, see Section X hereof.

### XII.
### VOTING PROCEDURES AND REQUIREMENTS

### A.    Voting Instructions and Voting Deadline

Only holders of Class 3 Claims (Notes Claims) ("**Eligible Holders**") are entitled to vote to accept or reject the Plan.  The Debtor is providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a ballot (collectively, a "**Solicitation Package**") to record holders of the Notes Claims.  Such record holders may include banks, brokers and other nominees, or their voting agent (each, a "**Nominee**").  By providing instructions to the Nominee responsible for voting their Notes Claims, a Beneficial Holder of Notes Claims is directing its Nominee to execute a Master Ballot on such Beneficial Holder's behalf that reflects their instructions with respect to the Plan.

Each ballot contains detailed voting instructions. Each ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan. The record date for determining which holders are entitled to vote on the Plan is January 5, 2017.

Please complete the information requested on the ballot, sign, date and indicate your vote on the ballot, and return the completed ballot as directed by your Nominee. The Master Ballot cast on your behalf (or the Beneficial Holder Ballot that has otherwise been validated by the Nominee) must be received by Epiq Bankruptcy Solutions, LLC (the "**Voting Agent**") by regular mail, overnight courier, or hand delivery to:

> Homer City Ballot Processing
> c/o Epiq Bankruptcy Solutions, LLC
> 777 Third Avenue, 12th Floor
> New York, NY 10017

**FOR YOUR VOTE TO BE COUNTED, THE MASTER BALLOT CAST ON YOUR BEHALF (OR VALIDATED BALLOT SIGNED BY THE NOMINEE) MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE VOTING DEADLINE: FEBRUARY 6, 2017, AT 5:00 P.M. EASTERN STANDARD TIME. IF YOUR NOMINEE IS CASTING A MASTER BALLOT ON YOUR BEHALF, PLEASE ALLOW ADDITIONAL TIME.**

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED. THE DEBTOR, IN ITS SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS. THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN. AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

If you are an Eligible Holder and you did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact the Voting Agent, at (i) (866) 734-9393 (toll free) or 1-646-282-2500 (international toll free) or (ii) by emailing **tabulation@epiqsystems.com** (please reference "Homer City" in the subject line).

---

**THE VOTING AGENT WILL NOT COUNT ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE.**

---

B.    **Tabulation Procedures**

In addition to the requirements set forth in the Ballots, Master Ballots and in this Disclosure Statement, the Voting Agent shall use the following tabulation procedures in the preparation of its vote certification:

- Votes cast by a Beneficial Holder on a Ballot that has been validated by the Nominee or on a Master Ballot through a Nominee will be applied against the positions held by such entities in the applicable security as of the Voting Record Date, as evidenced by the record and depository listings. Voters submitted by a Nominee, pursuant to the Master Ballots or validated Ballots, will not be counted in excess of the principal amount of such securities held by such Nominee;

- To the extent that conflicting votes or "overvotes" are submitted by a Nominee, the Voting Agent, in good faith, will attempt to reconcile discrepancies with the Nominee;

- To the extent that any overvotes are not reconcilable prior to the preparation of the vote certification, the Voting Agent will apply the votes to accept and to reject the Plan in the same proportion as the votes to accept and reject the Plan of Reorganization submitted on the Master Ballots or validated Ballots that contained the overvote, but only to the extent of the Nominee's position in the applicable security;

- For the purposes of tabulating votes, each Beneficial Holder will be deemed to have voted the principal amount relating to such security, although the Voting Agent may adjust such principal amount to reflect the claim amount, including prepetition interest;

- A single Nominee may complete and deliver to the Voting Agent multiple Master Ballots, Votes reflected on multiple Master Ballots shall be counted except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the last properly completed Master Ballot received prior the Voting Deadline shall, to the extent of such inconsistency, supersede any prior Master Ballot.

## C.    <u>Agreements Upon Furnishing Ballots</u>

The delivery of an accepting ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, and 10.7 therein.  All parties in interest retain their right to object to confirmation of the Plan, subject to any applicable terms of the Restructuring Support Agreement.

## D.    <u>Change of Vote</u>

Except as provided in the Restructuring Support Agreement,[10] any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed ballot for acceptance or rejection of the Plan.

## E.    <u>Waivers of Defects, Irregularities, etc.</u>

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent and/or the Debtor, as applicable, in their sole discretion, which determination will be final and binding.  The Debtor reserves the right to reject any and all ballots submitted by any of its creditors not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, as applicable, be unlawful.  The Debtor further reserves its rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of its creditors.  The interpretation (including the ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determines.  Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for

---

[10] The Restructuring Support Agreement provides that the Consenting Noteholders and GE will not be able to change their votes unless the Restructuring Support Agreement is terminated pursuant to its terms.

failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### F.        Miscellaneous

Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtor, in its sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the ballots.  If you return more than one ballot voting different Notes Claims, the ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those ballots will not be counted.  An otherwise properly executed ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Commencement Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of the Notes Claims, as applicable, who actually vote will be counted.  The failure of a holder to deliver a duly executed ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such ballot, the Debtor may, in its sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### XIII.
### CONFIRMATION OF THE PLAN

### A.        Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.   On, or as promptly as practicable after, the Commencement Date, the Debtor will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.   The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Case.

### B.        Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Delaware, must set forth the name of the objector, the nature and amount of Claims held or

71

asserted by the objector against the Debtor's estate or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Case, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

(a)    ***The Debtor*** at:
Homer City Generation, L.P.
1750 Power Plant Road
Homer City, Pennsylvania, 15748
Attn:   Matthew L. Weidner, Esq.

(b)    ***Counsel to the Debtor*** at:
Richards, Layton & Finger, P.A.
920 North King Street
Wilmington, DE 19801
Attn:   Mark D. Collins, Esq.
        Russel C. Silberglied, Esq.
        Paul N. Heath, Esq.

(c)    ***Office of the U.S. Trustee*** at:
Office of the U.S. Trustee for the District of Delaware
844 King Street
Suite 2207
Lockbox 35
Wilmington, DE 19801

(d)    ***Counsel to GE*** at:
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:   Robert J. Lemons, Esq.
        Sunny Singh, Esq.

-and-

Reed Smith LLP
1201 Market Street, Suite 1500
Wilmington, DE 19801
Attn:   Kurt Gwynne, Esq.

(e)    ***Counsel to the Consenting Noteholders at:***
O'Melveny & Myers LLP
Times Square Tower
7 Times Square
New York, NY 10036
Attn:   George Davis, Esq.
        Andrew Parlen, Esq.
        Joseph Zujkowski, Esq.

-and-

Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street
Wilmington, DE 19801
Attn:   Sean Beach, Esq.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

C.   **Requirements for Confirmation of Plan**

1.   **Requirements of Section 1129(a) of the Bankruptcy Code**

(a)   General Requirements.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)   the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)   the Debtor has complied with the applicable provisions of the Bankruptcy Code;

(iii)   the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)   any payment made or promised by the Debtor or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)   the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtor has disclosed the identity of any insider who will be employed or retained by the Reorganized Debtor, and the nature of any compensation for such insider;

(vi)   with respect to each Class of Claims or Interests, each holder of an impaired Claim has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim,

property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Commencement Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan; and

(xi)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtor believes that under the Plan holders of Class 3 Claims (Notes Claims) will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtor's belief is based primarily on (i) consideration of the effects that a chapter

7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit B**.

Holders of Notes Claims are projected to recover approximately 36.7%–46.5% on account of the Notes under the Plan in comparison to 6.5%–9.2%, which is what they would receive in a hypothetical chapter 7 liquidation of the Debtor.  Holders of GE Notes Claims are projected to recover approximately 23.0%–29.2% on account of the Notes under the Plan in comparison to 6.5%–9.2%, which is what they would receive in a hypothetical chapter 7 liquidation of the Debtor.  Holders of General Unsecured Claims will receive full payment.  Because the liquidation value of the Debtor is less than the amount of its secured debt, this treatment is more favorable than Holders of General Unsecured Claims would receive in a liquidation under chapter 7 of the Bankruptcy Code.  By the same token, Holders of Homer City Interests would receive nothing in a liquidation under chapter 7 of the Bankruptcy Code, so their treatment under the Plan (cancellation of their interests) is no less favorable than in a liquidation scenario.

The Debtor believes that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor.  The Liquidation Analysis provided in **Exhibit B** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)      Feasibility

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan.  As part of this analysis, the Debtor has prepared the Projections provided in Section VII hereof.  Based upon such Projections, the Debtor believes it will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Moreover, Section XI hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)      Equitable Distribution of Voting Power

On or before the Effective Date, only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtor shall be amended and shall include, among other things, (i) a provision prohibiting the issuance of non-voting equity securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

**2.      Additional Requirements for Non-Consensual Confirmation**

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Interests in Class 5 and Class 6 will not receive a distribution and are thereby deemed to reject the Plan. However, the Debtor submits that it satisfies the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

(a)    Unfair Discrimination Test

The "no unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtor believes the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtor believes that the Plan satisfies the "fair and equitable" test as further explained below.

(i)    Secured Creditors

The Bankruptcy Code provides that each holder of an impaired secured claim in a dissenting class either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof) or (iii) receives the "indubitable equivalent" of its allowed secured claim. The Debtor expects that Impaired Class 3 Claims or Intercompany Claims will accept the Plan.

(ii)    Unsecured Creditors

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured Claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization. Unsecured Claims in Class 4 will be Unimpaired. Additionally, all Homer City Interests will be cancelled, so no class below the General Unsecured Claims or Intercompany Claims will receive a distribution. Accordingly, the Plan meets the "fair and equitable" test with respect to unsecured Claims.

(iii)    Equity Interests

With respect to a class of equity Interests, either (i) each holder of an equity Interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity Interests that are junior to any dissenting class of equity interests will not receive any property

76

under the Plan. Pursuant to the Plan, no holders of Homer City Interests will receive a distribution on account of such Interests. Because the value of the Debtor in a liquidation scenario is less than its secured debt, holders of Homer City Interests are entitled to no recovery. Moreover, there is no class junior to Homer City Interests, and as such, no junior class will receive any distribution under the Plan. Accordingly, the Plan meets the "fair and equitable" test with respect to those equity Interests.

## XIV.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

The Debtor has evaluated several alternatives to the Plan. After studying these alternatives, the Debtor has concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtor's assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.      Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtor (or if the Debtor's exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of its assets. See Section XIV(B) and (C), infra. The Debtor, however, submits that the Plan, as described herein, enables its creditors to realize the most value under the circumstances because it will de-leverage the Debtor on terms acceptable to the key constituencies in this Chapter 11 Case, provide for exit financing to support the Debtor's working capital needs after emerging from chapter 11, and transition ownership Homer City from its current partners to the Noteholders.

### B.      Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtor could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell its assets under section 363 of the Bankruptcy Code. Holders of Claims in Class 3 (or the Indenture Trustee on their behalf) would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtor's assets held by holders of Claims in Class 3 would attach to the proceeds of any sale of the Debtor's assets. After these Claims are satisfied, the remaining funds could be used to pay holders of Claims in Classes 4 and 5. Upon analysis and consideration of this alternative, the Debtor does not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Plan.

### C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution to its creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit B**.

As noted in Section XIV of this Disclosure Statement, the Debtor believes that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the case and the additional administrative expenses associated with the

appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtor's Chapter 11 Case.

## XV.
## CONCLUSION AND RECOMMENDATION

The Debtor, GE and the Consenting Noteholders believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 3 to vote in favor thereof and to evidence such acceptance by returning their ballots so that they will be received by no later than the Voting Deadline, **February 6, 2017 at 5:00 p.m. (Eastern Time)**.

Dated:  January 9, 2017
          Wilmington, Delaware

Respectfully submitted,

**Homer City Generation, L.P.**
By: EFS HC GP, LLC, its General Partner

By: _____
      Name:  John Pettengill
      Title:   Vice President

*Signature Page for Disclosure Statement for Prepackaged Chapter 11 Plan*
*of Reorganization of Homer City Generation, L.P.*

## **Exhibit A**

Plan

(Filed contemporaneously herewith)

**EXHIBIT B**

**LIQUIDATION ANALYSIS**

<u>**LIQUIDATION ANALYSIS**</u>

**A.** **Introduction and Reservations**

In connection with the Plan and Disclosure Statement, the following Liquidation Analysis has been prepared by Zolfo Cooper. Although Homer City Generation, L.P. provided certain financial and operational information, it did not prepare or aid in preparing the Liquidation Analysis and is not responsible for the analysis presented herein. This Liquidation Analysis should be read in conjunction with the Plan and the Disclosure Statement.

This Liquidation Analysis has been prepared for the purpose of evaluating whether the Plan meets the so-called "best interests of creditors" test under section 1129(a)(7) of the Bankruptcy Code, which test is further described in Article XIII.C.1 of the Disclosure Statement, titled "Best Interests Test." It indicates the values which may be obtained upon disposition of assets, pursuant to hypothetical chapter 7 liquidation, as an alternative to the reorganization as proposed under the Plan. Accordingly, values discussed herein are different than amounts referred to in the Plan, which illustrates the value of the Reorganized Debtor's business as a going concern.

The Liquidation Analysis has been prepared assuming the Debtor enters a chapter 7 proceeding under the Bankruptcy Code on January 11, 2017 (the "**Liquidation Date**") and its assets are liquidated in a traditional liquidation with the loss of going concern value that would result from a liquidation of the Facility and other assets, as described below. A chapter 7 trustee (the "**Trustee**") would be appointed or elected to commence the liquidation of all of the Debtor's assets. To maximize recovery, the liquidation is assumed to occur over a two month period (the "**Wind Down Period**"). The Liquidation Analysis is based on unaudited book values as of September 30, 2016, and these values, in total, are assumed to be representative of the Debtor's assets and liabilities as of the Liquidation Date. However, the Liquidation Analysis does not include recoveries resulting from any potential preference claims, fraudulent conveyance litigation, or other avoidance actions.

To reflect the most comprehensive group of assets available to holders of Noteholder Claims, this Liquidation Analysis considers a liquidation of Homer City's assets, as reflected on its unaudited balance sheet as of September 30, 2016. The only assets of substantial value, are those related to the Facility, and the effect of these assets on recoveries is noted in footnote F.

Estimating recoveries in any hypothetical chapter 7 liquidation case is an uncertain process due to the number of unknown variables and is necessarily speculative. Thus extensive use of estimates and assumptions has been made that, although considered reasonable, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtor.

1

THE DEBTOR MAKES NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS OR A TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS. IN THE EVENT OF A CHAPTER 7 CASE, ACTUAL RESULTS MAY VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

NOTHING CONTAINED IN THIS HYPOTHETICAL LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION BY THE DEBTOR OR ANY OTHER PARTY. THIS LIQUIDATION ANALYSIS ASSESSES THE VALUE OF ASSETS IN A LIQUIDATION SCENARIO AND IS NOT AN ANALYSIS OF AND DOES NOT REFLECT GOING-CONCERN VALUE OF HOMER CITY. LIQUIDATION VALUE IS ANALYZED INSTEAD OF GOING- CONCERN VALUE FOR THE REASONS SET FORTH IN ARTICLE XIV OF THE DISCLOSURE STATEMENT, TITLED "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN."

EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THIS LIQUIDATION ANALYSIS WAS PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT THESE ANALYSES IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. NO PARTY INTENDS OR HAS UNDERTAKEN ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE LIQUIDATION ANALYSIS (OR ANY OTHER PART OF THE DISCLOSURE STATEMENT) TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THIS LIQUIDATION ANALYSIS IS INITIALLY DISTRIBUTED OR FILED, OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THE LIQUIDATION ANALYSIS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE LIQUIDATION ANALYSIS.

THIS LIQUIDATION ANALYSIS WAS DEVELOPED SOLELY TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE UNDER THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF SECURITIES OF, OR CLAIMS OR EQUITY INTERESTS IN, THE DEBTOR.

## B. Hypothetical Liquidation Analysis

This Liquidation Analysis should be read in conjunction with the accompanying notes, based on the unaudited balance sheet data for Homer City Generation, L.P. as of September 30, 2016.

**Liquidation Analysis**

Unaudited, $ in millions

| Homer City Generation, L.P Assets | Notes | Book Value 9/30/2016 | Recovery (%) Low | High | Recovery ($) Low | High |
|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | A | $   20.6 | 100% | 100% | $   20.6 | $   20.6 |
| Accounts Receivable | B | 17.2 | 100% | 100% | 17.2 | 17.2 |
| Inventory | C | 70.7 | 15% | 30% | 10.6 | 21.2 |
| Derivative Assets | D | 2.2 | 0% | 0% | - | - |
| Other Current Assets | E | 24.7 | 0% | 0% | - | - |
| Property and Equipment, Net | F | 1,867.8 | 0.1% | 0.5% | 1.9 | 9.3 |
| **Total Assets / Proceeds** | | **$   2,003.2** | | | **$   50.3** | **$   68.3** |
| **Costs Associated with Liquidation** | G | | | | | |
| Wind-Down Operating Costs | | | | | $   5.5 | $   5.5 |
| Chapter 7 Trustee Fees | | | | | 1.5 | 2.1 |
| Professional Fees | | | | | 1.0 | 1.0 |
| **Total Liquidation Costs** | | | | | **$   8.0** | **$   8.6** |
| **Net Estimated Proceeds Available for Distribution** | | | | | **$   42.2** | **$   59.8** |

| Distribution Summary | H | | Estimated Allowable Claims | Estimated Recovery on Claims Low | High |
|---|---|---|---|---|---|
| **Chapter 7 Claims** | | | | | |
| **Senior Secured Notes Claims** | I | | | | |
| 8.137% Senior Secured Notes due 2019 | | | $   149.7 | $   9.7 | $   13.8 |
| 8.734% Senior Secured Notes due 2026 | | | 500.0 | 32.5 | 46.0 |
| Total Senior Secured Notes Claims | | | $   649.7 | $   42.2 | $   59.8 |
| Hypothetical Percentage Recovery to Senior Secured Notes Claims | | | | *6.5%* | *9.2%* |
| Proceeds Available After Distribution on Account of Existing Senior Secured Notes Claims | | | | $   - | $   - |
| **Other Claims** | J | | | | |
| Other Claims | | | $ 100 - 150 | $   - | $   - |
| Hypothetical Percentage Recovery to Holders of Other Claims | | | | *0.0%* | *0.0%* |
| Proceeds Available After Distribution on Account of Other Claims | | | | $   - | $   - |
| **Equity Interests** | | | | | |
| Equity Interests | | | $   - | $   - | $   - |
| Hypothetical Percentage Recovery to Holders of Equity Interests | | | | *0.0%* | *0.0%* |
| Proceeds Available After Distribution on Account of Equity Interests | | | | $   - | $   - |

3

1.    *Notes to Liquidation Analysis*

**Note A - Cash & Cash Equivalents**

Reflects cash and cash equivalents held in all bank accounts.

**Note B - Accounts Receivable**

Accounts Receivable consists primarily of balances due from PJM and NYISO for day-ahead, capacity sales, and hedging activities which typically take two to three weeks to process and receive. Recovery on accounts receivable is assumed at 100%.

**Note C – Inventory**

Inventories are comprised of raw materials used in the production of energy, including oil, coal, lime and limestone. Inventories also include critical and non-critical spare parts for the Facility and the coal washing plant. Recovery on oil is assumed at 80% - 90%, based on current market prices and a discount to expedite the sale of oil. Recovery on coal is assumed at 60% - 90%, based on current market prices, handling costs and a discount to expedite the sale of coal.  Recovery on lime and limestone is assumed at 50% - 70%, based on handling costs and a discount to expedite the sale of limestone. Recovery on spare parts is assumed at 0% - 10%, based on estimated discounts, resulting in a blended recovery on inventories of 15 - 30%.

**Note D - Derivative Assets**

Derivative Assets represent the "mark to market" of the Debtor's hedge positions.  Recovery is assumed at 0% based on assumed costs to liquidate the existing hedge positions.

**Note E - Other Current Assets**

Other Current Assets includes prepaid invoices, prepaid insurance and other short term deposits. Recoveries on other current assets are assumed at 0%.

**Note F – Property, Plant & Equipment, net**

Property, Plant & Equipment consists primarily of Units 1, 2 and 3 and related environmental equipment, as well as supporting assets including furniture, vehicles and rolling stock, pipes, tubes and valves, transformers, deaerators, injection systems and controls, among other items, which are assumed to have *de minimis* recovery value, and account for the additional recoveries from Property, Plant & Equipment.  Units 1, 2 and 3 are assumed to be scrapped due to the inability to separate the units.  Recovery is assumed at 0.1% - 0.5% based on recoveries from certain parts that can be separated and sold at salvage values.  Further, the costs associated with scrapping Units 1, 2 and 3, including demolition, transportation and potential asbestos remediation, are assumed to exceed scrap metal costs.  Recoveries do not

4

account for potential remediation costs and environmental liabilities, which could result in a recovery of 0%.

The land related to the Facility site owned by Homer City is included in the Property, Plant & Equipment category. The recovery from the land owned by Homer City is assumed at 0% because of the lack of alternative uses and the potential for remediation costs and environmental liabilities to be associated with the land.

**Note G – Costs Associated with Liquidation**

- Wind-Down Operating Costs – Wind-down operating costs are assumed to comprise 60 days of compensation expense, plus 2 months of certain building operating expenses (including electricity, property taxes and maintenance) that would be required to maintain the properties during a sale process.

- Trustee Fees – Trustee fees include those fees associated with the appointment of a chapter 7 trustee in accordance with section 326 of the Bankruptcy Code. Trustee fees are estimated based on the requirements of the Bankruptcy Code and experience in other similar cases and are assumed to be 3% of the gross proceeds from the liquidation of the assets.

- Professional Fees – Fees for professionals (legal, investment banking, appraisal, brokerage and accounting) to assist the Debtor and the Trustee with the liquidation are assumed at approximately $500,000 per month for the two month Wind Down Period.

**Note H – Distribution Summary**

Proceeds available for distribution will be further eroded by creditors of Homer City, who will have competing claims on the Homer City assets that do not (indirectly) secure the Senior Secured Notes. The value of any Homer City assets that do not secure the Senior Secured Notes will be allocated first to any creditors holding security interests in those assets and then to holders of priority administrative claims and priority claims against Homer City, before being applied to satisfy unsecured claims, including any unsecured deficiency claims asserted on behalf of holders of Senior Secured Notes exercising rights against Homer City. Unsecured creditors of Homer City would share in any such distribution.

**Note I – Senior Secured Notes Claims**

Senior Secured Notes Claims represent the total outstanding bond debt of the Debtor. As of the Commencement Date, such Senior Secured Notes Claims totaled approximately $633 million in principal and $17 million in unpaid interest, comprised of (i) approximately $146 million in principal amount and $4 million in unpaid interest of 2019 Secured Notes and (ii) $487 in principal amount and $13 million in unpaid interest of 2026 Secured Notes, issued pursuant to that certain Indenture, dated as of December 14, 2012 (as amended, modified, or

5

otherwise supplemented), by and between Homer City, as issuer, and The Bank of New York Mellon, as trustee and collateral agent.

**Note J – Other Claims**

Other Claims represent claims relating to potential priority claims, general trade creditors, damages related to contract terminations, litigation expenses, and potential remediation costs and environmental liabilities.

6